**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**ALAN DALE WALKER**                                      **PETITIONER**

**VS.**                                      **CIVIL ACTION NO. 1:97CV29KS**

**CHRISTOPHER EPPS, Commissioner,
Mississippi Department of Corrections
and JIM HOOD, Attorney General of the
State of Mississippi**                                      **RESPONDENTS**

---

## MEMORANDUM OPINION AND ORDER

Alan Dale Walker was convicted of rape, kidnaping, and capital murder with the underlying crime of sexual battery in the Circuit Court of Harrison County in August, 1991. He was sentenced to death on the capital murder charge, to thirty-five years on the rape charge, and to thirty years on the kidnaping charge, with the last two sentences to run consecutively. The Mississippi Supreme Court affirmed his conviction[1] and denied post-conviction relief,[2] and Walker filed a Petition for Writ of Habeas Corpus in this Court.

## STATEMENT OF FACTS

On Saturday, September 8, 1990, nineteen-year-old Konya Edwards left the Long Beach duplex that she shared with her mother and her grandmother and went to the Fiesta Lounge in Biloxi with her aunt, Margaret Thomas, and her aunt's boyfriend, Andy Graham. At some point in the evening, Thomas and Graham left the lounge, but Konya stayed behind. She did not return home that night, nor did she call, as she customarily did, to let her mother or her grandmother know where she was. On Sunday afternoon, they called the police in Long Beach to report Konya missing.

---

[1]*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

[2]*Walker v. State*, 863 So. 2d 1 (Miss. 2003).

On Monday, September 10, a man out swimming in a pond just outside of Long Beach that local residents called Crystal Lake, or the Blue Hole, found Konya's wallet. Seeing that identification in the wallet had a Long Beach address, the man's brother, who worked at the docks with some Long Beach residents, took the wallet to work. A co-worker recognized Konya's name and took the wallet to her mother Monday afternoon. The family then notified Biloxi police that Konya was missing and that her wallet had been found.

It was not until Tuesday morning that the family determined where the wallet had been found and went to look for her in that area. At about 9:20 that morning, Konya's grandmother, Tillie Edwards, discovered her body. She was naked, and her body was burned almost beyond recognition; however, her grandmother identified her by a ring that she was wearing. The police were summoned, and the body was removed. An autopsy revealed that Konya had deep tissue damage indicative of blunt force injury, likely from a beating. Her lungs were full of fluid, and the condition of her inner organs, as well as hemorrhages in the vessels in the brain, suggested that Konya was unable to breath just before her death. The hyoid bone around her throat was fractured on one side, indicating that Konya was likely choked. A broken stick about four inches long protruded from her vagina, and the medical examiner believed the stick was inserted after death.

About a month before Konya's disappearance, another young woman's nude body had been found floating in the Wolf River near Gulfport. Konya Edwards's murder was the subject of extensive media coverage, both because of the details of the crime and the proximity in time and the similarities between her murder and the murder of the other woman, Sandra Pelley. On the day after Konya's body was found, the *Sun Herald* newspaper ran a story about the discovery of Konya's body, accompanied by a picture of her, taken while she was alive. Trina Perry, a young waitress

2

who was also at the Fiesta Lounge on September 8, recognized Konya as the young woman who had left the club that night with Trina, her boyfriend Alan Dale Walker, and his friend, Jason Riser. Trina went to the Long Beach Police Department and told Officer Linda Atterbury that she believed that Walker and Riser were responsible for Konya's death. Carl Rhodes, an investigator with the Harrison County Sheriff's Department, came to Long Beach and took a statement from Trina. With some relatively minor exceptions, Trina testified to the same series of events at trial.

According to Trina, in September, 1990, she lived with her parents on Longridge Road, just north of the city limits of Long Beach. Walker lived with his mother on Turner Road, which was the next street to the west. At the time of Tonya's murder, Trina and Walker had been dating for about a month. September 8 was a Saturday, and they had decided to meet later in the evening. Trina got off work around 10:30 p.m. A location had not been established, so, after she went home and changed clothes, Trina drove down Highway 90 looking for either Walker's or Riser's vehicle. She spotted Riser's truck at the Fiesta and met them there at about 11:00 - 11:15. Trina also met Konya Edwards at the Fiesta, and, at about 12:00 - 12:30 a.m., Trina and Walker left the Fiesta in Trina's car, while Riser and Konya left in Riser's truck.

Although Trina understood that they were taking Konya home, they drove instead to the area where Trina and Walker lived. At Walker's direction, Trina stopped in front of the house of another friend, Dwayne Maloney, on Bosarge Road, which is one block east of where Trina lived. Walker told Trina that he was going to ride with Riser and Konya, so that he could show Riser "a hut that his brother had built for them to be together, Konya and Jason." Before he left, Walker took off his shirt and left it in Trina's car. Trina had to take her car home; however, she and Walker agreed that she would leave her house on foot and meet him in a nearby field on Turner Road. Trina said that

3

she waited a long while, perhaps as long as an hour, when she accepted a ride from another man. Trina and this man, whom she did not know, went to a bar and to his parents' house, and then he took her to Walker's home around 2:00 - 2:30 a.m.   Walker and Riser arrived immediately thereafter, saying they had dropped Konya off at Klondyke Road and 28th Street after she began kicking.  Walker and Riser began drinking beer, and they and Trina posed for Polaroid pictures taken by Walker's mother.

After a few minutes, Walker asked Trina whether she wanted to go see a fire at Crystal Lake. She, Walker and Riser drove back to that area, but Riser persuaded them that they might be thought responsible for the fire if they got too close.  They rode around for a while longer and came upon a coon hunter who asked them for a ride back to his car.  In the process of taking the hunter back, the group was stopped by a Harrison County Deputy, who gave Riser a warning and let him go.  The three then returned to Walker's mother's house to spend the night.

After hearing this statement, Investigator Rhodes obtained an arrest warrant for Walker and a search warrant for his mother's home.  Officers went to the home, but Walker was not there at the time.  Rhodes found him at another location, and both he and Riser were arrested without incident. A search of Walker's mother's trailer and its surroundings turned up a black dress that was identified as the one Tonya was wearing on the night she was killed.

After they were arrested, both Walker and Riser gave statements admitting their participation in Konya's death.  Walker apparently incriminated himself in the Pelley murder, as well.  His statement was suppressed by the trial court, on grounds that he was intoxicated at the time that he gave it.  Additionally, the trial judge, throughout the proceedings, sustained any objection to evidence that would implicate Walker in Pelley's murder.  According to Trina Perry, Walker

admitted to her, both on a visit to the jail and by telephone, that he killed Konya . He also wrote letters to her. After an extensive proffer of this testimony and vigorous argument from defense counsel as to its admissibility, the prosecution announced that it would not offer that evidence to the jury.

Riser later pleaded guilty to capital murder and accepted a life sentence in return for his testimony at trial. His testimony can be summarized as follows: At the time of Konya's murder, Riser lived with a friend on Bell Circle, in the same general area as Walker and Trina Perry. Riser was nineteen years old and a junior at Long Beach High School, and he had known Walker for several months. According to Riser, he and Walker spent most of Saturday, September 8 together. They met at Walker's mother's house that morning and spent most of the day working on Walker's car. At around 7:30 or 8:00 that evening, they changed clothes – Riser borrowed a shirt from Walker – and left for the Fiesta Club in Riser's truck.

Riser met Konya for the first time at the Fiesta Club. Later that evening, he agreed to give her a ride home. Walker and Trina left at the same time in her car, with Riser and Konya following in his truck. Konya told Riser that she lived "near the new Delchamps" in Long Beach. According to Konya's grandmother's testimony, they lived much further south than Walker, Riser, or Trina – almost on the beach in Long Beach. Riser did not take Konya, who had passed out in his truck, home, or, apparently, anywhere near it. Instead, he followed Trina and Walker to their neighborhood. According to his testimony, he thought that they were going to Walker's house when they stopped a few blocks from it. Walker took his shirt off and put it in Trina's car, then got in Riser's truck with him and Konya and suggested that they go "to the lake."

When they got to Crystal Lake, Konya was still asleep in the truck.  Riser got out of the truck, and he heard Walker talking to her, as if he was trying to wake her up.  Walker got out of the truck and told Riser that they were going to rape her.  Walker went back to the truck and began "messing" with Konya, grabbing her legs and her breasts.  Konya began to wake up, and Riser heard Walker ask her whether she wanted to live or die, then hit her in the face.  Walker pulled Konya out of the truck, and Riser testified that she still seemed a little dazed or drunk.

The three of them began walking down a path that lead to the water, and, on the way, Walker ordered Konya to take off her clothes and leave them.  Further down the path, Konya began to argue with Walker, and he hit her in the face again.  Walker told Konya to lie down on the ground, and both he and Riser removed their clothes.  After a struggle, Walker attempted to rape Konya, but was, apparently, unable.  Riser then raped her.  When he finished, Walker struck Konya again and told her that he intended to have anal sex with her while she had oral sex with Riser.  When Konya protested, Walker instructed her to have oral sex with him.  She bit his penis, and Walker struck her in the face again, telling her that she should cooperate and she wouldn't get hurt.  Konya was pushed toward Riser, to perform oral sex, with Walker attempting to penetrate her anally.  Konya slapped him, and Walker began to choke her.  This went on for a few minutes, until Walker abruptly let go of Konya, and she fell to the ground.

At that point, Walker approached Riser and told him that they were going to have to kill her. Walker helped Konya up off the ground, however, and tried to calm her down.  He asked her again whether she wanted to live or die.  The three of them walked down to the water and into it, about ankle deep, then Walker lead Konya, with Riser following, back to the spot where he had choked her, and Walker and Riser got dressed.  There was another struggle, in which Walker hit Konya

again, then he told her to lie down on her stomach, with her chin on a log.  Walker checked to make sure that she was in the position he wanted, then he stomped on the back of her neck seven or eight times.  Konya was still alive at that point, but her jaw was bleeding.  She ran to Riser and asked him to help her.  Walker pulled her away and said they were going to take her to the lake, wash the blood off her, and let her go.

The three walked back to the area where Konya had originally disrobed, and Walker removed his clothes again.  Then Walker and Konya went back down to the water, with Riser watching from the shore.  He could hear Walker and Konya talking, then he told her to turn around. He put his arm around her neck like he had done before and pulled her under the water.  Konya struggled for several minutes, but finally the splashing stopped, and the water was calm.  Walker held her down for another minute, then pushed her back toward the shore.  Walker got out of the water and instructed Riser to pull Konya out of the lake while he got dressed.  As he was doing so, Konya jerked her arm back and made a sound.  Riser told Walker, who decided that Konya was not yet dead, so he pushed her back into the water, with her face submerged.  They left her there for a few minutes, then the two men carried her body back up to the edge of the woods surrounding the lake.  Walker picked up a stick and stuck it in Konya's vagina, saying he had always wanted to do that.

Walker and Riser carried Konya's body further up into the woods and left it there, with Walker announcing that they were going to have to burn her.  They got back in Riser's truck and drove to Walker's mother's trailer and retrieved a gas can.  Then they parked the truck in the driveway of a friend who lived close to the lake and ran back to Konya's body.  Walker poured gas

on the body and set it on fire.  He and Riser left in Riser's truck, dumped the gas can underneath

their friend's house, and returned to Walker's mother's place, where they found Trina.

When Walker and Riser had gone to the Fiesta Club, Riser was wearing a T-shirt that he had

borrowed from Walker, which had a hole in the side.  When they got back to Walker's after Konya's

body had been burned, the shirt had another rip in it.  According to the statement Riser made

immediately after his arrest, Walker ultimately tore the shirt off him.

Walker and Riser were arrested and charged with Konya Edwards's murder, and Walker was

also charged with the murder of Sandra Pelley.  At the hearing on Walker's motion for a new trial

on Konya's murder, the State and the defense agreed that Walker would waive his speedy trial rights

in the Pelley murder case, and it would not go forward.  There is no indication in the record as to

whether that case was ever tried.

Walker was charged with capital murder with the underlying offense being sexual battery.

His attorneys successfully moved for a change of venue and for suppression of his statements, both

to the police and to Trina Perry.  Although Riser had given a statement shortly after he was arrested,

the State's plea agreement with Riser, in which he agreed to testify, was not made until the weekend

prior to the beginning of trial.  Defense counsel were unsuccessful in excluding Riser's statement

or testimony, and the court refused to grant a continuance for further preparation because the defense

had been given the statement months before.

At the trial on the merits, Riser and Trina testified as described above.  Tillie Edwards,

Konya's grandmother, testified about the events of the evening before Tonya left for the Fiesta Club

and also about finding Konya's body.  A friend of Konya's, Tonya Kilgo, identified the dress that

was found at Walker's trailer as one she loaned to Konya.  Dr. Paul McGarry, the medical examiner,

testified as to Konya's numerous injuries and the cause of death.  In his opinion, it would have taken five to ten minutes to drown Konya if there had been no interruption in the process, but, if she was able to draw a breath during that time, it could have taken much longer.  Members of law enforcement testified about their investigation of the case, including the retrieval of Konya's dress from Walker's mother's trailer. The jury deliberated for a little over an hour before it returned a verdict finding Walker guilty of all of the charges.

At the penalty phase, the State argued two aggravating circumstances – that the murder was committed while in the commission of a sexual battery and that it was committed for the purpose of avoiding or preventing a lawful arrest.  The trial judge did not permit the State to present victim impact testimony, nor would he allow the State to introduce Walker's confession.  The State did offer testimony that Konya's hands and her pubic area were the most burned parts of her body, making it impossible to fingerprint her or to complete a rape kit.  Walker's attorneys called his employer, his half-brother, his sister, and his mother to offer mitigating evidence and to ask that his life be spared because he had a very young daughter.  In addition, Walker made the following statement:

> Hello, my name is Alan Walker.  I know all of you have heard a lot about me and have said a lot about me.  I just – I really don't know what to say right now.  I'm scared to death.  I'm just here to tell you that I'm not the person that they've got me made out to be.  I'm not a mean person, a violent person.  I don't have "the leader" written on me; none of this.
>
> The only really reason I've come up here to talk to you guys is because I've wanted to say something for 11 months now, and I haven't been able to say it.  I just wanted to tell the victim's family that I was sorry for what has happened.  I wanted to tell Riser's family what has happened, that I'm sorry, and I'm especially sorry for my family.  I'm sorry for any family that has to go through this.  I really don't know what to say but I'm sorry.  If I could do anything to make it better, I would.

The jury deliberated for about two and one-half hours before returning a verdict finding that both of the aggravating factors had been established, and it sentenced Walker to death.

## ANALYSIS

### Standard of Review

English courts have long had the authority to issue a writ of habeas corpus to test the legality of a prisoner's detention by the sovereign. *McNally v. Hill*, 293 U.S. 131, 136 (1934); 1 William Blackstone, *Commentaries* *131 (tracing the law to the reign of Edward 1). England's common law, as well as its Habeas Corpus Act of 1679, were the model on which the habeas statutes of the thirteen original colonies was based. *Boumediene v. Bush*, 553 U.S. 723, 742 (2008). The Constitution of the United States indirectly guaranteed the right to habeas corpus by directing that the writ "shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." U.S. Const. art. 1, § 9, cl. 2. The Judiciary Act of 1789 ultimately empowered federal judges to issue the writ to order the release of federal prisoners. *Fay v. Noia*, 372 U.S. 391, 415 (1963).

The expansion of federal authority to review state court judgments, however, has been controversial since its inception in the Act of Mar. 2, 1833, ch. 57, §7. *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 148 (2007); *Tennessee v. Davis*, 100 U.S. 257, 267 (1879). Later, during Reconstruction, the protection of the federal writ of habeas corpus was extended to *any person* restrained "in violation of the constitution, or of any treaty or law of the United States." Act of Feb. 5, 1867, ch. 28, 14 Stat. 285. As the Supreme Court noted shortly after the passage of this Act, "It is impossible to widen this jurisdiction." *Ex parte McCardle*, 73 U.S. 318, 325-26 (1867). Following Reconstruction, the Supreme Court began to limit the scope of the writ, cautioning that

the public good was threatened by a law that disturbed the relationship "between the judicial tribunals of the Union and of the States . . . ." *Ex parte Royall*, 117 U.S. 241, 251 (1886).

As the Fifth Circuit has recognized, the writ of habeas corpus "has a history bound up in the expansion of federal supervision over the States and the genesis of modern civil rights, and in particular the movement toward racial equality." *Burdine v. Johnson*, 262 F.3d 336, 350 (5th Cir. 2001) (Higginbotham, J., concurring). Historically, the writ was used to release prisoners who had been imprisoned without a trial. *Brown v. Allen*, 344 U.S. 443, 533 (1953) (Jackson, J., concurring). In *Brown*, however, the Supreme Court held that a federal court could grant habeas relief to a prisoner who had been tried in state court, but whose conviction was based on constitutional error. *Id.* at 458. The practical effect of *Brown*, according to Judge Higginbotham, was to "replace direct review in the Supreme Court of state convictions by enlisting the lower federal courts in the task of reviewing claims of constitutional deprivation ensuing from state criminal convictions." 262 F.3d at 351.[3]

The expansion of the writ reached its peak in *Fay v. Noia*, 372 U.S. 391, 415 (1963). There, the Court held that "conventional notions of finality" could not overcome "the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review." *Id.* at 424. Accordingly, the Court permitted habeas review of constitutional claims that had not been exhausted in state court, finding that the prisoner had no available state remedy at the time he filed his petition. *Id.* at 435. Shortly

---

[3]In his concurring opinion in *Brown*, Justice Jackson reported that the expansion of the writ had already resulted in "floods of stale, frivolous and repetitious petitions . . ." 344 U.S. at 536. In support of that statement, he noted that the number of habeas petitions challenging state court convictions had risen in the Supreme Court from 127 in 1941 to 541 in 1952.

thereafter, the Court held that the habeas statutes amounted to a "mandate of Congress . . . plainly designed to afford a trial-type proceeding in federal court for state prisoners aggrieved by unconstitutional detentions . . . ." *Townsend v. Sain*, 372 U.S. 293, 311 (1963). *Noia* and *Townsend* have been characterized as the "high-water mark for habeas review of state court judgments . . . ." John H. Blume, Sheri Lynn Johnson and Keir M. Weyble, *In Defense of Noncapital Habeas: a Response to Hoffman and King*, 96 Cornell L. Rev. 435, 440 (2011). A few years later, the water level began to lower, and the principle of exhaustion was re-introduced. *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977) (holding that a constitutional claim regarding the admission of a confession could be waived by failure to make a contemporaneous objection at trial); *Francis v. Henderson*, 425 U.S. 536, 539 (1976) (holding that a petitioner could waive his challenge to the composition of his grand jury by failing to object before trial). The number of habeas petitions continued to rise, nevertheless, and, by the late-1980's, the volume of cases created a profound delay of executions in capital cases.

In 1988, then-Chief Justice Rehnquist asked Justice Lewis Powell, who had recently retired from the Court, to head an Ad Hoc Committee on Federal Habeas Corpus in Capital Cases. In a Commentary published in the Harvard Law Review the next year, Justice Powell noted that the number of habeas petitions filed in federal district courts had risen at a pace that even Justice Jackson could not have foreseen – from 127 in 1940 to 9,542 in 1987. Lewis F. Powell, Jr., *Capital Punishment*, 102 Harv. L. Rev. 1035, 1039 (1989). Describing the process by which a death-sentenced inmate could seek state and federal review, Justice Powell concluded that an inmate could have as many as seven or eight judicial examinations of his case. *Id*. Even after that, intrepid counsel could find new arguments and advance plausible reasons for failing to raise those arguments earlier, thereby further prolonging the process. *Id*. at 1039-40. Compounding the problem was the

frequency with which the courts permitted last-minute stay applications, which, in his opinion, "imposes additional burdens on the courts, and often prevents the mature and thoughtful consideration our system expects." *Id*. at 1040.   At the time that Justice Powell wrote, this cumbersome process had resulted in a nationwide death row population of 2,110, with only 100 executions occurring in the twelve years since *Furman v. Georgia*, 408 U.S. 238 (1972). *Id*. at 1038. Additionally, the time between the murders and executions averaged as much as 10 years in one state.  *Id*.

Two years later, Justice Scalia updated those numbers and reported that there were 2,327 convicted murderers on death row by May, 1990, and only 123 had been executed since *Furman*.

> Small wonder then, that the statistics show a capital punishment system that has been approved, in many States, by the democratic vote of the people, that has theoretically been approved as constitutional by this Court, but that seems unable to function except as a parody of swift or even timely justice.

*Walton v. Arizona*, 497 U.S. 639, 668-69 (1990) (Scalia, J., concurring).   Ultimately, the Court admitted that *Noia* "was based on a conception of federal/state relations that undervalued the important interest in finality served by state procedural rules and the significant harm to the States that results from the failure of federal courts to respect them."  *Coleman v. Thompson*, 501 U.S. 722, 724 (1991).  By that time, the Ad Hoc Committee had published its report, which made several recommendations for overhauling federal habeas law to prevent perceived abuse of the writ.

Congress reviewed the Committee's findings, held hearings both in the House and in the Senate, and passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, 110 Stat. 1244 (codified at 28 U.S.C. 2254 (2006)); *Baze v. Rees*, 553 U.S. 35, 69 (2008) (Alito, J., concurring) (stating that the AEDPA "was designed to address this problem."). According to the Conference Committee Report that attended the passage of the bill:

This title incorporates reforms to curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases.  It sets a one year limitation on an application for a habeas writ and revises the procedures for consideration of a writ in federal court.  It provides for the exhaustion of state remedies and requires deference to the determinations of state courts that are neither "contrary to," nor an "unreasonable application of," clearly established federal law.

H.R. Conf. Rep. 104-518, 94th Cong., 2d Sess. 111 (1996).

The standard of review referenced in the Report is codified at 28 U.S.C. § 2254, which provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254.  Under this statute, where the state court adjudicates the petitioner's claim on the merits, this court reviews questions of fact under § 2254(d)(2), while questions of law or mixed questions of law and fact are reviewed under § 2254(d)(1).  Factual findings are presumed to be correct, and the reviewing court defers to the state court's decision regarding factual determinations.

14

*Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).[4]   The court independently reviews questions of law and mixed questions of law and fact to determine whether the state court's decision thereon was either "contrary to" or an "unreasonable application of" federal law.  *Williams v. Taylor*, 529 U.S. 362, 407-12 (2000).

The Court immediately recognized that the AEDPA "work[ed] substantial changes" to the law on habeas corpus in federal courts.  *Felker v. Turpin*, 518 U.S. 651, 654 (1996).   In spite of that recognition, however, early decisions interpreting AEDPA's standard of review applied a broad construction to its limitations, so as to preserve the right to habeas relief.  Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure,* §3.2, at 127-28 (5th ed. 2005).  ("The Court's decisions evidence the majority's rejection of the view (adopted by some lower courts) that doubts about the meaning of AEDPA's ambiguous provisions should usually or presumptively be resolved in favor of interpreting the statute to limit habeas corpus review or relief.").  Meanwhile, the number of habeas cases continued to climb.  In 1990, petitions filed by state prisoners seeking writs of habeas corpus accounted for 5% (10,823 of 218,258) of the civil cases filed in federal district courts.  2010 *Annual Report of the Director: Judicial Business of the United States Courts*, Administrative Office of the United States Courts, Judicial Facts and Figures, Tables 4.4, 4.6, available at http://www.uscourts.gov/uscourts/Statistics/JudicialFactsAndFigures/2010/Table406.pdf (as visited March 19, 2012).  By 1995, they accounted for 5.4% (13,462 of 248,335) of all the

---

[4]The Supreme Court has expressly reserved ruling on whether the provisions of § 2254(e)(1), which accord a presumption of correctness to state court findings that can only be overcome by clear and convincing evidence, applies to all fact findings, or only those extrinsic to the state court record. *Wood v. Allen*, No. 130 S. Ct. 841, 849 (2010);  *see also Haynes v. Thaler*, 438 F.App'x. 324 at *3 n.2 (5th Cir. 2011).

15

cases filed.  In 2000, four years after the passage of AEDPA, habeas petitions filed by state prisoners had risen to 8.1% (21,090 of 259,517) of the district courts' civil litigation.

In 2000, the Supreme Court, in a plurality opinion, finally addressed the meaning of AEDPA's standard of review.  *Williams*, 529 U.S. 362.  Justice O'Conner authored the portion of the opinion that explained the appropriate standard of review under AEDPA, and she limited "federal law" for purposes of AEDPA analysis, to the holdings of the Supreme Court of the United States. *Williams*, 529 U.S. at 378.  *Clearly established* federal law, Justice O'Conner stated, is that which exists at the time of the state court conviction.  *Compare id*. at 412 (O'Conner, J.) (stating that the law must exist when the state court decision is rendered) with *id*. at 390 (Stevens, J.) (stating that the law must exist when the state court decision is final); *see also Smith v. Spisak*, 130 S. Ct. 676, 681 (2010) (recognizing conflicting statements in *Williams*, but following the Court of Appeals' use of the date that the decision was rendered).  A state court's adjudication of a claim is *contrary to* clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  A state court's application of the correct legal precedent to the particular facts of a petitioner's case will be an *unreasonable application* of the law if it identifies the correct federal law but unreasonably applies it to the facts, unreasonably extends the correct legal principle to a new context where it should not apply, or unreasonably refuses to extend the principle to a new context where it should apply. *Williams*, 529 U.S. at 406.  The term "unreasonable," was distinguished in *Williams* from "erroneous" or "incorrect;" thus, a state court's incorrect application of the law may be permitted to stand if it is, nonetheless, "reasonable."  *Id*.

16

Recent decisions have reaffirmed the Court's adherence to this interpretation of AEDPA, noting that the appropriate standard of review is much more rigorous in a habeas case than on direct review. *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010). As the Court more recently explained, "If this standard is difficult to meet, that is because it was meant to be. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." *Richter*, 131 S. Ct. at 786. Due to the intrusive effect of the writ of habeas corpus on state court decisions, the Court reasoned:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 786-87.

A few months after *Richter*, the Court reviewed a decision of the Ninth Circuit that granted habeas with "a one-sentence conclusory explanation for its decision . . . ." *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011). Characterizing the decision as "as inexplicable as it is unexplained," the Supreme Court reversed it. *Id.* According to the Court, state court decisions "'must be given the benefit of the doubt.'" *Id.* (quoting *Lett*, 130 S. Ct. at 1862). The Ninth Circuit's "dismissive" opinion could not, in the Court's opinion, have given appropriate deference to the state court. 131 S. Ct. at 1307.

Shortly after issuing its opinion in *Felkner*, the Court further limited the scope of habeas review in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). There, the Court held that habeas review conducted under § 2254(d)(1) (the applicable section where the state court has reviewed a claim on the merits) must be limited to the record that was considered in state court. *Id.* at 1398-1400. The basis for the ruling was "Congress' intent to channel prisoners' claims first to the state court." *Id.*

17

at 1398-99.  A district court may still conduct hearings, under §2254(e)(2), where a petitioner has failed to develop the factual basis of his claim in state court, but the circumstances under which such a claim may be raised are severely limited.  *Pinholster*, 131 S. Ct. at 1400-01.

The Supreme Court's interpretation of  federal habeas law compels this Court to undertake a rigorous examination of habeas claims, with an eye to avoiding federal interference in the state court's judgment.  That review must be based solely on the record before the state court and must give the state court's decision the benefit of the doubt, unless it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 131 S. Ct. 786-87.  This is the standard with which this Court has reviewed Walker's claims in this case, and, based on this standard, and for the reasons that follow, this Court finds that he is not entitled to habeas relief.

**Claim A:**     **The conviction should be vacated because the instructions at trial violated the Due Process Claus of the Fourteenth Amendment by allowing Petitioner to be convicted without proof of the lawful elements of the underlying felony of sexual battery.**

The jury convicted Walker of murder in the course of committing sexual battery, thus satisfying the elements of capital murder.  (It separately convicted him of rape and kidnaping.)  Under Mississippi law, sexual battery is committed by a person who "engages in sexual penetration with another person without his or her consent . . . ."  Miss. Code Ann. § 97-3-95(1)(a) (1972).  In another statute, "sexual penetration" is defined as "cunnilingus, fellatio, buggery or pederasty; any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of any object into the genital or anal openings of another person's body."  In this case, despite evidence that Konya was forced to perform fellatio and may have been sodomized, the

prosecution chose to base its argument on Walker's insertion of a stick into her vagina. On this issue, the jury was instructed as follows:

> The Court instructs the jury that for the purpose of this trial Sexual Battery means the penetration of the vaginal opening of the body of Konya Rebecca Edwards by the use of a limb or stick by Alan Dale Walker alone or acting in conjunction with Jason Riser, when Konya Rebecca Edwards was dead or alive.

The jury was also told:

> The fact that the actual moment of the victim's death may have preceded alleged consummation of the underlying felony of Sexual Battery does not void the charge of Capital Murder.

Additionally, the trial court gave the jury these more general instructions:

> The Court instructs the Jury that each person present at the time and consenting to or encouraging the commission of a crime, and knowingly, wilfully and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hands committed the whole offense; and if you believe from the evidence, beyond a reasonable doubt, that the Defendant, ALAN DALE WALKER, did wilfully, unlawfully, knowingly and feloniously do any act which is an element of the crime with which he is charged, namely Capital Murder, or immediately connected with it, or leading to its commission, then and in that event, you should find the Defendant, ALAN DALE WALKER, Guilty of Capital Murder.

> The Court instructs the Jury that wilful means nothing more than intentionally doing an act.

In his opening statement, one of the prosecutors told the jury that a witness would testify that the event supporting the sexual battery charge occurred at "a point in all probability that there is death, which is the capital murder charge, or one part of it. Riser is going to tell you that Walker took a limb or a stick and inserted it in the vaginal cavity of Konya Walker (sic) and left it." Later, the prosecutor said, "You have the death of Konya, the insertion of the stick, being the sexual battery in the underlying charge of murder . . . ."

In questioning Dr. McGarry, the medical examiner, the prosecution attempted to establish the time that the stick was inserted:

> Q.   Doctor, could you tell when that stick had been placed in Ms. Edwards' vagina?
>
> A.   Well, it was fresh.  The abrasion it made in the vagina was very fresh.  It had no reactive change around it; that is, no swelling.  The stick was burned on the outside, not on the inside.  Probably placed in there after she was dead.
>
> Q.   Close in time –
>
> A.   And before she was burned or at the time she was burning.
>
> Q.   Close in time to her death?
>
> A.   Yes.

At the close of the prosecution's case, Walker's attorney moved the court to dismiss the sexual battery charge, on grounds that Konya was dead when the stick was placed in her vagina and the State had failed to prove that Walker formed the intent to commit that act before she died.  The State argued that the issue had already been decided by the Mississippi Supreme Court in *West v. State*, 553 So. 2d 8 (Miss. 1989).  Although the judge believed that *West* was not entirely on point with the allegations in Walker's case, he denied Walker's motion.

In closing argument, the prosecution stated again that the stick was placed in Konya's vagina "probably after death . . . ."  Later, however, he argued:

> If you're going to convict him of sexual battery, you've got to find some things, and that is is that he – sometime out there he and Jason are dragging the body up.  She's probably dead, but in the instructions it says dead or alive.  She's probably dead, but a stick goes in her vaginal opening, according to Jason Riser.

Clearly, then, the underlying charge of sexual battery was based solely on the insertion of the stick, The evidence strongly suggested that Konya was dead at that point, and the jury was instructed that it was irrelevant whether she was dead or alive.  The jury found Walker guilty of capital murder.

Walker raised this issue in his direct appeal to the Mississippi Supreme Court, which quoted his argument in its opinion:

> In this case the problem is not that the killing occurred before the sexual battery; the problem is the lack of intent to commit sexual battery before the killing.  If the intent to perform sexual battery was not formed until after the killing, the killing could not have been done in the course of sexual battery.

*Walker v. State*, 671 So. 2d 581, 593 (Miss. 1996).  In response, the State argued that the insertion of the stick was the culmination of two hours of forced sex acts, which, when combined with Walker's statement that he "always wanted to do that" evidenced intent to commit sexual battery before Konya's death.  *Id*.  The court discussed its earlier decision in *West*, the decision relied upon by the trial judge, and the cases upon which *West* relied.  *Id*. at 594-95.

Reciting all of the acts that Walker committed against Konya, the court stated, "Walker's contention that he did not form the intent to commit the act until after Edwards' death is not supported by the series of acts penetrated [sic] over an approximate two hour period immediately prior to the killing."  *Id*. at 595.  Based on this evidence, the court concluded, "Walker was unsuccessful for obvious reasons in convincing the jury that he formed the intent to commit the sexual battery only after killing Edwards."  *Id*.  Alternatively, the court cited *West* for the proposition that "the jury may not have been convinced that Edwards was dead at the time of the sexual battery." The court noted that she was, apparently, "still clinging to life" after Walker's first attempt to drown her, and Walker subsequently put her face back into the water for only a short time.  "Whether or not there was any life left in Edwards at that point cannot be determined."  *Id*.

Despite admitting to "the possibility that the actual moment of Edwards' death may have possibly occurred immediately prior to the sexual battery," the court returned to its discussion of intent. Based on Walker's statement that he "always wanted to do that," the other events of the evening, and the "substantial and temporal and factual relation [of insertion of the stick] to Edwards' murder," the court concluded that there was sufficient evidence on which to base the jury's verdict of guilty on the charge of sexual battery. *Id*. at 595-96.

Here, Walker argues that he is entitled to habeas relief on this issue for several reasons. First, he argues that the Mississippi Supreme Court "relied heavily" on its view that a rational jury could have found that Konya was still alive at the time that the stick was inserted. This Court disagrees. While the Mississippi Supreme Court did devote a paragraph of its lengthy discussion to the concept that the jury could have found that Konya was alive, that is clearly an alternate finding, sandwiched in the middle of the discussion on when the requisite intent was formed. The court did not "rely heavily" on that proposition.

Had the state court's opinion relied on the possibility that a rational juror could have found that Konya was still alive, there might be a different result. There must be more than a "modicum" of evidence to survive habeas review. *Jackson v. Virginia*, 443 U.S. 307, 320 (1979). Thus, even taking into account the presumption of correctness accorded to state court findings by § 2254(e)(1), a petitioner is entitled to habeas relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. at 324. There was no real evidence that Konya was alive when the stick was inserted; there was simply uncertainty about whether she was dead.

Jason Riser testified that Walker held Konya underwater until about a minute after she stopped struggling. When she exhibited some reflexive activity a few minutes later, he put her face in the water again, and he and Riser sat watching for "a few minutes." Dr. McGarry testified that Konya died from a lack of oxygen, likely by drowning, demonstrated both in the fluid in her lungs and the bluish tinge of her internal organs. There was discoloration and swelling around her head and neck injuries; in contrast, there was no reactive change around the scratches in her vagina. Dr. McGarry thought Konya was "probably" dead at that point, and the prosecutors repeated that opinion to the jury several times.

On the other hand, Riser testified that both he and Walker believed that Konya was alive the first time she was pulled out of the water. Dr. McGarry opined that it would take five or ten minutes of oxygen deprivation to result in death, but he also stated that an interruption in the process could cause it to take much longer. Riser testified that Konya was in the water only "a few minutes" the second time. There is no evidence that either Riser or Walker checked for breathing or a pulse before deciding that she was "dead weight." Finally, Dr. McGarry could only say that the stick was inserted "close in time" to Konya's death, and that she was probably dead when that happened. The jury was instructed in such a manner that it could find sexual battery whether Konya was dead or alive, thereby inviting the jury to consider the possibility that she was still alive.

A similar question was presented in *West*, 553 So. 2d 8, as to whether the victim had died by the time she was sexually assaulted. Like Walker, West also argued that he could not have committed a sexual assault if the victim was dead, since she would no longer be a "person" for purposes of the statute. The Mississippi Supreme Court observed, "The argument has a certain logical allure, although West is hard-pressed to cite to any authority for it." *Id*. at 13. This Court has

23

noted the same lack of authority for this statement, but, like the state court, will assume, for purposes of this analysis, that the proposition is valid.  The court in *West* quoted from another Mississippi statute that defines the occurrence of death as follows:  "An individual who has sustained either (a) irreversible cessation of circulatory and respiratory functions or (b) irreversible cessation of all functions of the entire brain stem, is dead."  Miss. Code Ann. § 41-36-3 (1972 & Supp. 2011).  The pathologist testified that the gunshot that killed the victim "would cause the heart to immediately cease pumping, rendering the victim unconscious within a second or two."  553 So. 2d at 12.  He also pointed out, however, "that the irreversible changes to the brain normally associated with death would not have occurred for five minutes, even after so traumatic a wound."  With this testimony, and the evidence that the victim was sexually assaulted, the court held, "There is certainly evidence in the record from which the jury could have found Brim alive when West's assault reached this point."  *Id*. at 13.

The question of whether any rational juror could have believed that Konya was alive at the time that the stick was inserted is closer than it was in *West*. If it were necessary to decide this issue, this Court would say that a rational juror could have found, based on the evidence presented at trial, that Konya was alive when the stick was inserted.  It is, however, unnecessary to make that determination because the issue that Walker argued to the state court, and the point on which it primarily relied in denying his appeal, was whether Walker formed the intent to commit this act prior to Konya's death.

Where a habeas petitioner challenges the sufficiency of the evidence used to convict him, the reviewing court properly defers to the state law governing the crime. *Jackson*, 443 U.S. 307, 324 n, 16 (1979): *Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000).  In Mississippi, intent may be proved

by circumstantial evidence.  *Voyles v. Sate*, 362 So. 2d 1236, 1242-43 (Miss. 1978).  As the Mississippi Supreme Court has stated:

> Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case.  The intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent.

*Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974); *see also Gillett v. State*, 56 So. 3d 469, 492-93 (5th Cir. 2010).  In this case, the court found that there was sufficient evidence for the jury to find that intent to commit the sexual battery was formed prior to Konya's death, based on the events of that evening.

Indeed, it is obvious from the proof that Walker and his codefendant Riser formed the intent to commit sexual battery on Konya when they got out of the truck at the lake.  At this time, Konya was still passed out in the truck.  After Walker told Riser, "we was gonna rape this girl," Walker and Riser began carrying out their specific intent to commit the crime of sexual battery of Konya.  They began by fondling her breasts, grabbing her legs, and ended with trying to cover up the event by burning her body.  As the state court, quoting from an earlier case, recognized:

> Mississippi law accepts a "one continuous transaction" rationale in capital cases.  In *Pickle v. State*, 345 So. 2d 623 (Miss. 1977), we construed our capital murder statute and held that "the underlying crime begins where an indictable attempt is reached . . . ." 345 So. 2d at 626; (further cites omitted).  There is certainly evidence in this record from which the jury could have found Brim alive when West's assault reached this point.  An indictment charging a killing occurring "while engaged in the commission of" one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony." *Id.*, *Neal v. State*, 451 So. 2d 743, 757-58 (Miss. 1984); *Pruett v. State*, 431 So. 2d 1101, 1104-05 (Miss. 1983).  The fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge.

*Walker*, 671 So. 2d at 594 (quoting *West*, 553 So. 2d at 13).  Put another way, "where the two crimes are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." *Pickle*, 345 So. 2d at 627.

What is clear from the evidence is that Walker formed an intent to commit sexual battery of Konya.  When he formed the intent, it is hard to imagine that he thought through every form of abuse that he would inflict.  During these next two hours, he violated every orifice of her body, in addition to beating and choking her.  The insertion of the stick was just one of the many forms of the underlying felony that he perpetrated on Konya.  The crime of sexual battery was not complete under Mississippi law until he had completed every act incident to it, including the attempted cover up by burning Konya's body.  The fact that his intent had been formed early on is highlighted, as well, by his statement to Riser that "he always wanted to do that."  This issue must be analyzed under the applicable Mississippi law, and it is clear that the murder of Konya was committed during the res gestae of the crime of sexual battery, one form of which included the insertion of a stick in her vagina.  To argue that this was a separate event that occurred after her death and, therefore, not part of the underlying felony is disingenuous.

Under § 2254 and *Jackson v. Virginia*, this Court's review is limited to determining whether the evidence, viewed in the light most favorable to the State, is so lacking that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001).  Based on the evidence presented at trial, a reasonable juror could have believed, based on Riser's testimony, that Walker intended early in the evening to commit every imaginable form of sexual assault on Konya.  There was ample evidence on which the jury could have found that Walker killed Konya while in the commission of a sexual battery.

Walker also argues, however, that the jury was not instructed to find that Walker formed an intent to commit the sexual battery prior to her death, but only that her death was not an issue in finding him guilty of this offense.  On this issue, the Mississippi Supreme Court held that, reviewing the jury instructions as a whole, there was no error.  In particular, the court referred to the instructions quoted earlier, which said, "The fact that the actual moment of the victim's death may have preceded alleged consummation of the underlying felony of Sexual Battery does not void the charge of Capital Murder."  Another instruction required that the jury find that Walker "wilfully, unlawfully and feloniously" killed Konya while committing a sexual battery, and yet another instruction defined "wilful" as "nothing more than intentionally doing an act."

Habeas precedent places an "'especially heavy' burden on a defendant who . . . seeks to show constitutional error from a jury instruction that quotes a state statute."  *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).  To meet that burden, the defendant must show that there was "a reasonable likelihood that the jury applied the instruction in a way that relieved the State of proving every element of the crime beyond a reasonable doubt."  *Sarausad*, 555 U.S. at 191,  A "'slight *possibility*'" that the jury misapplied the instruction, will not suffice.  *Id.*  (quoting *Weeks v. Angelone*, 528 U.S. 225, 236 (2000)),  Instead, the Court held, "[T]he pertinent question 'is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" 555 U. S. at 191 (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

On this issue, the Mississippi Supreme Court denied relief, recognizing that a challenge to a jury instruction required consideration of the instructions as a whole.  *Walker*, 671 So. 2d at 596. For that reason, the court considered the instruction at issue with an instruction that required a finding

that Walker "wilfully" killed Edwards while in the process of committing the crime of sexual battery. In another instruction, the jury was informed that "wilful" meant "nothing more than intentionally doing an act." *Id*. Read together, the court held, "the jury was clearly informed that it must find that Walker intended to kill Edwards while engaged in the commission of sexual battery." *Id*.

It does not appear, from this Court's review of the transcript of the closing arguments in the guilt phase, that either prosecutor discussed the issue of intent. Ironically, defense counsel had planned to argue that Walker had not formed the intent to commit sexual battery until after Konya was dead; however, he ran out of time during his closing, and the trial judge refused to give him additional time. The argument does appear in his proffer to the court that was made after the jury had retired to deliberate on guilt. Any guidance on this issue, therefore, must come from the instructions alone.

Again, in considering this argument, this Court properly defers to the state law governing the crime. *Jackson*, 443 U.S. 307, 324 n, 16 (1979): *Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000). The jury was clearly told that, to convict Walker of capital murder, it must find, beyond a reasonable doubt, that Walker killed Konya *while he was in the process of committing the crime of sexual battery* on her. Two following instructions defined "wilful" as intentionally doing an act and required a finding that Walker wilfully, unlawfully, knowingly, and feloniously did any of the acts for which he was charged with capital murder. It is true that two later instructions told the jury that Konya could have been dead or alive when the sexual battery occurred, and it is possible that a reasonable juror could have focused on those instructions and assumed that no part of the offense – including forming the intent to commit it – need have occurred prior to death. However, mere possibility is not enough to warrant habeas relief. While the issue is close, this Court cannot find that there was a

reasonable likelihood that the jury would have ignored the requirement that the murder had to be done while in the commission of a sexual battery. Since that instruction required Walker to have been doing *something* in furtherance of the crime, it is more likely that the jury found that he was at least considering it while Konya was alive than it was an idea that came to him after Konya was dead.

For all of these reasons, this Court cannot conclude that the Mississippi Supreme Court's opinion on this issue was contrary to, or an unreasonable application of, clearly established federal law, and habeas relief is not available on this issue.

**Claim B:** **The trial court's admission into evidence of the video tape and trial transcript of Riser's statements to the police violated Walker's 6th and 14th Amendment right to confront his accuser.**

Here, Walker argues that the admission of Riser's prior statements was error, as they were out of court statements used against him, in contravention of *Crawford v. Washington*, 541 U.S. 36 (2004). He further contends that the fact that Riser testified in person at trial does not cure the confrontation violation. Walker maintains, moreover, that the error was particularly egregious here, where the statement and the transcript were not read in open court, but were simply given to the jury to examine.

The Mississippi Supreme Court considered this claim on direct appeal and rejected it both as procedurally barred from review and, alternatively, lacking in substance on the merits. *Walker*, 671 So. 2d at 603-605. The procedural bar was based on trial counsel's agreement to allow the statement to be admitted. In this Court, Walker argues that counsel's agreement on the statement amounted to ineffective assistance of counsel. This particular ineffectiveness argument was not raised in the state court post-conviction pleadings, but Walker argues that the ineffectiveness of post-conviction counsel created that default, and he should be permitted to raise this claim here.

This issue is barred from habeas review as not having been exhausted in state court.  This Court is familiar with the arguments that have been raised by Walker with regard to the performance of the Mississippi Office of Post-Conviction Relief.  The argument has been raised in substantially the same form in several cases before this Court, and it has been consistently denied, based on both Fifth Circuit and United States Supreme Court precedent.  *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further."); *Coleman v. Thompson*, 501 U.S. 722, 755-56 (1991); *Murray v. Giarratano*, 492 U.S. 1, 10 (1989);  *Stevens v. Epps*, 618 F.3d 489, 504 (5th Cir. 2010); *Bishop v. Epps*, 265 F. App'x. 285, 290 (5th Cir. 2008)*; Ruiz v. Quarterman*, 504 F.3d 523, 531 (5th Cir. 2007).  The failure of post-conviction counsel to raise this issue in state court is fatal to Walker's claim.[5]

Even if Walker could overcome his default, however, he could not succeed on the substantive issue.  The Mississippi Supreme Court's opinion primarily considered whether, under state law, the trial judge erred in permitting the statement and videotape into the jury room.  671 So. 2d at 604. Reviewing its precedent, as well as Rule 5.14 of Mississippi's Rules of Criminal Practice, the court held that the judge was required to permit the jury to take these pieces of evidence into the jury room, unless, in his discretion, he determined that the evidence is "dangerous or prone to destruction."  *Id*. (citing *Pettit v. State*, 569 So. 2d, 678, 680 (Miss. 1990)).  Turning to the Confrontation Clause issue,

---

[5]*But see Martinez v. Ryan*, No. 10-1001, 2012 WL 912950 (U.S. Mar. 20, 2012) (holding that State may be precluded from arguing a procedural bar where the ineffectiveness of post-conviction counsel precluded state court review of a claim of trial ineffectiveness, where the post-conviction stage was the first available opportunity to raise the claim).  Unlike Arizona, where *Martinez* originated, Mississippi discourages, but does not prevent, counsel from raising ineffectiveness claims on direct appeal.  *Williams v. State*, 73 So. 3d 1125, 1129 (Miss. 2011).  In any event, because we reach the substance of Walker's claim of ineffectiveness, it is unnecessary to decide whether *Martinez* should apply to this case.

the court held that there was no violation in this case, since Riser testified at trial and was subjected to cross-examination.  671 So. 2d at 604-05.

After reviewing the record in this case, this Court cannot say that the Mississippi Supreme Court's decision misapplied clearly established federal law, or was contrary to it.  Clearly, Walker's attorneys believed that, once Riser made a deal with the State and agreed to testify, the only viable defense was to discredit his testimony.  One way to accomplish that was to point out any discrepancies between his trial testimony and his earlier statement to police.  To that end, Walker's counsel pointed out each departure from the statement, even during Riser's direct examination.

For example, at one point in his testimony, Riser stated that, after the drowning, when he and Walker were watching Konya's body after placing it face down in the water, he said to Walker, "[Y]ou act like you've done this before."  The jury was immediately sent out, and Riser was questioned about the instructions he had been given prior to trial not to give any testimony that could tie Walker to the Pelley murder.  Walker's attorney unsuccessfully moved for a mistrial and, in support of the motion, questioned Riser about his prior statement and what parts of it he had been told not to discuss.

At the end of Riser's direct examination, and on the request of Walker's attorneys, a copy of his statement was marked into evidence for identification "on the motions."  Walker's attorney referred to the statement on several occasions during cross-examination when he believed that Riser's testimony deviated from it, and he had Riser read some of it to the jury.  Finally, the prosecution objected, and the following colloquy occurred:

> MR. SAUCIER:  Your Honor, we would like to make an objection while this person is looking at that.  I think – and the grounds of the objection are is counsel is intentionally trying to mislead this jury because the questioning and answering in there was not always in a sequence or chronological sequence when this young man

was obviously answering questions. The purpose of using the statement for impeachment should be when a person gives something that is contradictory. The fact that it was out of chronological order from time to time, I don't think makes it contradictory; and we object to the method that counsel is using here.

MR STEGALL: Judge, we don't have any objection to 14 copies of this statement being made and given the jury so we can have it offered into evidence so they can have it to review as we do.

MR. SAUCIER: We have a better solution. We have the videotape, which is, in fact, what that's taken from, and we'll be happy to introduce the videotape for the jury to watch, which allows them to actually hear him say what he's going to say; and that is a transcript of the videotape.

MR. STEGALL: We don't have any problem if they want to offer it as well, Judge, but we would like for them to have an opportunity to review this to be able simply to back the video up.

THE COURT: Are you tendering this statement?

MR. STEGALL: Yes, sir.

At this point, there was a bench conference, after which the court ruled, "If one is offered, both are offered." A short time later, the judge made this statement:

You're certainly entitled to impeach him [Riser] on a prior inconsistent statement. Of course, at this time the prior inconsistent statement, I'm not certain that there was any oath given at that particular time which would make it conform to the requirements of 801 on a prior inconsistent statement. It would certainly conform as far as a prior consistent statement after his credibility has been attacked.

Riser's own attorney also asked that the statement and the videotape be entered into evidence, noting:

[I]t's part of the agreement that his statement has to be substantially consistent with the statements that he had made in his prior statement; and I think that since that's the case and since these questions have been raised as to the consistency of his statements, that I think that the videotape would be the best evidence as to – as to whether or not he was consistent or not.

Finally, during a discussion of the mechanics of providing the videotape and the transcript to the jury, one of the prosecutors suggested that it be done following Riser's cross-examination, stating, "The

purpose of the video would be for the State of Mississippi in its effort to rehabilitate the witness from the cross-examination and thereby allowing counsel to go ahead and finish his examination as he did."

Later, the court offered additional reasoning on its decision to allow both the statement and the videotape into evidence:

> Since this witness is still on the witness stand and has been on the stand for some period of time when this matter arose, I did anticipate a strong probability that upon the termination of the cross-examination, that the State would likely offer the transcript into evidence at that time, which I believe would be admissible under the circumstances since or detailed questions concerning the statement have been asked by counsel implying that this was a recently fabricated story or a changed story from a previous position; and as I remember the videotape and the statement itself, I do not see where there are any great inconsistencies.

The judge decided, however, that copies of the statement would not be provided to the jurors prior to their deliberations, to prevent the distraction of having them thumbing through pages to find a specific reference during Riser's testimony. The judge made the same ruling with regard to the videotape, noting that playing it after Riser's testimony "would be, in effect, repeating the same evidence twice or more to the jury." He decided that both the videotape and the statement would be "treated the same as any other evidence . . . and the video and television will be made available to them to play at their leisure . . . ."

Walker relies on *Crawford v. Washington*, 541 U.S. 36 (2004), as the basis for his claim for habeas relief, asserting that it is controlling. He is mistaken. The Court there prohibited the use of testimonial hearsay at trial; however, in the manner in which Riser's statement was used at trial, it was not hearsay under Mississippi law. Miss. R. Evid. 801(d)(1) states that a prior statement by a witness is not hearsay if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or

33

motive." *See also Caston v. State*, 823 So. 2d 473, 488-90 (Miss. 2002) (holding that admission of a prior consistent statement is proper, but only after the witnesses's credibility is attacked).

By the time that the statement was admitted into evidence, the prosecution had argued that the statement was not inconsistent with his trial testimony, and the trial judge's remarks showed that he believed it would be admissible "as far as a prior consistent statement after his credibility has been attacked." Later, even Riser's attorney asked that both the statement and the videotape be admitted into evidence, so as to show that his testimony conformed substantially to the statement, for purposes of protecting his plea agreement. Finally, the judge's later remarks show that he had admitted both the tape and the written statement under the belief that they "would be admissible under the circumstances since or detailed questions concerning the statement have been asked by counsel implying that this was a recently fabricated story or a changed story from a previous position . . . ."

Additionally, as the *Crawford* Court stated, "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id.* at 60 n.9. Although there is not a perfect congruence between the hearsay rules and the Confrontation Clause, there is not a Confrontation Clause problem where the witness testifies at trial and can be cross-examined. *California v. Green*, 399 U.S. 149, 156 (1970). It is "this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause . . . ." *Id.* at 157. Even where the out of court statement is used affirmatively to substitute for failed recollection, the Confrontation Clause is not offended if the witness is available for cross-examination at trial. *United States v. Owens*, 484 U.S. 554, 560-61 (1988).

34

Recent decisions by the Mississippi Supreme Court evince a thorough understanding of the principles announced in *Crawford* and *Owens* and the application of those principles to out of court statements. Thus, in *Smith v. State*, 986 So. 2d 290, 296-99 (Miss. 2008), after a careful review of *Crawford*, the court specifically overruled its prior cases that permitted the introduction of hearsay based on the reliability test of *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), the test that was rejected in *Crawford*. Later, in *Goforth v. State*, 70 So. 3d 174, 183-87 (Miss. 2011), the court extensively discussed both *Crawford* and *Owens* to determine whether an out of court statement could be used to substitute for the complete memory loss suffered by a witness in an automobile accident. Analyzing footnote 9 of the *Crawford* opinion, which is quoted above, the court held that the use of the statement violated the Confrontation Clause, because the witness could not "defend or explain it" at trial. *Id*. at 186.

This Court is satisfied that the use of Riser's statement in this case did not offend clearly established federal law, and the Mississippi Supreme Court's opinion offers no basis for habeas relief. Riser's statement, and the accompanying video tape, were offered into evidence only after his credibility had been attacked by Walker, and both the prosecution and Riser's attorney requested their admission to show that his testimony was consistent with his earlier statements to the police. Riser testified and was subject to a thorough cross-examination about the differences between his trial testimony and his earlier confession. Moreover, neither the statement nor the videotape was offered to the jury during trial. Walker's argument that the jury, during its deliberations, could have focused on the videotape to the exclusion of other evidence is unpersuasive. The tape is fifty minutes long, and the jury only deliberated for an hour and twenty minutes during the guilt phase, and two and one-

half hours during the sentencing phase.  There is no merit to Walker's arguments on this subject, and he is not entitled to habeas relief.

**Claim C:**      **The Prosecutor improperly struck African-American jurors on the basis of race, in violation of the Fourteenth Amendment.**

Walker contends that the State improperly struck four black jurors:  Pauline Lewis, Willie Ann Harper, Lillian Rush and Lewis Burke, in violation of the Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79 (1986).  There, the Supreme Court adopted a case-specific, three-part test, in which the defendant could establish that discrimination had occurred in the jury selection in his case.  As a preliminary matter, the defendant must show that the prosecutor's use of peremptory challenges raised an inference that the prosecutor was purposefully excluding members of his race from serving on the jury.  476 U.S. at 96.  (This holding has since been extended to members of any race.  *Powers v. Ohio*, 499 U.S. 400 (1991)).  The defendant must show that a discriminatory intent motivated the strikes; it is not enough to show that the strikes disproportionately impacted jurors of one race.  *Hernandez v. New York*, 500 U.S.352, 359-60 (1991).  Establishing a pattern or practice of strikes against black jurors is one means of establishing a prima facie case, but it is not the only way in which it may be established; showing that jurors of different races were questioned differently may also infer a discriminatory motive.  *Batson*, 476 U.S. at 97.  In fact, one discriminatory act in jury selection may be sufficient to establish a *Batson* violation.  *Johnson v. California*, 545 U.S. 162, 169 n. 5 (2005).

Once the defendant establishes a prima facie case of discrimination, the prosecutor must come forward with a race-neutral explanation for his challenges.  *Batson,* 476 U.S.  at 97.  Because the burden is always on the defendant to prove discrimination, the prosecutor's explanation need not be

36

persuasive; it must only be based on some factor other than the juror's race. *Hernandez*, 500 U.S. at 360. However, he must do more than simply deny that he had a discriminatory motive. *Batson*, 476 U.S. at 98. Even if the prosecutor's reasons are frivolous or nonsensical, the analysis does not end, it merely proceeds to the third step. *Johnson*, 545 U.S. at 171; *Purkett v. Elem*, 514 U.S. 765, 769 (1995).

During the third step, the trial court must determine whether the defendant has established purposeful discrimination in the jury selection process. *Batson*, 476 U.S. at 98. At that point, the most persuasive evidence of discriminatory intent can be the demeanor of the attorney challenging the juror, which is best evaluated by the trial judge. *Hernandez*, 500 U.S. at 365. However, the judge may also consider other factors; e.g., the fact that the prosecutor defended his strikes without being asked to may be viewed as favorable to his explanation for the strikes. *Id*. at 370. If the explanation includes reasons that are unacceptable, such as gender, the trial court is still not required to find that the other reasons are pretextual. *Rice v. Collins*, 546 U.S. 333, 341 (2006). Similarly, the fact that the trial judge did not see the conduct that is alleged as the reason for the strike does not eliminate that conduct as a race-neutral reason for challenging the juror. *Id*.

Once the trial court has made its determination with respect to discriminatory intent, that determination is a finding of fact that is entitled to a presumption of correctness. *Hernandez*, 500 U.S. at 364. When a *Batson* challenge is considered in the context of habeas review, the federal court cannot reject the state court's determination on the issue unless it was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Rice*, 546 U.S. at 338, quoting 28 U.S.C. § 2254(d)(2). However, a finding of non-discrimination must be based on the

actual reason[s] proffered by the prosecutor; neither the trial judge nor a reviewing court may substitute a better reason for the strike. *Miller-El* v. Dretke, 545 U.S. 231, 252 (2005).

The record shows that, at the beginning of the State's peremptory strikes, Walker's attorney announced, "Judge, on any black jurors that are excused on a peremptory challenge, we would ask them to state the *Batson* reasons for it." At that point, the State had excused one black juror, Lillian Rush. Earlier, during defense counsel's voir dire, he had asked the jurors to identify themselves if they had daughters who were teenaged or older. Ms. Rush raised her hand. Later, defense counsel asked whether any jurors felt that they needed to say something. Ms. Rush said, "When you asked the question about having daughters, teenagers or older, you think about people that have daughters. Suppose you had a son as old as the defendant; it would be kind of hard for you to take [sic] a positive decision." When asked to stand and repeat her statement, she said, "He brought up the question about the people having daughters, teenagers; and I said, suppose you had a son as old as the defendant or older, it would be kind of hard for you to come out with an unbiased decision."

The court conducted individual voir dire of jurors whose voir dire or questionnaire responses had caused concern. Rush was one of the those jurors. Although she had originally indicated a predisposition to impose the death penalty ("I am a firm believer that the punishment should fit the crime. If the crime committed is serious enough to warrant the death penalty, the person convicted should receive the death penalty."), she eventually stated that she could listen to the evidence and apply the law. Later, however, again discussing her two boys and two girls, she stated that she would relate to both families, and, "You know, it would really be hard for me to come out with a decision." Additionally, she told the prosecutor that it would be even more difficult for her because she had a son near Walker's age. Those feelings caused her to prefer not to serve as a juror in Walker's case.

As the judge noted, however, she later said that she would try to keep her feelings out of her deliberations and base her decision on the evidence and the law.

The prosecution challenged Rush for cause, arguing, "This juror under questioning indicated repeatedly that she did not want to serve, and she felt as though sympathy would influence her and she could not reach a decision." The judge refused to strike Rush for cause, saying "I have the note here that she said that she could be fair on death even if capital murder; would prefer not to serve on a capital murder case. She would try to be fair. She would lay aside her feelings. I do not feel that she is disqualified . . . ." When her strike was challenged by the defense, the trial court found that no pattern or practice had been established at that point, but left it up to the prosecutor whether he wanted to state a race neutral reason for the strike into the record. The prosecutor said, "We made an objection to this juror for cause, and I believe that the record will support it." The judge responded, "All right."

In reviewing this issue, the Mississippi Supreme Court discussed *Batson* and properly enunciated the analysis required when the defendant challenges a strike on the basis of racial discrimination. With regard to the strike of Ms. Rush, the court held, "As she was apparently the first minority juror excused, the trial court correctly found no prima facie case had yet been established." *Walker*, 671 So. 2d at 627. Finding no error in this strike, the Mississippi Supreme Court concluded:

> Again we are confronted with a juror who did not want to serve and felt that sympathy would influence her even to the point of not being able to reach a decision. Jurors should not be forced to serve when they expressly state they do not want to. This is especially problematic where a juror also contemplates not being able to reach a verdict. The trial judge was not in error in allowing Rush to be peremptory. [sic] There is no merit to this claim.

*Walker*, 671 So. 2d at 628.

39

The second black juror who was struck was Pauline Lewis.  Defense counsel asked for the "*Batson* reasons for the strike," and the prosecutor stated, "She had a teenage daughter, in response to a question that defense asked; and the manner in which she responded to questions, I felt like she was dealing with some problem that we weren't able to reach.  That perhaps would have been the basis of it."  Defense counsel named several other jurors, whom the State had accepted, who had teenaged children.  The prosecutor responded, "All of whom responded in a manner that allayed whatever concerns the State had.  The demeanor exhibited by Ms. Lewis did not satisfy that."  The trial judge ruled, "All right; I'm going to accept the State's statement as to their reasons.  I have not found that there's any particular pattern been established at this time either . . . ."

According to the transcript, Ms. Lewis responded affirmatively when the jury was asked whether anyone had a daughter at least of teenage years or older.  The record also shows that Ms. Lewis gave the following view of the death penalty on her questionnaire:  "If any one comiats 'a crying' of killing I thank thay shell get the death penalty."  Based on that answer, she was also questioned during the individual voir dire.  When asked by defense counsel to explain whether she thought that everyone convicted of capital murder should be sentenced to death, she said, "No.  It's according how – it's according to how, you know, I see it if I'm on the jury."  She followed up by saying that she would base her decision on the evidence and the instructions, and she told the prosecutor that she thought that she could be a fair juror.  The only other response by Ms. Lewis was to alert the court that she had a relative who worked for the Sheriff's Department.

In permitting the prosecutor to strike Ms. Lewis, the trial judge noted that he had still not found a pattern of discrimination in the prosecutor's peremptory challenges.  According to the Mississippi Supreme Court, that was a finding of fact that would not be reversed unless it was

manifestly wrong.  671 So. 2d at 628.  Finding no showing of discrimination, the court went on to state that it had accepted demeanor as a "legitimate, race-neutral basis for a peremptory challenge." *Id.* (citing *Lockett v. State*, 517 So. 2d 1346, 1352 (Miss. 1987)).  Thus, the court held, no error was made in permitting this challenge.

When Willie Ann Harper's name was raised during jury selection, one of the prosecutors said that he thought she had already been struck.  Apparently, there had been an agreement to let her go because she said that she had a teenager. Early in the voir dire, in response to the prosecution's questions about sequestration, Ms. Harper told the court, "I can't stay away from my family at night." The district attorney asked whether she had young children, and she replied, "Well, I'll put it like this.  I'm what you call the man and woman's daddy.  I've got to be there for things to go on right." She was individually questioned to clarify her hardship, and the following colloquy occurred:

> THE COURT:  All right.  Ms. Harper, during the question and answer session that we had, you indicated that as far as the sequestering was concerned, the saying overnight, that you would have a problem with that because of family obligations; is that correct?
>
> MS. HARPER:  Right.
>
> THE COURT:  What – what are those obligations?  Are you a single parent; is that what it is?
>
> MS. HARPER:  Yes, sir.
>
> THE COURT:  How old are your children?
>
> MS. HARPER:  I have one daughter.
>
> THE COURT:  One daughter?
>
> MS. HARPER:  She's 23, but it's just the two of us at home.
>
> THE COURT:  I see.

MS. HARPER:  And I raise animals.  Though I have my animals, then I also work for Dr. Dare, too.

THE COURT:  For who?

MS. HARPER:  Dr. Dare.

THE COURT:  Uh-huh.

MS. HARPER:  And I need to be at work during the daytime, you know, too.

THE COURT:  All right.  Well, the main question that I have is this:  Is because of your obligations, is there– would there be no one there to take care of your – the needs of the animals that you take care of?

MS. HARPER:  No, sir.  I mean, judge, I try to – I don't know of anyone right now that I can trust to be around there to take care of them.

THE COURT:  All right.  Well, let me ask you another thing; that if I required of you – which I have the authority to do – if I required of you to be sequestered along with the other jurors for several days, would you be able to give your attention to the trial for your worries about what's going on at home?

MS. HARPER:  Yes, sir.

THE COURT:  You could give your attention to the trial or not?

MS. HARPER:  I could.

THE COURT:  Well, who would take care of the animals for you?

MS. HARPER:  Well, I mean, this is between the times.  See, it's a certain time that I have to be there to see to them getting water and check and see if anybody around there – bothering them, stuff like that.  You know what I'm saying?

THE COURT:  Uh-huh.  Who is Dr. Dare?

MS. HARPER:  He's a surgery doctor here in Vicksburg.

THE COURT:  Oh, I see.  I see.  Does he have anybody to take your place?

MS. HARPER:  Well, maybe.  He could – he could probably find someone.

THE COURT:  Okay.

42

MS. HARPER:  But, I mean, you would have to talk to him about that.

THE COURT:  Okay.  Your daughter that's at home there with you, she doesn't suffer from any disabilities of any kind that you have to look after her, does she?

MS. HARPER:  She's full of health just like I am.  The only thing is her being alone.

At the invitation of the court, the prosecution made further inquiry:

MR. CARANNA:  Just a – ma'am, do you realize that you would not be able to go home any at all between now and maybe as long as next Wednesday?

MS. HARPER:  I realize that.

MR. CARANNA:  Okay.  And you would be able to stay here during that period of time and concentrate on this case?

MS. HARPER:  No, I'm not saying that I would be able to stay here.  I mean, I don't see no way possible right now, because I don't have anyone there to take care of anything.

THE COURT:  Well, that's what I was trying to ask you a while ago and give you the opportunity to tell me –

MS. HARPER:  Well, I'm sorry.  I was just ignorant to understand.  [Sic]

MR. CARANNA:  You would have to stay here, be put up at a hotel and stay here.

MS. HARPER:  I understand then.

MR. CARANNA:  Could you do that?

MS. HARPER:  I couldn't.  I don't know of anyone I could get to take care of what I have to take care of around home and stuff like that and be with my daughter.

MR. CARANNA:  Is that a farm or –

MS. HARPER:  Well, I guess you could call it – hogs, chickens, ducks.

MR. CARANNA:  Okay.

MS. HARPER:  Garden.

MR. CARANNA:  And that would require your attention?

MS. HARPER:  My fully attention, sir, fully.  I mean, I see to all that – taken care of like it's supposed to be.  Me, myself.

MR. CARANNA:  Yes, ma'am.

MS. HARPER:  I do it.

MR. CARANNA:  We would have no other questions.

THE COURT:  Do you have any?

MR. STEGALL:  Yes, sir.  Your daughter is how old?

MS. HARPER:  Twenty-three.

MR. STEGALL:  She's grown and you feel like you need to be there with her?

MS. HARPER:  My daughter got her own job, sir, and she have her own things, you know, and just me being her parent.  I'm her guardian.  You understand me?

MR. STEGALL:  And you have animals; and how many animals do you have?

MS. HARPER:  About 30 hogs and about 30 or 40 chickens; mixed between there, ducks.

MR. STEGALL:  She can't feed those things?

MS. HARPER:  She doesn't have time.  She have her occupation on her job, just like I have my duties to do.

MR. STEGALL:  Do you have another job besides those things?

MS. HARPER:  I work for Dr. Dare.

MR. STEGALL:  What's your hours?

MS. HARPER:  8:00 to 4:00, sometimes 4:30 to 5:00.

MR. STEGALL:  What's her hours?

MS. HARPER:  My daughter?

MR. STEGALL:  Uh-huh.

MS. HARPER:  8:00 to 5:30.

MR. STEGALL:  So she gets in well before dark?

MS. HARPER:  Sometimes 6:30.

The prosecution struck Harper, and defense counsel noted, "[T]his may be a pattern."  He then asked the court to require the State to offer a race-neutral reason for the strike.  The trial judge replied, "I don't believe that would really be necessary.  With all the questioning, the record will speak to that.  I will certainly take note of the fact that there was substantial reason for striking that juror no matter what her race would be."  The judge did, however, invite the prosecutor to state additional reasons for the strike if he wished, "because of her chickens and her pigs and her children and . . . ."  The prosecution  responded, "We just add to what's already in the record, the surprise that we had by our earlier mistake of her disposition yesterday."

The Mississippi Supreme Court reviewed this testimony and concluded that Ms. Harper established that she could not serve as a juror because she had to care for her animals and her garden, in addition to her full-time job.  671 So. 2d at 628.  In the opinion of that court, "she was validly subjected to the State's challenge."  *Id*.  The court noted that employment was a factor that the *Batson* Court listed as a consideration for a valid challenge.  Referring to an earlier decision, the court added that other courts had held that employment was a race-neutral reason for a peremptory strike.  *Id.* (citing *Lockett*, 517 So. 2d at 1352, and Appendix 1).

Lewis Burke was the final black juror challenged by the State.  When defense counsel noted for the record that he was black, the prosecutor said that he was a member of the board of directors of the Capital Defense Fund.  The court accepted that as a valid reason.

The record shows that Mr. Burke responded early in the voir dire, when the prosecutor asked whether anyone's employment would affect his ability to serve on a sequestered jury. Mr. Burke, an attorney with the U.S. Corps of Engineers, said that it would be a problem in some of his cases in which he was working against deadlines and preparing for hearings. Burke was not called in for individual voir dire; after that occurred, however, he notified the court that he had remembered reading about the case in the newspaper, although he said it would not affect his view of the case. He also stated:

> [B]ut I also want to bring out something else, too, that the DA probably doesn't know and the Court doesn't. The defense know that I was – that I was on the board of directors of the Capital Defense Project, which is a project sponsored by the State Bar Association. I have served two years on the board of directors of that project. Again, the purpose of that project was to provide a backup center for defense attorneys in capital cases.

The prosecution attempted to have Lewis struck for cause, because of his affiliation with the Capital Defense Project, but the trial judge refused, on grounds of the oath Lewis took as an attorney to follow the law.

The Mississippi Supreme Court reviewed this testimony and repeated that employment was a valid, race-neutral reason for a peremptory strike. 671 So. 2d at 629. The court continued, "[T]his situation for obvious reasons, justifies the State's wish to remove him from the jury on a capital case." Summarizing its review of the voir dire, the court said:

> It should be recalled that the State had five peremptory challenges remaining. Because no record is presented upon which the ultimate composition of the jury can be learned, it cannot be determined how many black persons served on the jury. Assuming some were seated, however, the State obviously did not use all its challenges in an effort to impermissibly eliminate all the minority venirepersons.
>
> A complete review of the jury selection process during peremptory challenges indicates no prima facie case of purposeful discrimination was established by Walker. Accordingly, there was no need for the State to offer its required race-neutral reasons

for exercising such challenges against 4 black venirepersons.  That notwithstanding, the State did offer its reasons, which the court accepted.  None of the four reasons appears suspect under prior holdings of this and other courts.

*Id*.

Walker argues that the trial court erred both in failing to find a prima facie case of discrimination and in failing to rule on the third-step issue of *Batson*: whether the reason offered for the strike was a pretext for racial discrimination.  Rush was removed because her voir dire responses indicated that she would have a hard time making a decision in this case, because she had daughters near the age of the victim and sons near the age of the accused.  The prosecution had attempted to have her removed for cause for this reason.  Lewis was removed because she had a teenaged daughter and because her demeanor caused the State's attorneys some concern.  Harper was removed because her duties at home prevented her from serving, and Burke was removed because his service as a director of an entity created to provide a backup center for defense attorneys in capital cases raised concern that he would be biased.

Unfortunately, other than the four jurors identified in this argument, the record before the court does not reveal the race of each member of the venire.  It is impossible, therefore, to conduct a comparative analysis to determine whether similarly situated white jurors were permitted to serve.  Walker argues, for example, that the removal of Lewis because she had teenaged children was pretextual, referring to defense counsel's argument that there were "a number of white jurors who stated that they had teenage children."  The record does not support that argument.  Instead, defense counsel merely noted that other jurors had been accepted by the State, despite the fact that they had teenaged children.  Defense counsel did not argue, and the record doesn't show, that these jurors were white.  The Court would note one exception, however.  During the discussion on for-cause strikes,

Joseph Williams was identified by defense counsel as black.  Defense counsel asked that he be excused, and the prosecutor objected to the strike.  Williams was ultimately struck for cause by the trial judge.

The first step in the *Batson* analysis is the establishment of a prima facie case of purposeful discrimination.  A prima facie case can be established by a showing that peremptory strikes were used to remove black jurors from the venire "and any other relevant circumstances" raise an inference purposeful discrimination.  476 U.S. at 96.  The opponent of the strikes has the burden of presenting evidence to the trial court that would raise that inference.  *Johnson v. California*, 545 U.S. 162, 170 (2005).  Here, there is no question that the prosecution used peremptory strikes to remove black jurors.  There is no evidence, however, of any other relevant circumstances that support Walker's claim of discriminatory intent.  This crime involved a white defendant and a white victim. There is no suggestion that the prosecution removed all of the black jurors from the venire; indeed, the record shows that defense counsel removed a black juror, and the prosecution objected.  There is no evidence upon which the Court can make a comparative analysis as to the situation of white and black jurors.  In sum, this Court, like the Mississippi Supreme Court, is limited in the analysis that it can conduct.         In contrast, the trial judge watched the voir dire and had the opportunity to study, not just the jurors, but the attorneys.  As stated earlier, the demeanor of counsel is often the best indicator of whether his strikes are motivated by a discriminatory intent, which is best evaluated by the trial judge.  *Hernandez*, 500 U.S. at 365.  Walker offers only the fact that the prosecution struck four jurors as the basis for his claim that a prima facie case had been established.  This fact, on its own, is irrelevant without additional information as to the makeup of the jury pool. *Medellin v. Dretke*, 371

F. 3d 270, 279 (5th Cir. 2004).[6]  Alternatively, Walker could have supported his claim by a showing

that race was an issue in his case.  *Price v. Cain*, 560 F.3d 284, 287 (5th Cir. 2009).  Since both he

and his victim were white, he could not have made that showing, either.  The trial court found no

evidence to support a prima facie case, the Mississippi Supreme Court affirmed that decision, and

this Court cannot say that the affirmance was the product of an unreasonable application of, or was

contrary to, clearly established federal law.

Even if a prima facie case had been made, the prosecutor gratuitously offered race-neutral

reasons for the strikes.  Lewis Burke's service as director of an organization that assists attorneys

representing defendants charged with capital crimes created an obvious belief that Burke would be

biased in Walker's favor.  This would have been buttressed by his remark that the court and the

district attorney did not know of this connection, although defense counsel did.  Lillian Rush's

statement regarding the problems she would have reaching a decision in the case because of the

similarities between the victim, the defendant, and her children also created a legitimate concern.

Willie Harper was unable to comprehend the trial judge's questioning as to her other responsibilities

– first announcing that she could serve, then declaring, "I don't see no way possible . . . ."  A juror

with other pressing concerns would have likely been inattentive, and her ability to understand the

court's instructions on the law would have been questionable.

In this Court's opinion, the only close call is the strike of Pauline Lewis.  The prosecutor's

explanation is vague, "She had a teenage daughter, in response to a question that defense asked; and

_____

[6]*Medellin* has, of course, a substantial subsequent history on the issue of whether Texas
courts adhered to the provisions of the Vienna Convention.  Ultimately, neither the Fifth Circuit's
nor the state court's opinion on that issue or the *Batson* question was disturbed.  *Medellin v. Texas*,
552 U.S. 491 (2008).

the manner in which she responded to questions, I felt like she was dealing with some problem that we weren't able to reach."  Walker is correct in his assertion that five other jurors who said that they had teenaged daughters – Bagley, Foster, Watkins, Shows, and Tipton – actually served on the jury. When confronted with this fact, the district attorney argued that those jurors "responded in a manner that allayed whatever concern the State had.  The demeanor exhibited by Ms. Lewis did not satisfy that."  The strike, then, was based upon Ms. Lewis's demeanor, and it was on this basis that the trial court allowed the strike.

In retrospect, it would have been better for counsel to specifically describe the behavior or demeanor that he found troubling, such as crossed arms or eye-rolling.  Absent a further explanation, the record does not indicate that the trial court observed the same demeanor that troubled the prosecutor.  However, the record does not have to provide that information.  *Thaler v. Haynes*, 130 S. Ct. 1171, 1174 (2010).  When an issue arises regarding a demeanor-based strike, the trial judge's observations of both the prosecutor and the juror are even more important, and his ruling on this issue "must be sustained unless it is clearly erroneous."  *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). Where circumstances suggest that the trial court did not actually agree with the prosecutor's assessment of the juror's demeanor, clear error may be shown.  *Id*. at 479.  Where, however, the record indicates that the trial judge accepted the prosecutor's assessment, even if the judge did not personally see the behavior that prompted it, the ruling should not be overturned unless it was clearly erroneous.  *Haynes*, 130 S. Ct. at 1175.

Again, the strike of Ms. Lewis presents the closest *Batson*-related issue; however, on the record presented to this Court, it cannot be said that the demeanor-based strike was contrary to, or a misapplication of, clearly established federal law.  This Court's denial of habeas relief is based

50

primarily on the ruling of the trial court and the appellate court that Walker failed to present a prima facie case of racial discrimination in jury selection.  Even if a prima facie case had been proved, however, the state court's opinion affirming the strikes of Burke, Harper, Lewis, and Rush does not offend clearly established federal law.  Habeas relief is not warranted here.

**Claim D:**  **At sentencing, the prosecutor improperly commented on the Defendant's failure to testify at the guilt stage of the trial, in violation of the Fifth and Fourteenth Amendments.**

Walker actually complains of two statements made by the prosecutor during his trial:  one during the guilt phase and one during the sentencing phase.  During the guilt phase, the prosecutor stated that Riser "told you how the shirt got ripped, and that is the only testimony – the only reliable information beyond inference and guess . . . ."  At the sentencing phase, Walker made a statement to the jurors.  During his closing argument there, the prosecutor stated, "If all he had to say was what he said in those less than two minutes he stood here before you, I can see why he hasn't bothered until now . . . ."  Walker claims that these statements were improper comments on his failure to testify and that the Mississippi Supreme Court's failure to reverse on this issue was contrary to *Griffin v. California*, 380 U.S. 609 (1965).

Walker's attorneys did not object to this argument at trial, and the Mississippi Supreme Court initially noted that it "applies the procedural bar to all instances where Walker failed to object at trial.  Without relaxing the procedural bar, this Court looks to the underlying merits of each of Walker's claims."  671 So. 2d at 614.  Later in the discussion, the court again recognized that Walker had not objected to the statements, but continued, "Walker correctly contends the failure to offer a contemporaneous objection does not necessarily bar consideration of a fundamental right."  *Id.* (citing *Livingston v. State*, 525 So. 2d 1300, 1306 (Miss. 1988)).

A state court may make an alternative merits ruling on an issue without waiving its holding that the issue is barred. *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005). Here, the Mississippi Supreme Court stated twice that defense counsel had not objected to the arguments at issue and indicated that it would review the merits "without relaxing the procedural bar." Walker argues that the state court's ruling was based on the merits of his claim, citing earlier cases for the proposition that "the Mississippi Supreme Court had a specific rule allowing appellate review of comments on a defendant's failure to testify . . . ." Br. in Supp. of Pet., p. 35.

A procedural bar will not prevent habeas review of an issue unless the last state court that ruled on the claim "clearly expressed its reliance on an adequate and independent state law ground . . . ." *Harris v. Reed*, 489 U.S. 255, 263 (1989). Where a state court has clearly expressed its reliance on a procedural bar, the fact that it alternatively rules on the merits will not vitiate the bar's validity. *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005); *Thacker v. Dretke*, 396 F.3d 607, 614 n. 8 (5th Cir. 2005). Courts do not have to use the word "alternatively" to signal that a holding on the merits is merely an alternative holding. For example, in *Sochor v. Florida*, 504 U.S. 527, 534 (1992), the state court found that a claim regarding jury instructions had been waived by failure to object at trial, but went on to say, "In any event, Sochor's claims here have no merit." *Id.* (quoting *Sochor v. State*, 580 So. 2d 595, 602-03 (Fla. 1991)). This language, the Supreme Court held "indicates with requisite clarity that the rejection of Sochor's claim was based on the alternative state ground that the claim was 'not preserved for appeal. . . .'" 504 U.S. at 534.

Given the decision in *Sochor*, the Fifth Circuit held that similar language used by the Texas courts "must be viewed as signaling an alternative holding independent of federal law, not as an indication that the state court is excusing the procedural default." *Amos v. Scott*, 61 F.3d 333, 341

(5th Cir. 1995). A contrary result, the court noted, would amount to telling the states in that circuit "[U]nless you use the magic word 'alternative' when following a procedural default holding with a merits holding, we will deem your application of your rule not to be strict or regular, and thus not independent and adequate." *Id.* at n.24. Recognizing "an infinite variety of particularized transitional phrases to signal alternative holdings," the court quoted from *Coleman*, "[W]e have no power to tell state courts how they must write their opinions. We encourage state courts to express plainly . . . the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim . . . ." *Id.* (quoting *Coleman*, 501 U.S. at 739). *See also Williams v. Puckett*, 283 F.3d 272, 280 (5th Cir. 2002) (finding that the Mississippi Supreme Court relied on the contemporaneous objection rule to deny relief and the discussion on the merits was merely an alternative ruling, even in the absence of an express statement to that effect).

Here, however, the state court's intent is much less clear. While it begins by noting that any merits-based discussion is an alternative ruling, it later disposes of the merits claim as a "fundamental right." 671 So. 2d at 615. Walker correctly notes that the Mississippi Supreme Court has treated alleged comments on the failure to testify as an abridgement of a fundamental right, and has reached the issue even in the absence of a contemporaneous objection. *See, e.g., King v. State*, 857 So. 2d 702, 727 n.9 (Miss. 2003); *Whigham v. State*, 611 So. 2d 988, 995 (Miss. 1992); *Livingston v. State*, 525 So. 2d 1300, 1307 (Miss. 1988); *Griffin v. State*, 504 So. 2d 186, 193 (Miss. 1987); *But see Rogers v. State*, 928 So. 2d 831, 836 (Miss. 2006); *Simmons v. State*, 805 So. 2d 452, 492(Miss. 2001). In light of that history, and the state court's language in this case, this Court holds that the Mississippi Supreme Court reached this issue on the merits and will review the claim in that light.

In order to properly assess Walker's contention, this court must evaluate the comments in the context of the trial. *United States v. Robinson*, 485 U.S. 25, 33 (1988). In *Robinson*, the Supreme Court retreated from the interpretation of *Griffin* urged by the defendant: that *any* direct reference to the defendant's failure to testify violated the defendant's rights under the Fifth Amendment. *Id*. at 31. In *Robinson*, defense counsel argued that his client had not been given an opportunity to explain his side of the case. The prosecutor then argued, "He could have taken the stand and explained it to you, anything he wanted to." *Id*. at 28. The Court found no error, distinguishing *Griffin* as follows:

> It is one thing to hold, as we did in *Griffin*, that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence.

*Id*. at 34.

Here, the first comment was made during the guilt phase of the trial. In his closing argument, Walker's attorney spent a great deal of time pointing out the inconsistencies in Riser's testimony. With regard to the shirt Riser was wearing on the night Konya was killed, defense counsel described its state when Riser and Walker returned to Walker's trailer:

> He's asked what clothes do you have on? The same clothes I had on when I was out there in the woods. Were any of your clothes ripped, torn, any blood or anything like this on any of your clothes? I had a white shirt on. It was Alan's I got from him; I got from him before we went to the Fiesta. It already had a big hole in the side of it, but when we got to the house it had a rip up here. And remember, he told you the rip was up at the top and had this big hole.

> Now this is a man who has borrowed a shirt to go out in. He won't – he didn't take any of his shirts, he said, because he wanted a nice dress shirt. So he goes to Alan's and borrows a shirt because none of his are nice, and he says he borrowed one that had a big hole in it to go out in. Now, is that reasonable in his explanation? Is he reasonable in that? Look how Alan responds to seeing that he's got a big hole.

How did that rip get there?  I'm not sure.  I guess when she come up against me, whenever I pushed her – again, he said he pushed her even though he denied it – when she was crying and all.  Then Alan ended up saying that he would hang on and ripped it even more and tore it off.

Do you remember me asking him about Alan tearing his shirt off of him?  Alan being upset and getting mad because he had the – he got a big hole and a big tear in his shirt, and Alan becoming upset about that and tearing it off of Riser.  Now, if Alan has been out in the woods and Alan knows that Riser has killed the girl and it's been torn during the course of this struggle, okay, why would Alan be upset about his shirt getting torn while Riser was wearing it?  But Riser says that Alan wasn't upset or mad about it.  He was just playing.

The prosecution rebutted this argument as follows:

But regardless of the level of his involvement, whether it's as little as he says or more, the man who was there with him shares equally in that crime.  And according to all the evidence, beyond a reasonable doubt, it wasn't that Alan Riser was the leader.  It was not – excuse me, Jason Riser was the leader.  It was not that Jason Riser was the one who did these deeds.  Every bit of testimony says this was Alan Walker.  Every bit of the forensic evidence is consistent with the account out there at Crystal Lake.

Much was made of the fact that he had a ripped shirt on, a shirt that had been ripped, and, why would one borrow such a shirt.  Well, I didn't get the picture during the trial that Jason Riser had very many options when it came to clothes.  I don't think he was leaving a full closet, and while it would – may have looked like modest attire to others, it was better than he had.  That doesn't create reasonable doubt.  He told how the shirt got ripped, and that is the only testimony – the only reliable information beyond inference and guess and just trying to avoid our duty, that is your certain guide to the correct conclusion.

In analyzing these remarks, the Court must ask two questions:  (1) whether the prosecutor's manifest intent was to comment on the defendant's failure to testify; and (2) whether the jury would necessarily have construed the remark as such a comment.  *Cotton v. Cockrell*, 343 F.3d 746, 751 (5th Cir. 2003).  An affirmative answer to either question means that the defendant's constitutional rights have been violated.  This Court cannot find such a violation here.

55

If there is another, equally plausible reason for the remark, the prosecutor's intent is not manifest. *United States v. Grosz*, 76 F.3d 1318, 1326 (5thCir. 1996). In Walker's case, defense counsel's argument was an attempt to discredit Riser's testimony by inferring that his shirt was torn because he was more involved in Konya's murder than he admitted. The Mississippi Supreme Court found no error, stating:

> It requires a great stretch of the imagination to categorize this part of the prosecutor's argument as a comment on Walker's failure to testify. A reading of the full remarks, in context, makes it plain that the prosecutor was simply summarizing the account of the night's events as told by the State's chief witness, Jason Riser, and rebutting defense efforts to show that Riser was lying.

671 So. 2d at 614. This Court cannot find that this opinion is contrary to, or a misapplication of, *Griffin*, as it was further refined by *Robinson*. Walker's counsel had advanced a theory to the jury, and the prosecutor was only refuting that theory. There is no constitutional violation here.

The second remark was made during the sentencing phase of the trial. Walker was given the opportunity to address the jury, and he said, in part:

> The only really reason I've come up here to talk to you guys is because I've wanted to say something for 11 months now, and I haven't been able to say it. I just wanted to tell the victim's family that I was sorry for what has happened. I wanted to tell Riser's family what has happened, that I'm sorry, and I'm especially sorry for my family. I'm sorry for any family that has to go through this. I really don't know what to say but I'm sorry. If I could do anything to make it better, I would.

The prosecutor responded as follows in his closing argument:

> For 11 months he's wanted to say something. He could have written a letter. He could have called them by phone. If all he had to say was what he said in those less than two minutes he stood here before you, I can see why he hasn't bothered until now, because I didn't hear anything that would change a single mind. You know, when you ask for mercy, first you have to be contrite. You have to repent first. If you saw a repentant man standing before you, you'd take the easy way out and you would give him life.

The Mississippi Supreme Court held that the prosecutor could comment on Walker's statement, to the extent that he argued that his statements were not sufficient mitigation to sway the jury against sentencing Walker to death. *Id*. at 615-16. Additionally, the court noted that the trial court had given a cautionary instruction, which read, "The jury must not consider the fact that the Defendant did not testify as evidence against him and no inference of any kind may be drawn from the fact that the Defendant did not testify in this case." Even if the argument had been improper, the court ruled, the court's instruction remedied the error. *Id*. at 615.

This Court can find no fault with this reasoning, either. As the Supreme Court explained in *Robinson*, it is permissible for a prosecutor to advert to a defendant's silence when it fairly responds to an argument proffered by the defendant. 485 U.S. at 34. Walker voluntarily testified at the sentencing phase of his trial to show the jury that he was remorseful. The prosecutor's comments were intended to show that Walker's statement was not sincere. The Mississippi Supreme Court's decision on this issue is not grounds for habeas relief.

**Claim E:       The prosecution improperly discussed appellate review of the death sentence.**

Walker's claim is predicated on a statement that the prosecutor made during his closing argument on the sentencing phase:

> [T]he constitution also permits death penalty [sic] in capital cases, and the State of Mississippi has required it. And its been through the courts, through the courts, through the appellate courts, and it has been honed and sharpened and brought into keen focus; and only in those few cases are we allowed to come up here and say we have met our burden.

Walker argues that this statement violated the principle announced in *Caldwell v. Mississippi*, 372 U.S. 320, 323 (1985), which prohibits the prosecution from leading the jury "to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with

the appellate court which later reviews the case." There, the jury was told that, if they imposed the death penalty, there would automatically be post-judgment review of the case. The prosecutor argued, specifically, "For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court." *Id.* at 326. The Supreme Court condemned the argument, holding that, by relieving the jury of its "awesome responsibility' in imposing the death penalty, the reliability in sentencing that the Eighth Amendment demands is lost. *Id.* at 329. When the responsibility for determining the appropriate sentence is shifted to an appellate court, the Court held, the defendant loses the constitutional right to present his case against the death penalty to sentencers who would actually see him in person. *Id.* at 330-31. Another reason that the jury should take full responsibility for this decision is that the appellate court must review the trial court's sentence with a presumption of correctness. As the Supreme Court recognized, quoting from the state court's dissenting opinion:

> The [mercy] plea is made directly to the jury as only they may impose the death sentence. Under our standards of appellate review mercy is irrelevant. There is no appellate mercy. Therefore, the fact that review is mandated is irrelevant to the thought processes required to find that an accused should be denied mercy and sentenced to die.

472 U.S. at 331 (quoting *Caldwell v. State*, 443 So. 2d 806, 817 (Miss. 1983) (Lee, J., joined by Patterson, C.J., and Prather and Robertson, JJ., dissenting).

From the jurors' perspective, this shifting of responsibility could result in a jury's returning the death penalty simply to "send a message," confident that any error would be corrected by the appellate court. 472 U.S. at 331. Alternatively, the jury may rightly comprehend that only a death penalty, and not a lesser sentence, would be reviewed. For that reason, the jury might impose the death penalty just to invoke appellate review and delegate its responsibility, thereby resulting in a

58

sentence based on factors "wholly irrelevant to legitimate sentencing concerns." *Id*. at 332.  The certainty of appellate review might also be used as an incentive for reluctant jurors to vote for the death penalty.  *Id*. at 333.  All of these reasons combined to create the possibility of bias toward the death penalty that was at odds with Eighth Amendment standards of reliability.  *Id*. at 341.

The Mississippi Supreme Court initially rejected Walker's claim on procedural grounds, recognizing that he failed to object to this argument.  671 So. 2d at 618.  It addressed the merits of the claim, but clearly on a "alternative" basis.  In its discussion on the merits, the state court discussed both *Caldwell* and an earlier Mississippi case, *Williams v. State*, 544 So. 2d 782 (Miss. 1987).  In *Williams*, defense counsel attempted to impress the jury with its responsibility in considering the death penalty by pointing out that the prosecutor had, in a recent clemency bid by another prisoner, informed the governor that he should not consider clemency because the jury had made the choice to sentence that defendant to death. *Id*. at 794.  The prosecutor responded with a further discussion of the other case, noting that it took seven years and fifty-eight judges for the death penalty to be imposed.  *Id*.  The Mississippi Supreme Court reversed the sentence and remanded the case, noting that established precedent "forbid[s] the mention of appellate review outright."  *Id*. at 801-02.

> In *Walker*, the state court distinguished both *Caldwell* and *Williams*:
>
> Here, the prosecutor merely stated that the constitution protects the accused while it (meaning the constitution) "also permits death penalty in capital cases . . . ."  The prosecutor's use of the word "it" obviously referred to the administration of the death penalty.  He neither mentioned nor inferred that Walker's case would begin a long laborious journey through the appellate court system.

671 So. 2d at 619.  The court characterized the prosecutor's argument as "an argument for implementing the death penalty," rejecting Walker's claim that the district attorney was actually

trying to "mislead the jury into believing that this Court was responsible for determining the appropriateness of the death sentence it was being asked to impose . . . ." *Id*. The court concluded that the issue was procedurally barred for failure to object, but alternatively held that there was no merit to the claim. *Id*.

This Court agrees. The statement at issue here is antipodal to the argument condemned in *Caldwell*. As the Supreme Court has stated, "To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989). Here, the jury was informed that the law on the death penalty had been reviewed and refined by numerous courts *prior* to Walker's trial, resulting in a selection standard that winnowed out of all but a few cases. That argument did not misstate the jury's role and would in no way lessen the jury's sense of responsibility for imposing the death penalty, as it was clearly just a comment on the evolution of death penalty jurisprudence. The jury had sworn to follow the law as given to them by the trial court, so their view of its development was irrelevant to their deliberations. While the jury may have felt more at ease in imposing the death penalty knowing that it was only sought in the most egregious cases, that is a far cry from being told that the responsibility for the decision actually rested in another court. This Court is of the opinion that the Mississippi Supreme Court's opinion was neither contrary to, nor a misapplication of, *Caldwell v. Mississippi*, and Walker is not entitled to habeas relief on this issue.

**Claim F:      The trial court's unconstitutionally vague "avoiding arrest" aggravating factor instruction, coupled with a lack of any evidence that Edwards was killed so as to avoid arrest, made the jury's death penalty determination unconstitutionally vague and arbitrary in violation of the 8th and 14th Amendments.**

Walker complains that the instruction on this aggravator did not explain what proof was necessary to establish it. He contends that, since every killing eliminates a witness to it, the aggravator itself is unconstitutionally vague. According to Walker, any act undertaken after Konya's death to cover up the murder cannot be used to support this aggravator, since those acts do not support a finding that Walker's intent, prior to the murder, was to kill Konya to avoid arrest.

The avoiding lawful arrest aggravating circumstance is codified at Miss. Code Ann. § 99-19-101(5)(e), which states, "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." The jury instructions in the death penalty case only told the jury that they could find, as an aggravating circumstance, "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest." Prior to the sentencing trial, Walker submitted a written objection to that part of the instruction on grounds that it was poorly defined and also on grounds that the proof did not support such a finding.

During the sentencing portion of the trial, the State presented testimony from Robert Burriss, a crime scene technician with the Biloxi Police Department. Burriss processed the scene where Konya's body was found at the request of the Harrison County Sheriff's Department. The district attorney showed him a photograph of Konya's body, as it was discovered, and asked him to describe the scene. Burriss reported that Konya's fingers were burned off, making it impossible to obtain fingerprints. He also testified that her pubic area was burned, which prevented him from getting pubic combings. According to Burriss, the body was not burned uniformly, and these areas were extensively damaged.

During the conference on jury instructions, the trial judge ruled against the Defendant on every argument in his written objection. The State had originally submitted four aggravating

circumstances:  (1) that the murder was committed while the defendant was committing the crime of sexual battery; (2) that the murder was committed for pecuniary gain; (3) that the murder was especially heinous, atrocious, and cruel; and (4) that the murder was committed for the purpose of avoiding a lawful arrest.  The State withdrew the second aggravator, admitting that there was no evidence that the robbery was committed for pecuniary gain.  The judge excluded the third aggravator, apparently over concern about the appropriate limiting instruction.  After agreeing to some editing of the sentencing instruction, defense counsel again objected to the wording of the aggravating circumstances, on grounds of lack of proof and failure to properly define them.  Although Walker offered his own set of instructions, some of which were given, there is no indication that he offered a limiting or defining instruction on either aggravator.

In his closing argument, the prosecutor said:

> What about the prevention of the lawful arrest?  Well, ladies and gentlemen, that's why Mr. Burriss came back to testify, because we believe that the burning of that body was to impede law enforcement.  We believe that the purpose of burning that body was to impede the ability to identify the body or to identify evidence that could have been in the vaginal area or any other area of the body.

In response, defense counsel argued, with regard to this aggravator:

> Two, the capital offense was committed for the purpose of avoiding or preventing a lawful arrest.  Now, Riser said – and whether you believe he was with Riser or whether Riser did this himself or whether Walker did what Riser said, that they had to kill the girl, that Walker said it; that they had to kill her and then that they had to burn her and hide the evidence.  So, believing that, it would be easy for me to see why you would believe that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest.

Walker raised this issue in his direct appeal, arguing that neither Burriss's testimony nor the photograph should have been admitted as probative evidence of this aggravator, as they reflected events that occurred after the killing.  The Mississippi Supreme Court rejected that argument,

holding, "[W]ithin the broad definition of a killing committed for the purpose of avoiding or preventing a lawful arrest are included those killings committed in order to conceal the killer's identity, to cover his tracks, and to avoid detection or arrest." 617 So. 2d at 610. Burriss's testimony and the photograph of Konya's body were admissible because they "revealed the extent of the victim's burns and illustrated that the areas most likely to reveal the killer's identity were crudely destroyed." *Id.*

Walker also argued that the instruction on the aggravator was unconstitutionally vague and that, because every murder necessarily eliminates a witness to a crime, it failed to adequately channel the jury's consideration of the death penalty. *Id.* at 611. He argued that a limiting instruction should have been given. Citing earlier precedent, the court held that a limiting instruction was not necessary. *Id.* (citing *Hansen v. State*, 592 So. 2d 114, 152 (Miss. 1991) (holding that the jury could consider the aggravating circumstance "if there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest . . . ." ))

As to the evidentiary support for the aggravator, the court reciting the following facts:

Walker began asking the victim if she wanted to live or die from the moment the group arrived at the lake. He expressly informed Riser they were "going to have to kill" Edwards. Walker choked Edwards to the point that she was left gasping for breath, then "stomped" the back of her head and neck seven or eight times. Walker tried to drown Edwards. Riser discovered Edwards was still breathing, so Walker put her face under water again. Walker then decided the body would have to be burned, to the extent that the men left the scene, located a gas can, parked their car in a friend's driveway and waited to make certain no one was there before returning with the gas can to the site of the body. Walker expended considerable effort to ignite the body. In the process, Walker stopped to hide the dress the victim had been wearing behind his trailer and warned Riser he would be killed if he ever told anyone of the night's events.

63

     The jury could also consider that the victim was a nineteen year old female, unclothed, in an area from which there was no foreseeable means of escape and with no means to speak of with which she could defend herself from Walker and Riser. Although she offered some resistance to the attacks upon her, the testimony indicated she cooperated for the most part with Walker's orders. Yet Walker still found it necessary to kill Edwards and finally to burn her body utilizing gasoline. The most severely burned areas were her fingers and pubic area, thereby prohibiting fingerprints, fiber and pubic hair comparison.

*Id*. at 611-12.  Based on this evidence, the court concluded that there was no "logical reason for Edwards' killing by Walker other than to eliminate her as a witness, prevent identification of Edwards and prevent scientific comparison of evidence linking Walker to the crime . . . ." *Id*. at 612. Thus, the court found, there was ample evidence on which the jury could find that avoiding detection and arrest was a substantial reason for the murder. *Id*.

     Generally, the federal court's role in reviewing a state court's finding of an aggravating circumstance is a review of whether the aggravator itself is constitutionally defined. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Barclay v. Florida*, 463 U.S. 939, 947 (1983) ("Our review of these findings [on aggravating circumstances] is limited to the question whether they are so unprincipled or arbitrary as to somehow violate the United States Constitution . . . ." ).  Walker cannot obtain habeas relief on this issue because Mississippi's construction of this aggravating circumstance has kept it within constitutional boundaries.  *Gray v. Lucas*, 677 F.2d 1086, 1110 (5th Cir. 1982) ("The [Mississippi Supreme] court has construed this aggravating circumstance to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony."); *Evans v. Thigpen*, 631 F. Supp. 274, 283 (S.D. Miss. 1986); *Wiley v. Epps*, No. 2:00cv130PA, 2009 WL 3747196 at *6-8 (N.D. Miss. Nov. 5, 2009).

     That being the case, Walker's argument is reduced to the claim that the evidence was insufficient to satisfy the jury's finding on this aggravator. The Court conducts its review of that

argument under the familiar rationale of *Jackson v. Virginia*, 443 U.S. 307 (1979). The relevant question is, "[W]hether, after viewing the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 324. The standard that must be met to show that the evidence was insufficient to sustain the jury's verdict is high, because, as the United States Supreme Court has explained, "Federal Courts are not forums in which to relitigate state trials." *Autry v. Estelle*, 464 U.S. 1, 3 (1983).

Mississippi has construed this aggravating circumstance "to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony." *Gray*, 677 F.2d at 1109-10. The evidence must be sufficient for the jury to "reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing." *Hansen v. State*, 592 So. 2d 114, 153 (Miss. 1991) (citing *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983)). The evidence relied on by the Mississippi Supreme Court was quoted earlier. Other state court cases have found the existence of this aggravator on far fewer facts. *See, e.g., Ross v. State*, 954 So. 2d 968, 1010 (Miss. 2007) ("Because Ross knew Yancey personally, it was reasonable for a jury to conclude that Yancey was murdered to conceal either the identity of the killer or to avoid investigation for the robbery."); *Thorson v. State*, 895 So. 2d 85, 99 (Miss. 2004) (holding that the aggravator was supported where, after raping his victim, the defendant wiped down the car, asked the victim whether she would tell anyone what happened, decided that he did not believe her and killed her); *Chase v. State*, 645 So. 2d 829, 857 (Miss. 1994) (holding that the aggravator could be found where defendant used gloves, parked his vehicle in a wooded area about

200 yards from the victim's home, refused to get out of his car at a service station because he had blood on his clothes, and later threw his clothes away).

Walker argues strenuously that the actions he took after the murder are not probative of his state of mind at the time the murder was committed. This Court disagrees. "Intent, being a state of mind, is rarely susceptible of direct proof, but ordinarily must be inferred from the acts and conduct of the party and the facts and circumstances attending them which reasonably indicate them to the minds of others." *Moore v. State*, 344 So. 2d 731, 735 (Miss. 1977). Likewise, "Defendant's intention is manifested largely by the things he does." *Newburn v. State*, 205 So. 2d 260, 265 (Miss. 1967)

The *Jackson* analysis focuses on the sufficiency of the evidence. Here, the evidence presented at trial showed that Walker took off his shirt prior to getting into the truck with Konya and Riser. He began asking her at the beginning of the assault whether she wanted to live or die. After Konya was raped and otherwise assaulted, Walker told Riser they were going to have to kill her. Walker's determination to kill Konya is evidenced by the length of the attack and the various methods he used until he was ultimately successful. After Konya was dead, Walker burned her body, paying special attention to areas from which law enforcement might be able to identify her or him, and hid her clothing. A reasonable juror could have found that the acts that Walker undertook to avoid arrest began with his announcement to Riser that they were going to have to kill Konya – if not earlier – and continued post-mortem to destroying her body and hiding her personal effects.

The Mississippi Supreme Court's decision on this issue is neither contrary to, nor an unreasonable application of, clearly established federal law. Mississippi's interpretation of this aggravator has sufficiently narrowed its application to murders where it can be shown that avoiding

arrest was a substantial reason for the killing; therefore, its application is not arbitrary or capricious. Moreover, the evidence in this case was sufficient to permit a reasonable juror to find that a substantial reason for Konya's murder was Walker's desire to avoid arrest.  There are no grounds for habeas relief in this issue.

**Claim G:       Petitioner's rights under the Sixth and Fourteenth Amendments were violated, in that he was deprived of the effective assistance of counsel at both the guilt and penalty stages of the trial.**

This claim has many sub-parts, each of which will be discussed separately below.

**1.       Trial counsel was ineffective for failing to preserve the denial of Petitioner's motion for a continuance (after it was announced that co-defendant Riser would plead and testify against Petitioner) for appellate review.**

Both Walker and Riser had given statements shortly after their arrests for Konya's murder. Walker's statement was suppressed.  On the Saturday prior to the beginning of Walker's trial on Monday, Riser accepted a plea bargain in return for testifying against Walker.  Walker's attorneys were notified at that time.  On the morning of trial, Riser pleaded guilty before the trial judge, who sentenced him to life imprisonment.  At that point, Walker's lawyer asked for the opportunity to interview Riser.  During the discussion of whether the court could order Riser to talk with them, Walker's counsel admitted that they received Riser's statement, along with other discovery, at Walker's arraignment.  Ultimately, Riser informed the court that he did not wish to speak to defense counsel.

Walker's attorneys then moved for a continuance, based on the late notice of Riser's testimony, "so that we might more adequately prepare for his testimony or to – by way of motion in limine, to preclude him from testifying during the course of this trial . . . ."  The trial court denied the motion, based on the length of time that counsel had possessed Riser's statement, stating:

That being given, even though it's not necessary that counsel would in every event expect that there would be a sudden change from that of the defendant to a cooperating witness, I still feel that that was probably something that was considered from the very beginning, that either one of the defendants could very well change their position if offered an opportunity to do so.

The transcript of the presentation of testimony and evidence in the guilt phase of Walker's trial consumed just over 450 pages of the record.  Riser's testimony accounted for 230 of those pages; his cross-examination was 164 pages long.  Counsel questioned him thoroughly about every event of the night of Konya's death, painstakingly asking about every detail mentioned in his statement. Almost the entirety of counsel's closing argument, which was not completed within the hour originally requested, was used to discredit Riser's testimony, based on the evidence obtained during cross-examination.

Walker's Motion for a New Trial was brief, stating, in pertinent part, "The Court erred each time it overruled each of the Defendant's pretrial motions."  In his argument on the motion, however, counsel made the following statement:

> Judge, there are just two points that I wanted to argue.  The case is not that old, and I'm sure it's fresh in the Court's mind; and I potentially felt the two strongest potential chances of reversing the case, at least as far as the guilt phase is concerned, the first was the failure to grant a continuance after the State over the weekend – or to at least sustain our motion in limine as to the testimony after the State over the weekend decided to use the testimony of the codefendant and worked a plea arrangement out with the codefendant; and that put us in the position of going to – having to change our defense, so to speak, at the last moment.

> While it's true that obviously that when you have a codefendant, particularly in capital murders, you frequently expect deals to work out; that is, plea bargains to be made for testimony of the one that's less culpable, perhaps; but in this particular case, Friday afternoon of that week at that last moment Mr. Caranna indicated even then that he was not going to use the testimony of the codefendant or let him plead to any reduced time or lesser type offense; and of course they did call me over the weekend.

> [A discussion followed over whether it was Saturday or Sunday.]

68

Over the weekend they obviously advised me of that; and we felt like that created a situation where we had to change our defense at the last moment; obviously with the suppression of the confession, put us in a strong position, stronger obviously than prior to that time, and we had been worrying about the confession and defending that; but then when we had the live witness suddenly appear against him, that changed things. We felt like we should have been granted a continuance or motion in limine. Of course the Court did grant us an opportunity to speak with him; and we felt like that was error so far as requiring us to go forward in that fashion.

On direct appeal, this issue was raised as a trial error, for failure to grant the continuance. The Mississippi Supreme Court held, initially, that Walker had defaulted this claim for failing to raise it in the same manner in the trial court as he did on appeal. While the grounds he argued in the trial court are detailed above, at the supreme court, he argued that he needed additional time to gather information to impeach Riser or reveal inconsistencies in his story and to study his mental capacity. (At trial, Riser testified that he was a slow learner, and this fact was mentioned by the prosecution in closing argument as support for Walker's role as the ringleader.) Having made that ruling, however, the court also addressed the merits.

Citing earlier cases, the court held that the issue was whether counsel had a reasonable opportunity to prepare to confront the evidence at issue, which depends upon the facts or circumstances of each case. 671 So. 2d at 592 (citing *Taylor v. State*, 582 So. 2d 1003, 1006 (Miss. 1991); *Reuben v. State*, 517 So. 2d 1383 (Miss. 1987)). Addressing Walker's case, the court noted that Walker obtained Riser's statement two months prior to trial. Additionally, since Riser refused to speak with Walker's attorneys, additional time was not needed for that purpose. 671 So. 2d at 592. Other factors considered by the court were: (1) Walker had not specified what tasks his attorneys would have performed if a continuance had been granted; (2) there was no discovery violation, as the State informed Walker's attorneys of Riser's plea as soon as it was accepted; and (3) Walker's attorney extensively cross-examined Riser at trial – according to the State, that examination lasted

69

four hours.  *Id*. at 592-93 ("Counsel's cross-examination does not indicate that he was unprepared."). Based on all of these circumstances, the state court held that there was no error in denying the motion for a continuance.

Walker brings this issue to this Court as a claim of ineffectiveness of counsel,  That issue was raised in state court in his petition for post-conviction relief, claiming that his counsel was deficient in failing to properly raise the grounds for his motion for a continuance in the motion for a new trial and also in failing to show how the denial of a continuance impaired his defense.  The Mississippi Supreme Court began its discussion by noting that, in its earlier opinion, it found the substantive claim barred, but continued, alternatively, to address it on the merits, quoting as follows:

> Under the facts presented:  where no discovery violation occurred, where the defense was afforded two days to review the fifty five minute videotape and accompanying typed transcript of Riser's statement (provided two months before trial); where extensive cross examination was conducted, and where there is no indication the case would have been handled differently had more time been allowed, the denial of a continuance was not in error.  This assignment of error is procedurally barred and alternatively without merit.

*Walker v. State*, 863 So. 2d 1, 12 (Miss. 2003) (quoting 671 So. 2d at 593).  Applying the familiar two-part test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the state court recognized that Walker had to establish both deficient performance and a reasonable probability that the deficient performance affected the outcome of his trial.  863 So. 2d at 12-13.  Even assuming deficient performance, however, based on its findings in Walker's direct appeal, the court held that Walker had not shown that the performance affected the outcome of his trial.  *Id*. at 13.

Walker's counsel now argues that this finding that the denial of a continuance did not prejudice Walker was unreasonable.  The addition of Riser's testimony, he argues, changed the complexion of his case.  "Overnight, the case changed from a case of weak circumstantial evidence

70

with a good chance of securing an acquittal to a case with detailed eyewitness testimony from an accomplice." This Court disagrees with Walker's assessment. Even without Riser's testimony, this was not a weak circumstantial case. The last time Konya was seen alive by anyone other than Riser and Walker, she was in their company. Walker took his shirt off and left it in Trina Perry's truck. Konya's body was found a short distance from the place where Trina left them, which was also close to where both Riser and Walker lived. Riser and Walker offered to take Trina by a fire that was burning at the same spot where Konya's body was found, although they did not want to get too close to it. Finally, Konya's dress was found at Walker's home.

Additionally, the question is not whether the state court's opinion was "unreasonable," but whether it unreasonably applied, or was contrary to, clearly established federal law. Walker cites four Supreme Court cases on the issue of a continuance. In *Ungar v. Sarafite*, 376 U.S. 575 (1964), the Court denied relief on the direct appeal from a criminal contempt conviction in which the defendant had sought a continuance before his contempt trial. As recognized by Walker in his argument, the Court held that there was "no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." *Id*. at 590. There, the defendant was given five days' notice of his contempt trial, which the Court held "was not a constitutionally inadequate time to hire counsel and prepare a defense to a case in which the evidence was fresh . . . ." *Id*. The Court recognized that the issue was "arguable;" however, it held, "But the fact that something is arguable does not make it unconstitutional. Given the deference necessarily due a state trial judge in regard to the denial or granting of continuances, we cannot say these denials denied Ungar due process of law." *Id*. at 591.

In contrast, in *Chandler v. Fretag*, 348 U.S. 3 (1954), the defendant, who was uneducated, was not aware until the day of trial that he would be charged both with housebreaking and larceny and as a habitual offender.  He was willing to plead guilty to the housebreaking and larceny charges, but asked for a continuance to obtain counsel on the habitual offender charge.  *Id*. at 6.  The court refused, and the defendant was sentenced to life imprisonment.  The Supreme Court granted habeas relief, holding that the proceedings had violated the defendant's right to be heard through counsel. *Id*. at 10.  A refusal to hear a defendant's argument through counsel would, in a case such as this one, "be a denial of a hearing, and, therefore, of due process in the constitutional sense."  *Powell v. Alabama*,  287 .S. 45, 69 (1932).  Failure to give a defendant reasonable opportunity to hire and consult with counsel amounts to a denial of the right to be heard through counsel and is, therefore, a deprivation of due process.  *Chandler*, 348 U.S. at 10.

Walker also cites *Morris v. Slappy*, 461 U.S. 1 (1983), where the Court held that a substitution of counsel six days' prior to trial did not mandate a continuance.  "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel"  *Id*. at 11.  Explaining the problems inherent in "assembling the witnesses, lawyers, and jurors at the same place at the same time," the Court held that trial courts must be granted "broad discretion" on the decision to grant or deny a continuance. *Id*.  That discretion is abused only when the refusal to grant a justifiable request for delay is "unreasoning and arbitrary."  *Id*. at 11-12.  The Court reached a similar conclusion in *Nilva v. United States*, 352 U.S. 385, 395 n.10 (1957), where a defendant was advised by the court that it found his testimony "evasive or false, or both" on April 15, a show cause order was issued on April 23, and a contempt hearing was held on April 27.  Under those circumstances, the Court held, "and in view of

72

the wide discretion on such matters properly vested in the trial court," the defendant had adequate time to prepare his defense. *Id*. at 395.

Finally, Walker refers to *Lankford v. Idaho*, 500 U.S. 110 (1991), and its discussion on due process. In *Lankford*, the issue was whether defense counsel was adequately notified prior to a sentencing hearing that the judge was considering the death penalty. There, the defendant and his older brother were involved in the deaths of a man and wife. Lie-detector tests convinced the prosecutor that the older brother was primarily responsible for the crimes and was the actual killer of both victims, which persuaded the prosecution to announce that it would not seek the death penalty. *Id*. at 112. The jury was not told of those tests, and Lankford was convicted of two counts of first degree murder.

The sentencing hearing was postponed until after the older brother's trial. As stated above, the State announced that it would not recommend the death penalty as to either count. At the sentencing hearing, the prosecutor repeated his recommendation that the death penalty not be imposed, and the only argument between counsel was the length and nature of the sentence. *Id*. at 116-17. At the conclusion of the hearing, the court mentioned that death was one of the options he could consider. The judge postponed a final decision to the next week, at which time he sentenced Lankford to death. In so doing, the judge stated that, in his opinion, the brothers were equally culpable. *Id*. at 117.

The Supreme Court held that the sentence violated Lankford's due process rights. In so doing, the Court emphasized that defense counsel would have presented an entirely different argument during the sentencing hearing if she had understood that the death penalty was a possibility, despite the prosecutor's recommendation against it. *Id*. at 122. In particular, she could have

73

presented an argument based on his participation under the standard of *Enmund v. Florida*, 458 U.S. 782 (1982).  Such a presentation, which would have included the results of the lie detector test, might have influenced the judge's decision.  *Id.* at 123-24.  The Court concluded that the judge's failure to announce his consideration of the death penalty "had the practical effect of concealing from the parties the principal issue to be deciding at the hearing."  *Id.*  The Court continued, "Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure."  *Id.*  The absence of such notice "created an impermissible risk that the adversary process may have malfunctioned in this case."  *Id.* at 127.

In this case, the Mississippi Supreme Court found that Walker's counsel was not denied a reasonable opportunity to prepare his defense.  671 So. 2d 581.  In this Circuit, the standard for habeas review of a refusal to grant a continuance is high.  "When a denial of a continuance is the basis for a habeas petition, the petitioner must show an abuse of discretion that was so arbitrary and fundamentally unfair as to violate the constitutional principles of due process."  *Newton v. Dretke*, 371 F.3d 250, 255 (5th Cir. 2004).  Consideration of whether the denial met that standard must be based on "the circumstances present in every case . . . ."  *Ungar v. Sarafite*, 376 U.S. at 589.  Based on the circumstances of this case, this Court cannot conclude that the denial of a continuance here was sufficiently arbitrary and fundamentally unfair as to merit habeas relief.  Walker has not demonstrated that the opinion of the Mississippi Supreme Court on the substantive issue of failure to grant a continuance was contrary to, or an unreasonable application of, any of the Supreme Court cases he cites.

Likewise, the court's conclusion that trial counsel's failure to argue every conceivable reason for granting a continuance did not amount to ineffectiveness does not entitle Walker to habeas relief,

as he has not shown that he was prejudiced thereby.  He has not established that there is a reasonable probability that the verdict in this case would have been different if his counsel had been given additional time to "obtain information to impugn Riser's credibility, find impeaching background information, or investigate Riser's limited mental capacity."  Absent a showing of prejudice, Walker cannot show ineffectiveness.  *Premo v. Moore*, 131 S. Ct. 733, 739 (2011).  For all of these reasons, habeas relief is not available on this issue.

2.     **Counsel was ineffective for failing to offer lesser included offense instructions.**

**and**

5.     **Counsel was ineffective for failing to object to the granting of S-2 on "heat of passion" manslaughter, and for failing to offer a manslaughter instruction as was don in *Butler v. State*, 608 So. 2d 314 (Miss. 1992).**

Although Walker admits that he was given an instruction about the lesser offenses of murder and manslaughter, committed either in the heat of passion or resulting from culpable negligence, he argues that he was entitled to another instruction on manslaughter.  According to Walker, he was entitled to an instruction based on Miss. Code § 97-3-27 (1972), which provides:

> The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

Walker actually makes two arguments in this regard.  First, he asserts that he was entitled to a manslaughter instruction based upon the statute quoted above, and the failure to request that instruction constituted ineffectiveness.  Second, he claims that, had counsel requested this instruction, he could have made an Eighth Amendment argument that imposition of the death penalty where a murder is committed during a sexual battery was arbitrary.

75

The Mississippi Supreme Court considered and rejected these arguments on direct appeal, on several grounds.  First, the court noted that Walker had failed to object to the manslaughter instruction that was given at trial, nor had he offered an instruction of his own.  *Walker v. State*, 671 So. 2d at 596.  Having made that observation and found the argument barred, the court continued, alternatively, to consider the merits of the claim.

Walker relied in state court, as he does now, on the case of *Butler v. State*, 608 So. 2d 314 (Miss. 1992).  The Mississippi Supreme Court found *Butler* inapposite, for reasons with which this Court agrees.  *Butler* involved the death of a child from internal injuries that could have been caused by abuse, and the child's mother was convicted of capital murder and sentenced to death.  The mother gave conflicting stories, including a claim that he had fallen out of his stroller.  She was convicted of capital murder under Miss. Code Ann. § 97-3-19 (2)(f) (Supp. 1991) which permits the charge where the murder was committed "with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child . . . ."  This section did not require a finding of intent.  Butler requested an instruction under the manslaughter statute quoted above, and the court recognized, in the absence of a requirement of intent, the capital murder and manslaughter statutes were virtually identical.  Thus, the court held, Butler was sentenced to death "when there was another criminal statute for the same offense with the maximum penalty of twenty years imprisonment.'  608 So. 2d at 319.  Although the case was reversed on different grounds, the court held that, on remand, Butler would be entitled to the manslaughter instruction.

The Mississippi Supreme Court was not convinced that the reasoning of *Butler* should be applied to Walker's case.  As that court has held, "[T]he accused is entitled to a lesser offense instruction only where there is an evidentiary basis in the record therefor."  *Mease v. State*, 539 So.

76

2d 1324, 1330 (Miss. 1989).  Even though manslaughter is a lesser-included offense to a charge of

murder, a manslaughter instruction "should be refused when the evidence supports only a verdict of

murder." *Anderson v. State*, No. 2010-KA-01052-SCT, 2012 WL 309320 at \*4 (Miss. Feb. 2, 2012)

(citing *Ruffin v. State*, 444 So. 2d 839, 840 (Miss. 1984)).  Likewise, such an instruction should not

be granted indiscriminately or on the basis of speculation.  *Id.*  Quoting from an earlier case, the court

set out its evidentiary standard:

> [A] lesser included offense instruction should be granted unless the trial judge–and
> ultimately this Court–can say, taking the evidence in the light most favorable to the
> accused and considering all reasonable favorable inferences which may be drawn in
> favor of the accused from the evidence, that no reasonable jury could find the
> defendant guilty of the lesser included offense (and conversely not guilty of at least
> one essential element of the principal charge).

*Id.* at 1330 (quoting *Harper v. State*, 478 So. 2d 1017, 1021 (Miss. 1985)).

In *Butler*, the evidence before the jury was not conclusive as to how the child's injuries

occurred.  Here, there was detailed testimony that Walker choked Konya, jumped on her neck while

she was prone, and drowned her.  For Walker to have been entitled to the manslaughter instruction

he now offers, evidence would have to be presented to show that Konya was murdered "without

malice."  Malice can be defined as "[t]he intentional doing of any wrongful act in such manner and

under such circumstances as that the death of a human being may result therefrom . . . ."  *Berry v.*

*State*, 575 So. 2d 1, 12 (Miss. 1990) (quoting *Garrett v. State,* 749 S.W.2d 784, 789 n.7 (Tex. Crim.

App. 1986)).  Malice is implied "whenever a death occurs as a result of some willful act by the

accused under circumstances where he knows the act is likely to cause death or serious bodily

injury."  *Id.*  The existence of malice may be inferred from the manner in which the victim was killed.

*Berry*, 575 So. 2d at 12.  As the state court recognized in this case, "There is not a shred of testimony

or other evidence which might allow a reasonable juror to find beyond a reasonable doubt that

Walker did not intend to kill Konya Edwards." 671 So. 2d at 599.  Even without Riser's testimony, the condition of Konya's body when it was discovered, as well as the results of the medical examiner's autopsy, preclude any suggestion that her death was other than intentional.  *See Holland v. State*, 587 So. 2d 848, 870-71 (Miss. 1991) (holding that manslaughter instruction was not warranted where autopsy report revealed that the victim's death could not have been accidental). Because Walker was not entitled to a manslaughter instruction under § 97-3-27, his attorney was not ineffective in failing to request it.  *Paredes v. Quarterman*, 574 F.3d 281, 291 n.13 (5th Cir. 2009) (citing *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1993) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.")


Walker also argues that Mississippi's statutory scheme violates the Eighth Amendment by not distinguishing death-eligible killings involving sexual battery from those that are not death eligible, and that his trial counsel was ineffective in failing to preserve this argument by requesting a manslaughter instruction consonant with § 97-3-27.  He did not raise this argument in his post-conviction petition, and it is, therefore, unexhausted and barred from review.  Even if Walker had made this argument, however, it would not have entitled him to relief.

Under Mississippi law, the crime of capital murder while in the commission of a sexual battery may be committed "with or without any design to effect death."  §97-3-19(e).  Mississippi's homicide statutes use the terms "design," "malice," and "intent" interchangeably.  *Sands v. State*, 62 So. 3d 374, 378-79 (Miss. 2011).  As this Court understands Walker's argument, he contends that, had he not intended to kill Konya Edwards, he still could have been charged and convicted of capital

78

murder; i.e., murder in the commission of sexual battery.  At the sentencing phase, the same crime could have been used as an aggravating circumstance, thereby making him eligible for the death penalty.  Miss. Code Ann. § 99-19-101(5)(d).

The statute that sets forth the factors to be considered in imposing the death penalty also, however, requires the jury to make at least one of the following findings – that the defendant actually killed the victim, that he intended to kill the victim, that he attempted to kill the victim, or that he contemplated that lethal force would be used.  *Enmund v. Florida*, 458 U.S. 782 (1982), as codified in Miss. Code Ann. § 99-19-101(7) (1972 & Supp. 2007).  Under Walker's theory, this statute could have been imposed on Walker upon a finding that the defendant actually killed his victim, still without a finding of intent.  Thus, he contends, any evidence that he did not intend to kill could have been ignored by the jury during sentencing, because it did not have to find intent to kill to return the death penalty.[7]  According to Walker, this scenario would have made the imposition of the death penalty in his case arbitrary and capricious, in violation of the Eighth and Fourteenth Amendments. *Zant v. Stephens*, 462 U.S. 862 (1983); *Gregg v. Georgia*, 428 U.S. 153 (1976); and *Furman v. Georgia*, 408 U.S. 238 (1972).

Walker's argument is unpersuasive, as it depends upon a hypothetical scenario that may never occur.  *See Robinson v. United States*, 324 U.S. 282, (1945) ("We do not know what provision of law, constitutional or statutory, gives us power wholly to nullify the clearly expressed purpose of Congress to authorize the death penalty because of a doubt as to the precise congressional purpose

---

[7]Although Walker did not make the same argument that he offers here, he did argue during post-conviction that Mississippi's statutory scheme was unconstitutional in failing to require a finding of intent, in derogation of *Tison v. Arizona*, 481 U.S. 137 (1987).  The Mississippi Supreme Court found that the argument was barred, and, alternatively, without merit because the jury made a finding of intent in his case.

in regard to hypothetical cases that may never arise.")  The situation is hypothetical, as to Walker's case, because the jury found intent.  The jury in Walker's case made two of the requisite *Enmund* findings  – that Walker intended that the killing of Konya Walker take place and that Walker contemplated that lethal force would be employed.  Because of these findings – particularly, the finding that he intended to kill – this argument does not entitle Walker to habeas relief.

The issue of whether Mississippi's death penalty law violated the Eighth Amendment by permitting that sentence without a finding of intent was raised in the Fifth Circuit in *Gray v. Lucas*, 677 F.2d 1086, 1103 (5th Cir. 1982).  Although it characterized the argument as posing "a difficult question of constitutional law, " the court held that it need not be resolved, since the jury had found that Gray "purposefully" killed his victim to avoid capture.  That court reached the same decision on rehearing, concluding that, though the argument was "ticklish," the finding that Gray killed his victim to avoid arrest was, necessarily, a finding of intentional murder.  685 F.2d 139, 140 (5th Cir. 1982).  *See also Edwards v. Thigpen*, 595 F. Supp. 1271, (S.D. Miss. 1984).

Moreover, the situation is unlikely to recur because the statute was amended in 1994 to eliminate this scenario.  The statute now provides:

> The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except those felonies enumerated in Section 97-3-19(2)(e) and (f), or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

Walker was charged and tried under the old version of the statute, in which sexual battery was not excluded from the manslaughter statute.  The new manslaughter statute excludes every one of the underlying offenses, including sexual battery, that can elevate a murder charge to a capital murder charge.

The Supreme Court has held that states must have capital sentencing schemes that narrow the class of persons eligible for the death penalty, thus distinguishing those defendants from others found guilty of murder. *Lowenfield*, 485 U.S. at 244. Most states narrow at the sentencing phase, where the jury must find at least one aggravating circumstance, but the narrowing function can also occur during the guilt phase, by defining what constitutes a capital murder. *Brown v. Sanders*, 546 U.S. 212, 216 n. 2 (2006); *Jurek v. Texas*, 428 U.S. 262, 269 (1976). There is no requirement in the law that the narrowing function occur twice, so long as Mississippi's statutory scheme performed a narrowing function at either phase. In Walker's case, the narrowing occurred at the sentencing phase, where the jury found that he intended to kill Konya Edwards. Under the new statute, the narrowing will also occur at the indictment stage, since murder during the course of sexual battery can no longer be considered as manslaughter. For these reasons, there is no merit to Walker's argument on this issue. Because he was not entitled to the manslaughter instruction, and because it would not have enabled him to make his Eighth Amendment argument, his attorney was not ineffective in failing to offer the instruction. The Mississippi Supreme Court's decision that its holding on the substantive merits of this claim precluded a finding that his counsel was ineffective is neither contrary to, nor an unreasonable interpretation of, clearly established federal law. Walker is not entitled to habeas relief on this issue.

> **3.      Trial Counsel was ineffective for failing to object to Instruction S-9 on Aiding and Abetting.**

Walker argues that his attorney was ineffective in failing to object to the following instruction:

> The Court instructs the Jury that each person present at the time and consenting to or encouraging the commission of a crime, and knowingly, wilfully and

feloniously doing any act which is an element of the crime or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hands committed the whole offense; and if you believe from the evidence, beyond a reasonable doubt, that the Defendant, ALAN DALE WALKER, did wilfully, unlawfully, knowingly and feloniously do any act which is an element of the crime with which he is charged, namely Capital Murder, or immediately connected with it, or leading to its commission, then and in that event, you should find the Defendant, ALAN DALE WALKER, Guilty of Capital Murder.

According to Walker, this instruction permitted the jury to find him guilty of capital murder without finding that he intended to commit the underlying felony.  Walker had complained about the substance of the instruction in his direct appeal, and the Mississippi Supreme Court denied relief, holding that the claim was procedurally barred.  671 So. 2d at 606.  In his post-conviction petition, Walker raised the claim in the context he argues it here, that his counsel was ineffective.

In its post-conviction opinion, the Mississippi Supreme Court discussed the extensive history of challenges to this instruction.  863 So. 2d at 14-16.  The court noted that it had, in numerous instances, held that any error was harmless when all of the instructions given to the jury, read as a whole, accurately stated the law.  *Id*. at 14-15 (citing *Bell v. State*, 725 So. 2d 836, 847-48 (Miss. 1998); *Carr v. State*, 655 So. 2d 824, 832-33 (Miss. 1995); *Simmons v. State*, 568 So. 2d 1192, 1203-04 (Miss. 1990); *Kelly v. State*, 493 So. 2d 356, 359 (Miss. 1986); *Malone v. State*, 486 So. 2d 360 (Miss. 1986); *Bullock v. State*, 391 So. 2d 601, 609 (Miss. 1980); *White v. State*, 330 So. 2d 877, 879 (Miss. 1976)).  In *Hornburger v. State*, 650 So. 2d 510, 514-15 (Miss. 1995), the court held that a virtually identical instruction was improper.  "However, when read together, these instructions adequately informed the jury of the law making the improper instruction a harmless error."  *Id*. at 515.  In contrast, the court found this instruction to be reversible error in cases where its defects were not cured by other instructions given to the jury.  *Lester v. State*, 744 So. 2d 757, 760 (Miss. 1999); *Berry v. State*, 728 So. 2d 568, 571 (Miss. 1999).  Ultimately, in *Milano v. State*, 790 So. 2d 179, 185

(Miss. 2001), the court prospectively adopted the Fifth Circuit's Pattern Jury Instruction on Aiding and Abetting, in order to avoid future confusion.  In doing so, however, the court still did not reverse Milano's conviction, finding that "read with the other instructions which properly stated the law and required the jury to find that all elements of the offense had been proven before Milano could be found guilty, this error was harmless."  *Id*.

Having summarized its jurisprudence on this issue, the state court reviewed S-9, as given in Walker's case, in conjunction with C-1, C-20, and S-1 and concluded, "Reading the above instructions . . . as a whole, the jury was fully informed that every element of the capital murder had to be proved by the State."  863 So. 2d at 16.  Turning to Walker's *Strickland* claim, the court noted, "At the time of trial Instruction S-9 was considered a proper statement of the law.  Trial counsel is not required to be prescient, but only to know the law as it exists at the time of trial."  *Id*.  Since Walker could not show deficient performance based on his attorney's failure to predict a change in the law, he could not establish an essential element of the *Strickland* test.  Moreover, the court held, because giving the instruction was "at most harmless error," Walker could not establish that he was prejudiced by his counsel's performance.  *Id*.  For these reasons, he could not succeed on his ineffectiveness claim.

Walker has not demonstrated in his petition how this decision was contrary to, or an unreasonable application of, clearly established federal law.  Instead, he simply re-argues the merits of his ineffectiveness claim.  According to Walker, his attorney's performance was deficient because he had an erroneous understanding of the law, regardless of whether the Mississippi Supreme Court had actually recognized that Instruction S-9 was reversible error, because that claim had been "percolating" for some time.  The Court rejects this argument, for two reasons.

83

First, Walker reads too much into the Mississippi Supreme Court's decisions on instructions similar to S-9. He has not shown that the state court has ever reversed a case in which this instruction was used, except where no other instructions were given that would give the jury a complete understanding of the State's burden of proof. *See, Walker*, 863 So. 2d at 15-16. In fact, in a post-Milano case, the Mississippi Supreme Court again confronted an instruction similar to the one used in Walker's case, but refused to reverse the conviction because the instructions, taken as a whole, adequately instructed the jury on the law. *Wilson v. State*, 967 So. 2d 32, 40-41 (Miss. 2007). In so doing, the court noted that it reached the same result in other post-*Milano* cases. *Id*. (citing *Duncan v. State*, 939 So. 2d 772, 779-81 (Miss. 2006); *Brengettcy v. State*, 794 So. 2d 987, 997-98 (Miss. 2001)). This Court recognizes that the state court, in Walker's case, said that, at the time of trial, Instruction S-9 was considered a proper statement of the law. The Court does not construe that statement as meaning that the instruction mandated reversal in later cases. Apparently, the Mississippi Supreme Court has continued to review the instructions given to the jury as a whole, and this instruction will only constitute reversible error where no other clarifying instructions are given.

To find that a state court's opinion provides grounds for habeas relief, this Court must find that it unreasonably applied or acted contrary to clearly established federal law. *Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010). That law must emanate from the United States Supreme Court; substitution of other precedent–even from another federal court–will not suffice. *Id*. To establish deficient performance under *Strickland,* however, a habeas petitioner must show that his attorney's performance was so sub-standard, that he was, essentially, not performing as counsel in the sense of the Sixth Amendment. *Harrington v. Richter*, 131 U.S. 770, 787-88 (2011). The bar to establishing that level of deficient performance is high. *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). In

84

fact, in light of the deference given to counsel's performance under *Strickland* and the deference given to the state court's opinion under § 2254(d), when the two are combined as they are here, review is "doubly" deferential.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Walker's attorney failed to object to an instruction that, when given with other instructions as it was in his case, does not constitute reversible error.  The Mississippi Supreme Court found that the failure to object did not amount to deficient performance within the meaning of *Strickland*. Walker has not persuaded this Court that the decision runs afoul of clearly established federal law. The case he cites, *Smith v. Murray*, 477 U.S. 527, 536-37 (1986), does not help him.  In *Smith*, counsel chose not to advance a claim on appeal on the basis of his perception that it would be futile. In later proceedings, his counsel realized that the perception was incorrect.  The Supreme Court denied habeas relief on grounds that Smith had not established cause to excuse defaulting the claim. *Id.* at 536.  In dicta, the Court noted, "Nor can it seriously be maintained that the decision not to press the claim on appeal was an error of such magnitude that it rendered counsel's performance constitutionally deficient under the test of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984)."

Walker also argues that he was prejudiced by counsel's failure to object to the instruction. The Mississippi Supreme Court believed otherwise, and wrote, "[S]ince the granting of Instruction S-9 is at most harmless error, Walker cannot demonstrate actual prejudice."  863 So. 2d at 16.  Again, Walker has not established that this finding is in derogation of clearly established federal precedent. In a similar case, the Fifth Circuit considered a jury instruction that the State admitted was a violation of *Sandstrom v. Montana*, 442 U.S. 510 (1979).  The State argued, however, that giving the instruction was harmless error; the Fifth Circuit agreed.  *Garcia v. Quarterman*, 454 F.3d 441, 449

85

(5th Cir. 2006). Garcia also argued that his trial counsel was ineffective, both in arguing in favor of the erroneous instruction and in failing to raise the *Sandstrom* error on appeal. The court dismissed that claim because the *Sandstrom* error was harmless. *Id*. at 450.

This Court likewise finds that Walker has failed to establish that the state court's rejection of his *Strickland* claim was contrary to, or an unreasonable application of, clearly established federal law. He has not shown that he is entitled to habeas relief on this issue.

**4. Counsel was ineffective for failing to object to comment on Petitioner's failure to testify**

**and**

**10. Counsel was ineffective for not preserving other grounds raised in the petition.**

In Section D above, this Court held that the Mississippi Supreme Court ruled on the merits of this claim, despite the lack of contemporaneous objection to the statements that Walker contended were comments on his failure to testify. The Mississippi Supreme Court found that the underlying claim lacked merit; therefore, it also held that his attorney could not be ineffective for failing to object. 863 So. 2d 1, 19. Walker's argument that his trial counsel was ineffective for failing to preserve that objection is offered only as an alternative, in the event that this Court held this claim barred. Since the Court did not, this contention is moot. In any event, this Court would be constrained to hold that the Mississippi Supreme Court's opinion on the ineffectiveness issue would not have provided a basis for habeas relief.

Walker also contends that his trial counsel was ineffective for failing to object to improper comments on appellate review. As he did in the preceding discussion, Walker advances his theory of ineffectiveness only if this Court found his claim barred for failure of his attorney to object. On this issue, this Court found that the Mississippi Supreme Court clearly held that the issue was barred

and addressed the substantive claim only on an alternative basis.  That court found no merit to the claim and, likewise, no merit to Walker's *Strickland* contention, since he could show neither deficient performance nor prejudice.  863 So. 2d at 20-21.  Like the state court, this Court considered the merits of the claim and found that Walker was not entitled to habeas relief.  Counsel will not be termed ineffective for failing to make a meritless objection. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1422 (2009).  For the reasons given by the state court, this Court finds that Walker's counsel was not ineffective, and habeas relief is not warranted on this issue.

> **6.    Counsel was ineffective to the extent he allowed the admission of the videotape of Riser's statement to law enforcement.**

This claim was not presented to the state court in Walker's petition for post-conviction relief; therefore, it is procedurally barred from review.  In its discussion on the underlying claim regarding the videotape, this Court discussed the issues raised by Walker to overcome the bar and found them unpersuasive.  In any event, the Court alternatively found the substantive argument to be meritless.  For that reason, counsel cannot have been ineffective for failing to raise a meritless argument, and this issue does not offer Walker a basis for habeas relief.

> **7.    Trial counsel was ineffective for failing to prepare for the possibility that Jason Riser would plead guilty and testify against Petitioner**

> **and**

> **8.    Trial counsel was ineffective for failing to investigate and present mitigating evidence at the sentencing phase.**

These claims were also not made in state court and are procedurally barred from habeas review for that reason.  Even if these claims were not barred, they would fail on the merits.  As discussed in Section G.1 above, on Walker's contention that his counsel was ineffective for failing to preserve all grounds to claim error on the failure to grant a continuance in this matter, the record

of this case demonstrates that Walker's counsel was adequately prepared to cross-examine Riser. It appears from Walker's discussion of this issue, however, that his claim is not that counsel failed to adequately prepare for Riser's testimony, but that he failed to prepare an adequate mitigation case after he realized that Riser would testify.

Walker has admitted that this claim is not exhausted, and he has filed a motion for leave to file a successive petition for post-conviction relief in the Mississippi Supreme Court in which to raise it. In that motion, he argues that language in recent opinions from that court provides a right to effective post-conviction counsel.[8] Since he claims that his post-conviction counsel was ineffective, Walker argues that he should be permitted to exhaust all claims that were not raised until his federal habeas petition. In conjunction with that motion, Walker has filed in this Court a Motion to Hold Petition in Abeyance Pending Exhaustion of Available State Court Remedies. Walker's state court motion remains pending, and, in accordance with Miss. Code Ann. § 99-39-27(5), the state court must review it and issue an order before the State is obliged to respond. At this point, that has not occurred.

Similar motions have been recently filed in the Mississippi Supreme Court in at least three other cases: *Grayson v. State,* 2012-DR-00059-SCT; *Mitchell v. State*, 2012-DR-00277-SCT; and *Puckett v. State*, 2012-DR-278-SCT. In each of these motions, the petitioner has sought to litigate his claim that the ineffectiveness of his original post-conviction counsel constitutes cause for defaulting certain claims. One of those motions, in *Grayson,* is pending at this time. The motions in *Mitchell* and *Puckett* have been denied on grounds of *res judicata*. This Court is of the opinion

---

[8]Specifically, Walker refers to *Knox v. State*, 2011 WL 5985593 (Miss. Dec. 1, 2011), and *Stevens v. State*, No. 2011-DR-00637-SCT.

that a stay is not warranted in this case, since the petition has little chance of success.  By a separate order, the motion has been denied.

As with many of Walker's other claims, even if this issue could be reviewed on the merits, he would not be entitled to relief.  Habeas claims must ordinarily be decided, according to the United States Supreme Court, on the state court record.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254 on the record that was before that state court.").  Where a petitioner has failed to present evidence to support his claim in state court, § 2254(e)(2) prevents this Court from receiving new evidence during federal habeas, except in certain, limited circumstances.  *Williams v. Taylor*, 529 U.S. 420, 430-31 (2000).  Walker does not satisfy the requirements of those circumstances.  Since this claim was not raised in state court, the material on which Walker relies to support it was not included in the state court record and cannot be considered here.

Even if this material could be considered, however, the Court is of the opinion that it is not of sufficient weight to merit habeas relief.  At trial, defense counsel offered four mitigation witnesses–Mike Maniscalco, for whom Walker worked; Leon Frederick, Walker's half-brother; Amanda Frederick, Walker's half-sister; and Anita Frederick, Walker's mother.  A summary of each witness's testimony follows:

**Mike Maniscalco** - Maniscalco was a foreman at Tilley Constructors Construction Firm, a general contractor.  At the time of the murder, Walker had worked for him for about eight months on an apartment renovation project, doing general labor.  Walker worked full-time and some overtime.  Maniscalco described him as follows:

> He was a very good employee.  I depended on him a lot.  He showed up on time every morning.  He missed very few days out of the eight months he worked for me.  He

missed probably three days work, and then he would call and let me know that he wasn't going to be there.

With respect to his co-workers, Maniscalco testified, "He was well liked among his peers. I don't think he ever had any problems with anybody on the job." Maniscalco also told the jury that, based on his work habits, he would have "worked there through the duration of the job and probably longer." On cross-examination, the prosecution asked whether Maniscalco would hire Walker after his convictions, and he said, "No, sir."

**Leon Frederick**. Leon was eighteen years old at the time of the trial and a senior in high school in Long Beach. He lived with his mother, Anita, and his sister, Amanda. Walker's sixteen-month-old daughter, Michele,[9] also lived with them. Prior to the murder, Walker also lived there. Leon testified that Walker took care of him, Amanda, and Michele while Anita worked. He told the jury that Walker was nice to them and drove them to school and other places that they needed to go. At the conclusion of his testimony, when asked if there was anything he wanted to tell the jury, Leon said, "I just feel that he should get a life sentence just like Jason because they were both there, and he has a right to live and he has a baby, a 16-year-old–month-old baby to worry about; and that's about all I can think of."

**Amanda Frederick**. Amanda was a sixth grader at Long Beach Middle School at the time of the trial. She was a cheerleader. Amanda testified that Walker had lived with her for most of her life. When asked what Walker was like as a brother, Amanda said, "Well, he was nice and he never

---

[9]The child's name was typewritten "Michelle" in the affidavit submitted by Anita Frederick; however, she apparently struck through that spelling. The name is handwritten "Michele" with the initials "A.F." just above the strikeover. The spelling "Michele" also appears in Amanda Frederick's affidavit. The name was spelled "Michelle" in the affidavit given by the child's mother, Robin Saucier Martin, with no correction. Since the child is in the custody of Anita Frederick, the Court will adopt her spelling when referring to this child.

treated me bad or anything."  She also said that Walker took them places.  Defense counsel asked

Amanda what she would like to tell the jury about Walker, and she said, "Well he has a little girl.

Her name is Michele Ashley Walker, and she's sixteen months old and . . . ."  At this point, Amanda

began to cry, but continued, "And she cares about her daddy and . . . ."  Amanda was still crying and

was allowed to step out for a moment to compose herself.  Amanda returned and concluded, "And

when he got his income tax this year, she [sic] told my mom to buy her something real special that

he would remember her by; and she was – he named her after me."  Neither Leon nor Amanda was

cross-examined.

**Anita Frederick**.  Anita testified that she was originally from Pensacola, Florida.  Walker

was born in Panama City, Florida, in 1965, when Anita was almost seventeen.  His father's name was

Ronald Dale Walker.  Ronald Walker, who was seventeen, was a meat cutter.  Anita did not work

outside the home.  Ronald's job required him to move, and, after about a year and a half in Pensacola,

the family moved to South Carolina, where Walker's brother, Terry, was born.  Ronald's employer

transferred him to Hawaii, but Anita and Walker stayed in South Carolina, because she was pregnant

with Terry.  After Terry was born, Anita and her two boys moved back to Pensacola.  Ronald's

brother, Kenny, lived with them.  Kenny had some sort of mental problems, and Ronald had to return

from Hawaii to check on him.

Ronald and Anita divorced when Walker was four years old.  At around that time, Anita and

her sons left Pensacola with a couple who was going to New Orleans.  They left New Orleans and

came to the Mississippi Gulf Coast, where Anita got a job at a restaurant.  They had no place to live,

so the people who owned the restaurant let them live behind it.  Anita worked mostly nights, so the

children would stay in a nursery.  After a few months, she was able to save enough money for an apartment.

In 1971, when Walker was about six years old, Anita remarried.  Her new husband was named Winfred Lamar Frederick, Sr., and he is Leon's father.  He and Anita were married for eight years. Frederick's family owned property on Longridge Road, and they built a house on it.  After they divorced, Anita was given the use of the property in which to raise their child; however, she moved away so that his family, who lived around her, would not pry into her private life.

In the meantime, Ronald had also remarried.  His wife's name was Sally, and they lived in Wasilla, Alaska.  After being absent from his children's lives for several years, Ronald got in touch with Anita and asked for Walker and Terry to come live with him for a while.  They stayed for about a year and then returned to Mississippi.  A few years later, when Walker was about sixteen, the two boys went back to Alaska.  Walker stayed about a year and returned to Mississippi, but Terry stayed with his father.

After Walker returned from Alaska, he lived with Anita, Leon, and Amanda.  Anita had been in a car accident and was unable to work for almost a year, so Walker helped her with the children. He dropped out of school in the eleventh grade and lived, off and on, with Anita or with friends.  He worked nearly all of that time, and he paid Anita rent when he lived with her.  Since Anita worked nights, he also watched the children for her.

Anita testified that Walker and Robin Marroy had a baby in March, 1990.  Robin and Walker split up in August of that year, and, in October, 1990, Robin left the baby with Anita.  Since that time, Robin had not contributed financially in any way to the care of the child.  At defense counsel's request, Anita brought a picture of the baby, Michele, with Anita's daughter Amanda.  That

photograph was admitted into evidence, and defense counsel was able to elicit the following testimony about Walker's relationship with Michele:

Q.    Could you describe the relationship between Alan and the child?

A.    Yes; Alan loved her all the time; loved her very much.

Q.    Did he take care of the child?

A.    Yes, sir.

Q.    Did he provide for the child?

A.    Yes, sir.

Q.    Even since he's been in jail, has he made any provision for the child?

A.    Yes, sir.

Q.    How?

A.    Well, he got $2,000 back on his income tax check and told me to make sure that, you know, Michele got what she needed.

Q.    He had given that money – I'm sorry.

A.    And to give – buy him – buy her something special from him.

Additionally, Walker's lawyer asked Anita about an incident in which Walker had received a certificate of appreciation. Anita testified that Walker and a friend of his were driving home from work when they were flagged down by a woman whose house was on fire. She told them that there was a child inside. Walker and his friend went inside the burning house, and Walker got the baby out of his bed, broke out a window and handed the child to a man outside. Walker and his friend left just afterward "because he knows how all the cops are down there, so he didn't bother about saying anything and he left." The next day, a newspaper story appeared that gave credit for the rescue to a bus driver, so Anita called the press and told them what had actually happened. Ultimately, Walker

93

and his friend were called to a ceremony where they met the child who was saved.  They both

received certificates, and Walker's certificate was introduced into evidence.

In concluding, Walker's attorney asked Anita whether there was anything else she wanted to

tell the jury.  She began by attacking Riser's testimony, and an objection to that statement was

sustained.  Anita then testified:

> A.    Well, all I've got to say is if – what Alan did and what Jason did, they should
> get the same.  I don't think that Alan was there because he wasn't there or
> Jason wasn't there or whatever.  I think they should get the same thing.
>
> MR. STEGALL:  That's all the questions –
>
> A.    And like me, I don't know.  I guess everybody loves their own kids, and I do
> mine, because Alan – I grew up with Alan from a child.  I didn't just come up
> with him when he was little, and like Alan was mine.  That's all I've got to
> say.

Anita's testimony concluded the mitigation case.

The evidence that Walker seeks to add would give more background information about his

family and the environment in which he was raised.  Much of the information contained in the

affidavits offered would have been excluded as hearsay if it had been offered at trial.  *See Clark v.*

*Thaler*, No. 07-70037, 2012WL688519 at *9 (5th Cir. Mar. 5, 2012).  More importantly, little of this

additional evidence is directly related to Walker.

Walker's lead counsel, Earl Stegall, submitted an affidavit recounting his recollection of his

trial preparation.  Stegall was, as Walker has pointed out, disbarred a few years after Walker's trial

for, among other reasons, neglect of cases.  *Stegall v. The Mississippi Bar*, 618 So. 2d 1291 (Miss.

1993).  Stegall's file of Walker's case was destroyed by the effects of Hurricane Katrina, so his

affidavit is based on memory.  He stated that he believed that they "had a relatively strong case" after

the trial was moved to Vicksburg and Walker's confession was suppressed.  However, when he was

told that the State had entered into an agreement with Jason Riser just before trial, it "changed

everything about how we planned to handle the trial."  With regard to preparing a mitigation case,

Stegall said:

> I don't recall preparing much for the penalty phase.  I seem to recall talking
> to some members of Mr. Walker's family in Vicksburg at the time of the trial.  I did
> not go to their homes to interview them, and I don't recall contacting any other friends
> or relatives who lived out-of-state.  I had filed a motion for a competency evaluation.
> However, I do not recall seeking the assistance of an expert to help prepare for the
> penalty phase or to help develop mitigating evidence.

Walker argues that his attorneys' preparation fell below the standard established by the ABA

Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA

Guidelines").  However, the Supreme Court has made it clear that those Guidelines are not dispositive

on the issue of performance.  *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009).  Instead, "The question

is whether an attorney's representation amounted to incompetence under 'prevailing professional

norms' not whether it deviated from best practices or most common custom."  *Premo v. Moore*, 131

S. Ct. 733, 740 (2011).  Walker has not established the prevailing professional norms for preparing

a mitigation case in a death penalty matter in Mississippi at the time that Walker was tried.

Walker alleges that his attorneys were ineffective for failing to conduct sufficient

investigation into his background, which, according to Walker, would have provided a wealth of

additional mitigation evidence that could have been introduced in his case.  He argues that his

counsel should have investigated his "social history [which] would have uncovered extensive

evidence of chaos, intellectual shortcomings, dysfunction, substance abuse, and bizarre and

inappropriate sexual conduct."  The *Strickland* standard requires an attorney "to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary."

*Richter*, 131 S. Ct. at 779.  There is no one-size-fits-all type of investigation that must be performed;

95

counsel's duty is dictated by the circumstances of the case and his judgment as to the appropriate strategy. *Strickland*, 466 U.S. at 688-89.

Stegall's affidavit does little to clarify what he actually did to prepare the case. He "seems to recall" talking to family members in Vicksburg, although he did not go to their homes. It is obvious, however, by the testimony at trial, that defense counsel talked to Anita Frederick before she arrived in Vicksburg; otherwise, she would not have brought the picture of Michele or the certificate with her. He apparently gathered enough information to ask that Amanda and Leon also attend the trial and provide testimony. He also located a non-family witness, Mike Maniscalco, to give positive testimony about Walker's work habits. Although Stegall admits that he did not seek the assistance of an expert to help him prepare the case; whether an expert would have been expected, given the facts of this case and under prevailing professional norms, is simply unknown.

Walker argues that trial counsel's deficient performance is established by the information more recently provided that his previous attorney failed to uncover. Anita Frederick submitted an affidavit containing information about her parents' dysfunction and the environment in which she and her siblings grew up. She gave more details about her marriage to Ronald Walker, their divorce, and the children's visiting him, most of which was presented to the jury at Walker's trial. Beyond that, she described her marriage to her second husband, his drinking, his infidelity, and his general disinterest in her children. She recounted an incident where she caught Winfred having sex with his young niece. There are also allegations about other members of his family. While Winfred was obviously not a father figure to her sons, and although Anita said that he punched holes in the walls when he was drunk, there is no suggestion of physical abuse of the children.

According to Anita, her daughter Amanda was the product of a one night stand with a man named Michael Shavers.  Shavers has submitted an affidavit to confirm this.  Anita also stated that Walker's earlier girlfriend, Sherry, had a reputation for sleeping around.  Robin, the woman with whom he had his daughter, was, according to Anita, "sold" to an older man by her poor parents.  The man eventually married her, and she was still married when she had Michele, but Walker insisted that his name be put on Michele's birth certificate.  Anita said that she did not speak to Walker's attorney until she came to Vicksburg for the trial.

Anita's sister, Nellie, has also submitted an affidavit describing her and Anita's childhood.  After Anita married Ronald Walker and moved away, Nellie only saw her sister once a year.  However, she has provided information about that marriage that she apparently gained through conversations with her sister.  Additionally, Nellie stated that Ronald's second wife, Sally, believed that Anita did not parent her children effectively.  She admitted that Ronald and Sally were more financially stable than Anita and could provide them more things.  Finally, she said that Anita had problems with Walker because of his drinking.  She concluded, "Prior to Alan's trial, I don't recall any lawyer or investigator contacting me to learn about Alan or his background.  I would have been happy to talk to them."

Ronald Walker's affidavit describes his own background and family, including a brother, Kenneth, who was diagnosed as a paranoid schizophrenic.  Kenneth lived with them for a while.  He described some odd behavior exhibited by Anita, including making anonymous telephone calls.  He thought her family was "strange."  Ronald lost touch with Anita and his sons after she moved to Mississippi, but eventually located them and had the boys come live with him for a time.  He thought Anita let the boys do whatever they wanted, and he thought Anita let Walker come live with him so

97

he would stay out of trouble.  Ronald met Winfred once when he came to Mississippi to pick up the boys.  He "understood" that one of the reasons that the boys wanted to stay with him was that Winfred mistreated them.  According to Ronald, "It is my understanding that he was verbally and physically abusive.  One of the boys told me about a time that Winfred was abusive and Anita had to intervene."  He thought Walker did better in Alaska, but noticed that, as he got older, he drank a lot and used drugs.  Finally, Ronald said, "I do not recall hearing from any of Alan's attorneys after he was arrested on these charges.  I would have been happy to talk to them and do anything to help out."

Terry Walker, Walker's brother, testified that life was better in Alaska than in Mississippi, where they did not receive many gifts at Christmas.  He thought that his brother's difficulties with Ronald were caused by Ronald's failure to express emotion.  He also thought that his father and stepmother were stricter than his mother.  Terry described a situation from his childhood when they were in a car with a female cousin about Walker's age, when his Uncle Kenneth made a highly inappropriate and vulgar remark about wanting to have sex with her.  Terry described Winfred as a drunk and said they had no supervision from him.  He said that both Winfred and his mother hit them with a leather strap when they misbehaved.  His grandmother took the strap away once, but his mother found a new one.  He said that Winfred regularly had sex with a member of a neighboring family to whom he "may have been related."  Terry also said that other female members of that family performed oral sex on him and Walker before they had reached puberty.  Terry did not like his brother's friends.  He remembers a time when Walker was beaten up by two boys.  After going to Alaska the second time, Terry did not spend much time with his brother.  He said, "I don't remember Alan's lawyers talking to me before his trial.  I would have wanted to help my brother if

98

they had approached me.  No one else who has been involved with representing Alan has approached me until recently."

Amanda Frederick, who testified at trial, has also signed an affidavit for use with Walker's habeas petition.  She said that her mother had divorced Winfred before she was born, and her father was largely absent from her life.  Amanda was two years old when Walker went to Alaska.  She said that she didn't see him again until she was twenty, when he returned for Leon's wedding.  However, she also said that she was ten years old when Walker was arrested.  According to Amanda, her mother was always tired from working multiple jobs, and she would fall asleep in the car when she took Amanda to cheerleader practice.  She repeated her trial testimony about Walker taking care of her when she was younger.  She stated that he drank a lot.  According to Amanda, Robin, the mother of Walker's child, was "sold" to Leroy Marroy when she was a child, so that Leroy would pay her family's bills.  Robin was still married to Marroy when she had Michele.  She described Walker as a good father and said that she and her mother were raising Michele, who had been abandoned by her mother.  Amanda has a child by a man named Merlin Castleberry, whom her brother had told her not to trust.  She got pregnant when she was in the ninth grade and dropped out of school.  Merlin was abusive, and the members of his family are heavy drinkers, as are the members of Jason Riser's family.

Another affiant was Faye Breland, who was Anita's supervisor for about ten years.  She said that Walker watched Amanda sometimes while Anita worked, but she also left her in the care of a neighbor, who had an "inappropriate interest" in Amanda and was ultimately discovered looking at her through a window.  She has seen Walker come to Anita's job drunk, and he "was sometimes inappropriate around Anita."  Breland believes that Anita and her son Leon are "slow."  With regard

to Walker, she said, "Alan also had his generous side.  He attended a crawfish boil and purchased a doll for me.  I kept it for a long time.  I lost it in Katrina."

Paula Shavers is the sister of Michael Shavers, who is Amanda's father.  She says that, because of that relationship, she has "always loved Alan as a brother."  She thought that he was a "loving and caring person."  Shavers did, however, believe that Walker hung out with the wrong crowd, who drank a lot and did drugs.  She also thought Anita was naive and not very bright.  Shavers related that Walker had a baby with Robin Marroy, whom she has heard was allowed, as a child, to become involved with an older man in exchange for gifts.  She is also "aware" of the Frederick family.  She believes that the family is "not right," and Winfred never had anything to do with Anita's children.

Michael Shavers signed an affidavit regarding his relationship with Anita, acknowledging that it was "spontaneous."  He had respect for Anita, but, when she got pregnant with Amanda, he was having sexual relationships with many women.  He believed that the neighborhood in which they lived was not good for children because of the drinking, drug activity, and promiscuity.  Shavers had a falling out with Walker when Shavers mistakenly accused him of stealing from him, after which their relationship was never the same.  Shavers said, "No one ever came to discuss Alan's case with me or to ask me anything about Alan or his family.  I would have been happy to cooperate."

Robin Marroy, who by then was Robin Martin, also provided an affidavit.  She described her relationship with Walker as mercurial, because of Walker's moodiness:

> When he was himself, he could be very nice.  I remember we'd sit together, watch TV and have a great time.  Other times, though, something set Alan off, even slight things, if he thought anyone was showing him disrespect.  He sometimes seemed to lose control and act psychotic.  He could be very impulsive.  There were times, not too many, when he hit me.

Robin also said that Walker drank a lot, spending most of his paycheck on beer.  Despite all of this, she said that Walker was a good father.

Walker has submitted school records that show that he was a satisfactory student in the first grade.  By the first term of the fourth grade, he was struggling in some subjects; however, his teacher noted, "Alan has worked very hard in Spelling.  I hope to see improvement in other subjects."  He has also provided a junior high school record, which notes that his elementary school progress was "Satisfactory."  In the seventh grade through ninth grades, his grades were barely passing, but he was apparently promoted each year.

Other documents have also been attached, including the divorce decree ending Anita and Winfred's marriage, on grounds of his cruel and inhuman treatment.  Walker's grandmother divorced his grandfather on grounds of extreme cruelty, as is shown by documents from the Florida court.  During the marriage, his grandfather was arrested for driving while intoxicated and without a valid driver's license.  After the marriage ended, he was arrested for a crime against nature, for having sex with a black woman.

Having reviewed this evidence, this Court cannot say that anything in it demonstrates that Walker's attorney performed an inadequate investigation.  Mitigation evidence often functions as a "double edged sword," in that it can support aggravating circumstances as well as mitigating circumstances. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011) ("The new evidence relating to Pinholster's family – their more serious substance abuse, mental illness, and criminal problems [page reference omitted] is also by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond rehabilitation.").  This is especially true in states such as Texas, where future dangerousness is a statutory aggravating factor. *Martinez v. Dretke*, 404 F.3d 878, 889-90 (5th

101

Cir. 2005).  Future dangerousness is not a statutory aggravating circumstance in Mississippi; however, while evidence of future dangerousness cannot be introduced by the State, the concept can be discussed in argument.  *Bell v. State*, 725 So. 2d 836, 862-63 (Miss. 1998).  Thus, the prosecutor in Walker's case could have discussed any mitigating evidence that Walker produced, particularly where it might indicate that he was beyond rehabilitation or presented a future threat to the prison staff and population.  Even when future dangerousness is not an issue, mitigating evidence such as drug and alcohol use often "provides an independent basis for moral judgment by the jury."  *Suggs v. McNeil*, 609 F.3d 1218, 1231 (11th Cir. 2010).  Additionally, the record in this case demonstrates that the prosecution was particularly hopeful that evidence offered by the defense during the mitigation case that might open the door to the introduction of Walker's confession or the introduction of victim impact statements that had been prepared by Konya's family.

Given these circumstances, it is quite possible that much of the additional evidence offered in these affidavits would not have been used at trial.  In particular, the information given by Robin Martin regarding his violent temper and the fact that he had hit her in the past would not have been helpful.  The repeated references by all of the affiants to Walker's drinking and drug use would likely have been viewed with disfavor by the jurors.  The problems of his parents, grandparents, and neighbors were just not particularly relevant.

Much of the evidence concerned the general environment in which Walker lived.  The affidavits demonstrate that the neighborhood was full of unsavory characters.  Drug and alcohol abuse was rampant, as was promiscuity, even at an early age.  There was, apparently, little or no supervision of older children or teenagers.  This evidence, however, could already have been gleaned by the jurors from the testimony at trial.  Riser was nineteen years old at the time of the crime, still

in high school, and moving from one friend's house to another to live.  He and Walker spent the day of the crime drinking, and they continued drinking that night at the Fiesta Club.  He had to borrow a shirt from Walker to go there.  While there, Walker got in a fight in the parking lot.  After the murder, they returned to Walker's mother's house, where Trina Perry was waiting for them.  Trina, who would have been eighteen or nineteen at the time of the murder, was still living with her parents. After she returned her car to the home, however, she left again to wait for Walker on a street in that neighborhood.  After waiting for some time, she accepted a ride with a stranger, who took her to a bar, and then to his house.  Once she met up with Walker and Riser, they drank more beer and Anita took pictures of them drinking.  Then they left for another adventure, after which Trina spent the night with Walker at his mother's house.  This Court is of the opinion that the evidence before the jury in the guilt phase, combined with the mitigation testimony offered during the sentencing phase, would have conveyed an adequate understanding of Walker's environment that would not have been materially enhanced by the additional evidence he now submits.

The most favorable pieces of mitigation evidence were these:  Walker had a supportive family, some of whom came to testify on his behalf, he had a young daughter whom he loved, and he had once unselfishly entered a burning house to save a child.  The jury heard that evidence.  In the final analysis, it is not even clear whether this additional evidence would have available at trial. Although some of the affiants said that they would have "helped" or "cooperated" in Walker's defense, none of them said that they were available and willing to testify.  *See Gray v. Epps*, 616 F.3d 436, 443 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

This issue is unexhausted and barred from review by this Court.  Even if the alleged ineffectiveness of Walker's post-conviction counsel could be used as cause to overcome that bar, the

evidence that he has offered to this Court has not been reviewed by the state court. Even if Walker were determined to have fallen within the exception of § 2254 (e)(2), and could present this evidence for the first time in this Court, the evidence he has offered is not persuasive. In this situation, with counsel necessarily skirting around issues that could have resulted in the introduction of additional aggravating evidence, with the mitigation evidence newly offered being primarily cumulative or possibly harmful, and in light of the harsh facts of Konya's murder, this Court could not, even if it were permitted to do so, say that Walker's attorney was ineffective for failing to adequately investigate his case. *See Wong v. Belmontes*, 130 S. Ct. 383, 391 (2009) (holding that, in light of the possibility that the prosecutor would introduce evidence of an earlier murder and the manner in which this victim was killed, the notion that additional witnesses would have helped the mitigation case was "fanciful.") For the same reasons, the Court finds that this evidence would not have made a substantial difference in the outcome of his case, and, therefore, he cannot show the second required element of *Strickland*, which is prejudice. Habeas relief is not justified on this issue.

## CONCLUSION

Having reviewed each of Walker's claims for habeas corpus relief under the deferential standard of review required by 28 U.S.C. §2254(d), it appears that none possesses sufficient merit to warrant issuance of the writ. The Court finds no part of the Mississippi Supreme Court's opinions to be contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts in light of the evidence presented. It is the Court's opinion that Alan Dale Walker is not entitled to habeas corpus relief under 28 U.S.C. § 2254.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Alan Dale Walker's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is hereby **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that this action is hereby **dismissed with prejudice**.   A separate final judgment dismissing this action with prejudice shall be entered in accordance with FED. R. CIV. P. 58.

**SO ORDERED** on this the 27th day of March, 2012.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE