# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

ALAN DALE WALKER                                    PETITIONER

v.                                    CIVIL ACTION NO. 1:97-CV-29-KS

LYNN FITCH, *et al.*                                    RESPONDENTS

### MEMORANDUM OPINION AND ORDER

This is a capital habeas case. The Petitioner, Alan Dale Walker, was convicted of capital murder and sentenced to death in the Circuit Court of Harrison County, Mississippi, in August 1991. He wants this federal court to issue a Writ of Habeas Corpus that vacates his state-court conviction and sentence. For the reasons below, the Court denies Walker's petition and dismisses this case with prejudice.

### I. BACKGROUND

On the night of September 8, 1990, Alan Dale Walker murdered Konya Edwards.[1] Walker and his coconspirator, Jason Riser, took Edwards to the shore of Crystal Lake, outside Long Beach, Mississippi, while she was passed out after a night at the club. Once there, they sexually assaulted and beat her. Then, Walker tried to choke her to death. Next, he put her chin on a log and stomped on her neck repeatedly. He eventually drowned Edwards, molested her body with a stick, and then set it on fire to hide the evidence.

---

[1] The Court discussed the crime in detail in its previous opinion and incorporates that discussion here. *See, e.g., Walker v. Epps ("Walker III")*, 2012 WL 1033467, at *1-*4, *12-*15, *37-*40, *47-*49 (S.D. Miss. Mar. 27, 2012).

In March 1991, a grand jury indicted Walker and Riser on charges of capital murder while committing the felony of sexual battery, rape, and kidnapping. *See* [135-6], at 202-03. A few days before trial, Riser entered a plea agreement, agreeing to testify against Walker. Trial commenced on August 6, 1991. On August 10, the jury found Walker guilty on all counts. Two days later, they found that he should be sentenced to death.[2]

Walker appealed the conviction and sentence, asserting twenty-two assignments of error. On October 12, 1995, the Mississippi Supreme Court affirmed the conviction and sentence, *Walker v. State ("Walker I")*, 671 So. 2d 581 (Miss. 1995), and the Supreme Court later denied Walker's petition for a writ of certiorari, *Walker v. Mississippi*, 519 U.S. 1011, 117 S. Ct. 518, 136 L. Ed. 2d 406 (1996).

On March 17, 1997, Walker filed his first petition for post-conviction relief in the Mississippi Supreme Court. The Mississippi Supreme Court denied the petition on October 16, 2003, *Walker v. State ("Walker II")*, 863 So. 2d 1 (Miss. 2003), and the Supreme Court later denied Walker's petition for a writ of certiorari, *Walker v. Mississippi*, 543 U.S. 842, 125 S. Ct. 281, 160 L. Ed. 2d 68 (2004).

On October 18, 2004, Walker filed a petition for a writ of habeas corpus [20] in this Court. On January 17, 2012 – after years of habeas litigation – he filed a Motion to Stay [116] the case so he could pursue a successive post-conviction petition in state

---

[2] The Court discussed the trial and events leading up to it in detail in its previous opinion and incorporates that discussion here. *See, e.g., id.* at *1-*6, *11-*13, *17-*30, *32-*34, *36-*37, *40-*41, *45, *49-*50, *54-*62.

court and exhaust certain claims. On the same day, he filed a motion in the Mississippi Supreme Court seeking leave to file a successive post-conviction petition. On March 27, 2012, the Court entered an Order [117] denying Walker's Motion to Stay [116] and a Memorandum Opinion and Order [118] denying his petition. *Walker III*, 2012 WL 1033467, at *53, *62. On the same day, the Court entered a Final Judgment of Dismissal [119] with prejudice and an Order [120] denying a Certificate of Appealability.

On April 24, 2012, Walker filed a Motion to Alter or Amend Judgment [121], which he later supplemented [123]. Among other things, he argued that the Court should alter its judgment to stay the case and permit him to exhaust certain claims in a successive petition to the Mississippi Supreme Court.

On February 21, 2013, the Court entered an Order [124] staying the case. The Court noted that Walker had initiated a successive post-conviction proceeding in the Mississippi Supreme Court, which "could . . . drastically alter[ ]" the procedural posture of this federal habeas case. The Court also observed that the United States Supreme Court had agreed to hear a habeas case from the Fifth Circuit which could have bearing on the Court's previous opinion denying Walker's petition. For these reasons, the Court stayed the case pending the resolution of his successive post-conviction proceeding and represented that it would "set a briefing schedule . . . on the pending motions in this Court" once the Mississippi Supreme Court finally adjudicated the matter.

On December 12, 2013, the Mississippi Supreme Court granted Walker leave to file a successive petition for post-conviction relief raising the claim that his trial counsel provided ineffective assistance in investigating and presenting mitigation evidence during the sentencing phase of trial. *Walker v. State*, 131 So. 3d 562, 564 (Miss. 2013). It remanded the case to the trial court to

> conduct a hearing to determine whether Alan Dale Walker's trial counsel was ineffective in searching for and presenting mitigation evidence during the penalty phase of his trial, and whether Walker suffered prejudice from such deficient performance, if any, sufficient to undermine the confidence in the outcome actually reached at sentencing.

*Id.* (punctuation and citation omitted).

On February 22, 2016, and December 1, 2016, the trial court held an evidentiary hearing on the mitigation claim, hearing testimony from several lay and expert witnesses. On April 17, 2018, the trial court denied Petitioner's claim. [135-10], at 119-48.[3] First, the trial court found that Petitioner's trial counsel had not provided deficient representation at trial. *Id.* at 143. Specifically, it found that trial counsel's strategy of humanizing Petitioner through the testimony of friends and family was reasonable because 1) the crime was particularly brutal, 2) a pretrial competency evaluation obtained by trial counsel included potentially inculpatory information, and 3) the new evidence presented by successive post-conviction counsel contained even more inculpatory information. *Id.* at 141-43.

---

[3] The state-court record is contained in this Court's docket entries [135] and [158]. When citing the record, the Court will refer to the relevant docket entry and page number.

4

The trial court also found that Petitioner's failure to conduct additional mitigation investigation and present more evidence during the sentencing phase of trial did not prejudice Petitioner. *Id.* at 146-47. It noted that "much" of the lay testimony presented in the successive post-conviction hearing "did not pertain to Walker personally." *Id.* at 144. The trial court discredited as speculative an expert's assertion that Petitioner was traumatized by sexual abuse at a young age. *Id.* In fact, the trial court discredited much of Petitioner's expert testimony because it was "based on unverified information (and in some instances rumor and mere speculation)," but found that, regardless, it was not "reasonably likely" that such evidence would have persuaded a jury to choose life imprisonment, rather than the death penalty. *Id.* at 145. The trial court emphasized that Petitioner's alleged "childhood trauma" would not have outweighed the "heinous facts" regarding his murder of Konya Edwards, listing almost a full page of gruesome details from the evidence presented at trial. *Id.* at 145-46. The trial court acknowledged that Petitioner "did not have an easy life," and that his childhood and adolescence were "marred by lifestyle choices of people over whom he had no control." *Id.* at 146. But these issues were not enough to "disturb confidence in the jury's verdict." *Id.* at 146-47.

Petitioner appealed, and on October 8, 2020, the Mississippi Supreme Court affirmed the trial court's decision. *Walker v. State ("Walker IV")*, 303 So. 3d 720, 729 (Miss. 2020). It noted that Petitioner had the burden of proof, and that the trial court, as the factfinder, was free to "accept all, part, or none" of Petitioner's evidence. *Id.* at

5

727. Considering the record, the Mississippi Supreme Court agreed with the trial judge, and found "no grounds for reversing [his] determination that Walker's trial counsel provided adequate representation at sentencing." *Id.* at 728. Because Petitioner had not proven that his trial counsel's performance was deficient, there was no need to address the prejudice prong of the analysis. *Id.*

On November 10, 2020, Petitioner filed a Notice [126] in this Court, providing a status update on the case. He expressed his intention to file a petition for writ of certiorari with the United States Supreme Court, seeking review of the Mississippi Supreme Court's decision. [126], at 5. He also requested that this Court schedule a status conference to discuss "a scheduling order for filing an amended petition . . for a writ of habeas corpus to include all exhausted claims now that state court proceedings have concluded." *Id.*

The United States Supreme Court denied Petitioner's petition for writ of certiorari on June 28, 2021. *Walker v. Mississippi*, 141 S. Ct. 2855, 210 L. Ed. 2d 962 (2021).

On July 1, 2021, this Court entered an Order [127] re-opening the habeas case and setting a briefing schedule. The Court observed that Petitioner wanted "leave to file an amended petition, to advance the claims recently exhausted in state court." [127], at 2. The Court directed him to file an "amended petition and include those recently exhausted claims that are cognizable in this Court . . . ." *Id.*

On November 1, 2021, Petitioner filed his Amended and Supplemental Petition

6

for Writ of Habeas Corpus [132], asserting seven claims, and the last one – Claim G – contains multiple sub-parts. [132], at 22-23. The final sub-part – Claim G(9) – is the ineffective assistance claim Petitioner asserted in his successive post-conviction proceeding. *See* [132], at 23-61. Each of the claims asserted in the Amended and Supplemental Petition for Writ of Habeas Corpus [132] had already been asserted in Petitioner's initial Petition for Writ of Habeas Corpus [20], briefed by the parties [84, 92, 99, 115], addressed by the Court in its previous Memorandum Opinion and Order [118], and dismissed with prejudice via the Court's Final Judgment [119] entered in March 2012. This time, however, Petitioner attached new evidence in support of Claim G(9) that he had presented to the Mississippi Supreme Court in his successive post-conviction proceeding.

In August 2022, when addressing a motion from Petitioner seeking an extension of time to file a brief, the Court denied as moot Petitioner's Motion to Alter or Amend Judgment [121], Motion for Certificate of Appealability and for Reconsideration of Order [122], and Supplemental Motion to Alter Judgment [123].

Petitioner's Amended Petition [132] is ripe for review. Before the Court discusses Petitioner's claims, it must address two threshold issues raised by Respondents.

## II. SUCCESSIVE PETITION

First, Respondents argue that the Amended Petition [132] must be dismissed as a second or successive petition pursuant to 28 U.S.C. § 2244(b)(1). *See* [153], at 28-

29.[4]  In reply, Petitioner argues that the Amended Petition is not a successive petition but an amended petition which this Court properly granted leave to file. [156], at 3.

"AEDPA was enacted in part to bring finality to state court judgments." *Leal Garcia v. Quarterman*, 573 F.3d 214, 220 (5th Cir. 2009). Thus, "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1); *see also Tyler v. Cain*, 533 U.S. 656, 661, 121 S. Ct. 2478, 150 L. Ed. 2d 632 (2001) ("If the prisoner asserts a claim that he has already presented in a previous federal habeas petition, the claim must be dismissed in all cases."). A petition "is not second or successive simply because it follows an earlier federal petition." *Rivers v. Lumpkin*, 99 F.4th 216, 220 (5th Cir. 2024). Rather, a "second or successive petition" is "one that 1) raises a claim challenging the petitioner's conviction or sentence that was or could have been raised in an earlier petition; or 2) otherwise constitutes an abuse of the writ." *Id.* (quoting *In re Cain*, 137 F.3d 234, 235 (5th Cir. 1998)).

Each of the claims asserted in Petitioner's Amended and Supplemental Petition [132] was also asserted in his initial Petition [20]. In Claim A of each petition, Walker asserted that the instructions at trial violated the Due Process Clause of the Fourteenth Amendment by allowing Petitioner to be convicted without proof of the

---

[4] Respondents' briefing on this point was insubstantial, consisting primarily of a bare assertion that the Amended Petition [132] was successive. Failure to adequately brief an argument normally constitutes waiver. *See, e.g., Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Barnes v. Johnson*, 184 F.3d 816, 1999 WL 499655, at *3 (5th Cir. 1999). But this issue implicates the Court's jurisdiction, and the Court must address it. *United States v. Vargas-Soto*, 35 F.4th 979, 988 (5th Cir. 2022) (no jurisdiction over successive petitions if appellate court has not granted leave under § 2255(h)).

lawful elements of the underlying felony of sexual battery. *Compare* [132], at 7, *to* [20], at 4. In Claim B of each petition, Walker asserted that the trial court's admission of the video tape and trial transcript of Riser's statements to the police violated his right to confront his accuser. *Compare* [132], at 10, *to* [20], at 6. In Claim C of each Petition, Walker asserted that the state improperly used peremptory strikes to remove prospective jurors who were African-American. *Compare* [132], at 11, *to* [20], at 7. In Claim D of each petition, Walker claimed that the prosecutor improperly commented on his failure to testify during the guilt phase of trial. *Compare* [132], at 15, *to* [20], at 12. In Claim E of each petition, Walker claimed that the prosecutor improperly discussed appellate review of the death sentence. *Compare* [132], at 16, *to* [20], at 13. In Claim F of each petition, Walker claimed that the trial court provided an unconstitutionally vague instruction on the "avoiding arrest" aggravating factor, and that there was insufficient evidence to support such an instruction or finding. *Compare* [132], at 18, *to* [20], at 15.

In Claim G of each petition, Walker asserted several claims of ineffective assistance of counsel. *Compare* [132], at 22-23, *to* [20], at 19-20. In each petition, he asserted that his trial counsel provided ineffective assistance by 1) failing to preserve a claim premised on the denial of his motion for a continuance after it was announced that his co-defendant would plead guilty and testify at trial; 2) failing to offer a lesser-included-offense instruction; 3) failing to object to the trial court's granting Instruction S-9 on aiding and abetting; 4) failing to object to the prosecutor's comment

on Petitioner's failure to testify; 5) failing to object to the trial court granting Instruction S-2 on "heat of passion" manslaughter, and failing to offer a manslaughter instruction; 6) agreeing to the admission of the videotape of Riser's statement to police; 7) failing to prepare for the possibility that co-defendant Riser would plead guilty and testify against Walker; 8) failing to preserve, at trial, on appeal, or in post-conviction proceedings, any of the claims asserted in his habeas petition; and 9) failing to adequately investigate and present mitigating evidence at the sentencing phase of trial. *Compare* [132], at 22-23, *to* [20], at 19-21.[5]

The only material difference between the two petitions is that the Amended Petition [132] contains forty pages of new facts developed in the successive post-conviction proceeding related to the claim that Walker's trial counsel provided ineffective assistance by failing to adequately investigate and present mitigating evidence at the sentencing phase of trial. *See* [132], at 23-61.

Every claim asserted in the initial Petition [20] was addressed by this Court in its previous opinion. *See Walker III*, 2012 WL 1033467, at *10, *17, *21, *30, *34, *36, *40, *45, *49, *52-*53. On the same day the Court entered its Memorandum Opinion and Order [118], it also entered a Final Judgment of Dismissal [119] denying the Petition [20] and dismissing the case with prejudice.

In his Motion to Alter or Amend Judgment [121], Petitioner argued, among

---

[5] The final ineffective-assistance claim was enumerated as Claim G(8) in the initial Petition [20], and G(9) in the Amended Petition. *Compare* [132], at 23, *to* [20], at 20. The Court clarifies this point because its discussion below will focus on this claim.

10

other things, that the Court should have granted his Motion to Stay [116] so that he could exhaust Claim G(8) in a successive state-court post-conviction proceeding. [121], at 13. In his Supplemental Motion to Alter or Amend Judgment [123], Petitioner again argued that the Court should have stayed the case and permitted him to exhaust Claim G(8). [123], at 1.

"When a district court dismisses an action and enters a final judgment . . . , a plaintiff may request leave to amend only by either appealing the judgment, or seeking to alter or reopen the judgment under Rule 59 or 60." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003). That is precisely what Petitioner did here: he filed a Rule 59 motion asking, among other things, the Court to reopen the case, stay it while he exhausted Claim G(8), and then grant him leave to amend his pleading to include the newly exhausted factual support for the claim. The Court effectively granted that aspect of the post-judgment motions when it stayed the case pending the final adjudication of Petitioner's successive post-conviction petition, *see* [124], at 2, then later reopened the case and directed Petitioner to file an amended petition which included the claim that he had exhausted in the successive post-conviction proceeding, *see* [127], at 2. Indeed, that was why the Court later denied the post-judgment motions as moot in its Order [147] of August 12, 2022: Petitioner had already effectively received the primary relief he sought in them.

Respondents are correct that, "in general, once the district court has entered its judgment with respect to the first habeas petition, a second-in-time application

11

qualifies as 'second or successive' and is thus properly subject to the requirements of § 2244(b)." *Rivers v. Guerrero*, 605 U.S. ---, 145 S. Ct. 1634, 1640 (2025). In other words, any "filings introduced after a final judgment that raise[ ] habeas claims, no matter how titled, are deemed successive," *Rivers*, 99 F.4th at 222, with the exception of Rule 59(e) motions, *Thomas v. Lumpkin*, 995 F.3d 432, 440 (5th Cir. 2021) (citing *Banister v. Davis*, 590 U.S. 504, 521, 140 S. Ct. 1698, 207 L. Ed. 2d 58 (2020)).

On its face, *Rivers* appears to require this Court to find that Petitioner's Amended Petition [132] is successive. The Amended Petition [132] was filed after the Court entered a Final Judgment [119], it seeks to add new factual support for a previously asserted ground for relief, and it attacks the Court's previous resolution of Petitioner's claims. But the Court believes that *Rivers* is distinguishable. There, a notice of appeal had already been filed from the district court's opinion dismissing the first-in-time habeas petition, divesting the district court of jurisdiction over the case. *See Rutherford v. Harris County, Tex.*, 197 F.3d 173, 190 (5th Cir. 1999) (a timely notice of appeal divests the district court of jurisdiction). Likewise, in *Gonzalez* – the precedent relied upon by the Fifth Circuit panel in *Rivers* – the second-in-time petition was filed well after the district court's dismissal of the first-in-time petition had been affirmed on appeal. 545 U.S. at 527.

Here, Petitioner never filed a notice of appeal because the Court did not address his timely post-judgment motions. *See* FED. R. APP. P. 4(a)(4)(A) (time for filing notice of appeal is tolled until the district court disposes of timely filed Rule 59

motion). Moreover, the Court believes that imprecision in its own orders led to the current procedural tangle. The Court's intent was to permit Petitioner to exhaust new evidence related to Claim G(9) of the Amended Petition, replead that claim, and then the Court would address it alone. The Court did not intend to re-address every claim on which it had already entered a judgment. However, the Court never addressed Petitioner's Rule 59 motions, vacated any aspect of the previous judgment, or clearly stated what Petitioner was permitted to plead in the Amended Petition. The Court denied the Rule 59 motions as moot after the Amended Petition had already been filed because it had, at that point, effectively granted Petitioner the primary relief he sought in the post-judgment motions: a stay and the chance to exhaust new evidence.

Regardless of what the Court should have done, the result here is the same because, as explained below, Petitioner has not presented any new evidence in support of Claims A, B, C, D, E, F, G(1), G(2), G(3), G(4), G(5), G(6), G(7), or G(8). Rather, he only presented new evidence in support of Claim G(9), the claim which the Court expressly contemplated he would replead.

For these reasons, the Court finds that the Amended Petition [132] is not a successive petition. Thus, the Court declines to dismiss it pursuant to 28 U.S.C. § 2244(b)(1).

### III. STATUTE OF LIMITATIONS

In their Answer [136], Respondents asserted that all claims advanced in the Amended Petition [132] are barred by the applicable statute of limitations. [136], at

3. However, they did not brief the issue, beyond a bare assertion that Petitioner's new claim that the trial court erred by refusing to reopen the successive post-conviction evidentiary hearing is barred by the statute of limitations. [153], at 38. So the Court deems this argument waived because Respondents failed to adequately brief it. *See, e.g., Ragas*, 136 F.3d at 458; *Barnes*, 1999 WL 499655, at *3.[6]

## IV. DISCUSSION

In the Amended Petition [132], Petitioner asserted seven claims, one of which has multiple sub-parts. As discussed above, each of these claims was also asserted in his initial Petition [20]. *Compare* [132], at 7, 10-11, 15-16, 18, 22-23, *to* [20], at 4, 6, 7, 12-13, 15, 19-21. The Court addressed each of these claims in its previous opinion. *See Walker III*, 2012 WL 1033467, at *10, *17, *21, *30, *34, *36, *40, *45, *49, *52-*53. The only material difference between the two petitions is that the Amended Petition [132] contains forty pages of new facts developed in the successive post-conviction hearing on the claim that Walker's trial counsel provided ineffective assistance by failing to adequately investigate and present mitigating evidence at the sentencing phase of trial. *See* [132], at 23-61.

In his briefing, Petitioner cited none of the new evidence developed in the successive post-conviction proceeding in support of Claims A, B, C, D, E, F, G(1), G(2), G(3), G(4), G(5), G(6), G(7), or G(8) from the Amended Petition. Petitioner only cited the successive post-conviction record in support of Claim G(9). Therefore, the record

---

[6] *See also Ficher v. Bickham*, 70 F.4th 257, 259 (5th Cir. 2023) (AEDPA statute of limitations may be forfeited or waived).

currently before the Court with respect to the remaining claims is the same as it was when the Court entered its previous opinion. Accordingly, the Court denies Claims A, B, C, D, E, F, G(1), G(2), G(3), G(4), G(5), G(6), G(7), and G(8) for the same reasons provided in its previous opinion, which is incorporated with this opinion.[7]

Additionally, Petitioner only provided briefing on Claims A, C, and G(9). *See* [132], at 3, 14, 28; [156], at 2, 5. Therefore, Claims B, D, E, F, G(1), G(2), G(3), G(4), G(5), G(6), G(7), and G(8) are also denied because Petitioner waived them. *Ragas*, 136 F.3d at 458; *Barnes*, 1999 WL 499655, at *3.

Claim G(9) – that Walker's trial counsel provided ineffective assistance by failing to adequately investigate and present mitigating evidence at the sentencing phase of trial – is the only one which the Court need address in any detail in the present opinion. After the Court sets out the applicable standard of review, it will summarize the new evidence relevant to the claim and analyze it in light of the relevant governing law.

---

[7] The parties disagree as to the permissible scope of Petitioner's Amended Petition [132]. Respondents argue that the Court only permitted Petitioner to re-plead Claim G(9), while Petitioner argues that the Court placed no restrictions on the content of his amended pleading. Admittedly, the Court's orders were not as clear on this point as they should have been. But it was clear from the Court's orders and the course of litigation that the *only* reason the Court stayed the case and later allowed Petitioner to file an Amended Petition was to exhaust Claim G(9) and permit Petitioner to present the new evidence developed in the successive post-conviction proceeding. The Court never intended to give Petitioner another shot at every claim already denied in its previous opinion. Petitioner knew this, as shown by his own Amended Petition [132]. He perfunctorily listed each of the claims previously asserted and then provided another forty pages of pleading related to Claim G(9). When the time came for briefing, he decided to also re-argue Claims A and C. The Court did not intend for Petitioner to replead every claim denied in the Court's previous opinion. Rather, it only intended for him to replead the freshly exhausted Claim G(9). Therefore, Claims A, B, C, D, E, F, G(1), G(2), G(3), G(4), G(5), G(6), G(7), and G(8) are denied for that reason in addition to the others provided herein.

### A. *Standard of Review*

Petitions for writs of habeas corpus by prisoners challenging state-court convictions because of alleged constitutional deprivations are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). AEDPA permits this Court to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reeximine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). Rather, AEDPA only permits this Court to grant habeas relief in two circumstances:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Claims presenting mixed questions of law and fact are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under Section 2254(d)(1), while the underlying factual findings supporting that

conclusion are reviewed under Sections 2254(d)(2) and (e)(1)." *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023). When conducting a § 2254(d) analysis, the Court may generally only consider "the record that was before the state court that adjudicated the claim on the merits." *Lucio v. Lumpkin*, 987 F.3d 451, 472 (5th Cir. 2021); *see also Cullen v. Pinholster*, 563 U.S. 170, 180-81, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011).

Generally, § 2254(d) imposes a highly deferential standard of review which precludes a federal habeas court from setting aside reasonable determinations by a state court. *Neal*, 78 F.4th at 783; *Seals v. Vannoy*, 1 F.4th 362, 370 (5th Cir. 2021). But if the state court did not adjudicate a claim on the merits, "the deferential AEDPA standards of review do not apply," and the Court reviews the claim de novo. *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003).

Even if a petitioner clears AEDPA's general bar on relitigation, the Court may not grant habeas relief "if the trial error was harmless." *Burgess v. Dretke*, 350 F.3d 461, 466 (5th Cir. 2003). That is, "a federal court may grant habeas relief only if it determines that the constitutional error had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 466-67. Finally, the petitioner must "persuade a federal habeas court that 'law and justice require' relief. And whatever else those inquiries involve, they continue to require federal habeas courts to apply the Court's precedents governing the appropriate exercise of equitable discretion." *Neal*, 78 F.4th at 783 (quoting *Brown v. Davenport*, 596 U.S. 118, 134, 142 S. Ct. 1510, 212 L. Ed. 2d 463 (2022)).

### B. New Evidence

As discussed above, the Mississippi Supreme Court remanded Petitioner's successive post-conviction petition to the trial court to

> conduct a hearing to determine whether Alan Dale Walker's trial counsel was ineffective in searching for and presenting mitigation evidence during the penalty phase of his trial, and whether Walker suffered prejudice from such deficient performance, if any, sufficient to undermine the confidence in the outcome actually reached at sentencing.

*Walker*, 131 So. 3d at 564 (punctuation and citation omitted). The trial court held an evidentiary hearing on February 22 and December 1, 2016. [135-12], at 70; [135-13], at 122. Petitioner offered testimony from eight fact witnesses and two expert witnesses. [135-12], at 3-5.

#### 1. Amanda Frederick

First, Petitioner called Amanda Frederick, his sister. [135-12], at 86. She grew up in the same home as Petitioner, and she was ten years old when he murdered Konya Edwards. *Id.* at 89, 101. Amanda was the youngest of four siblings, while Petitioner was the oldest. *Id.* at 87. The two oldest siblings – Petitioner and Terry – shared a father, but the two youngest – Leon and Amanda – each had a different father. *Id.* at 87-88. All four siblings shared the same mother. *Id.* Petitioner's father lived in Alaska with one of the siblings, and Amanda only recalled seeing him once in her life. *Id.* at 89.

Throughout their childhood, their mother worked two jobs, including one on a night shift. *Id.* at 89-90. Amanda testified their mother was "always sleeping,"

including in her car during their school activities. *Id.* at 91. Her older brothers, including Petitioner, looked after her. *Id.* Petitioner "[c]ooked, cleaned, took care of [her]." *Id.*

Petitioner was never mean to Amanda, but he often drank beer and smoked marijuana with his friends. *Id.* at 91-92, 101. One of them was Jason Riser, his future codefendant. *Id.* at 99. Amanda saw Petitioner drunk "quite a few times." Id. at 92. Their mother never drank. *Id.* at 102-03.

One of Petitioner's drinking friends while he was teenager was a man in his fifties named Frank Potter. *Id.* at 92-93. Amanda once witnessed Potter flash their mother, and although Petitioner was upset about it, no trouble resulted from the incident. *Id.* at 93, 104. Petitioner was just protective toward their mother. *Id.* at 104-05. According to Amanda, that was how they were taught to act. *Id.* at 105.

Petitioner also had another older friend, Jack Collins, who drank around them and "had them do things that they probably shouldn't," like "[s]teal stuff" for him. *Id.* at 94. Amanda testified that Petitioner would bring stolen goods to their home. *Id.* at 101.

As a teenager, Petitioner had a child with his girlfriend. *Id.* at 95.[8] Petitioner's mother had custody of the child, a girl named Michelle. *Id.* at 96. According to Amanda, Petitioner was "fine with her. Really attentive." *Id.* The girlfriend later –

---

[8] Petitioner's mother later clarified that, contrary to Amanda's testimony, Petitioner was about twenty-three when he fathered the child. *Id.* at 138.

although still a teenager – married a man from the neighborhood who was in his fifties. *Id.*

Amanda was seven years younger than Petitioner and eleven years old when she testified at his trial.[9] *Id.* at 87, 99. She testified that none of Petitioner's attorneys spoke with her or told her anything about her testimony before the trial. *Id.* at 100. She said she would have been willing to provide the same testimony at trial. *Id.*

### 2. Anita Frederick

Next, Petitioner called his mother, Anita Frederick. *Id.* at 106-07. Ms. Frederick testified at length about her own childhood. *Id.* at 107-114. She met Petitioner's father, Ronnie Walker, when she left home to sell magazines at the age of sixteen or seventeen. *Id.* at 107. They got married when she was eighteen or nineteen, and Petitioner was born when she was twenty or twenty-one. *Id.* at 114-15.

When Petitioner was about two years old, his father went to Hawaii for a job. *Id.* at 115-17. Petitioner's parents eventually got a divorce when he was about four years old. *Id.* at 117. His father paid only one month of child support. *Id.* at 117-18. Ms. Frederick said: "I went on my own. I did not ask for [Petitioner's father] to support us because he did not know where I was at." *Id.* at 119.

Ms. Frederick eventually moved to Mississippi with Petitioner, his younger

---

[9] Again, this contradicts what Petitioner's mother said, who testified that Petitioner had the baby when he was about twenty-three years old and took care of her until he was arrested for the murder of Konya Edwards. *Id.* at 135, 138-39.

brother Terry, and two acquaintances from New Orleans. *Id.* at 117-18. When they first came here, all five of them slept in a station wagon near the beach. *Id.* at 118. She eventually secured employment and a one-room apartment for her and the two boys. *Id.*

Ms. Frederick testified that when Petitioner was about kindergarten age, a babysitter had "pulled his pants off or something like that." *Id.* at 119. She said, "He was kind of scared." *Id.*

Petitioner's father did not see them again until Petitioner was six or seven years old, when Ms. Frederick "called him up to let him know where I was at." *Id.* at 120. She admitted that she kept the boys from their father. *Id.* at 154. Petitioner's father "was living in Alaska" at the time, and he came to see them and "brought them a big box of toys." *Id.* at 120. But he did not stay long. *Id.* On at least two occasions during Petitioner's life, he went to live with his father in Alaska for about a year each time. *Id.* at 121-22, 144-46.[10]

Ms. Frederick eventually remarried. *Id.* at 122. Petitioner was about seven years old at the time. *Id.* at 123. Her second husband, Winfred Frederick, "was there as a father," but later "he just worked all the time and never did have anything else to do with them." *Id.* She was married to Winfred Frederick for seven years, until Petitioner was about fourteen years old. *Id.* She had one son with him, Leon

---

[10] It was unclear from Ms. Frederick's testimony how old Petitioner was during each of these intervals. *Id.* at 146-48. The last stay in Alaska was after Petitioner had reached adulthood, shortly before he murdered Konya Edwards. *Id.* at 148-49.

Frederick. *Id.* at 122.

Winfred Frederick drank "[a] whole case of beer every day," but he was "okay" when he drank. *Id.* at 124. Ms. Frederick said, "He drank. When he got tired he went to sleep, went to bed." *Id.* Once, he punched a hole in a wall, but he did not "bother" Petitioner. *Id.*

At this point in Petitioner's childhood, Ms. Frederick was working two or three jobs at once. *Id.* at 125. At various points in time, she worked at McDonald's, a clothing factory, a convenience store, a clothing store, and the South Mississippi Regional Center. *Id.* at 125-26. They lived near Winfred Frederick's sister, and her sons "used to like to come across the fence and try to beat up" Petitioner and his younger brother, Terry. *Id.* at 128. They never "bothered Leon," Winfred Frederick's son. *Id.*

Ms. Frederick and Winfred eventually divorced. *Id.* When asked why, she testified that "he drank a lot and liked to run around with other women, especially his ex-wife." *Id.* One event in particular caused her to leave him. *Id.* She testified that he "used to like to . . . hang around and sleep with his niece, Brenda . . . in the camper of the truck that he had." *Id.* One night when she got home from work, Winfred was not there. *Id.* at 128-29. She asked the boys where he was. *Id.* at 129. Petitioner "said he didn't know," but his younger brother, Terry, "said he was in the back end of the truck" having sex with his niece, Brenda. *Id.* Ms. Frederick "went out there to look where he was at, and he was in the back end of the truck with his whities on . . . ."

*Id.*

After Ms. Frederick left Winfred, they moved around to at least three houses, eventually settling in Long Beach. *Id.* at 130-31, 152-53. She lived there with Alan, Terry, and Amanda, raising them alone. *Id.* at 130. They went to church "sometimes." *Id.* at 131.

When Petitioner was a teenager, he began to have disciplinary issues. *Id.* at 126. "Sometimes he didn't listen . . . . And then sometimes he would do what he wanted to do." *Id.* Petitioner "stayed at the house a lot," but he would also "run the roads." *Id.* When he was about fifteen or sixteen, Petitioner started "stay[ing] out . . . a lot of nights and come back home" after his mother was asleep. *Id.* When asked where he had been, Petitioner "would always say he was at a friend's house . . . ." *Id.* at 127.

Petitioner had friends his own age, as well as some men old enough to be his father. *Id.* at 131-32. Petitioner and his friends all drank alcohol and smoked marijuana. *Id.* at 132-33. Ms. Frederick testified that Petitioner drank in front of her as a teenager, and she recalled smelling marijuana on him. *Id.* at 140-41. Once, she caught him with "little packages" of marijuana, as if he had been "selling it or giving it to somebody." *Id.* at 141-42. One of the older men he hung around with grew marijuana in his home. *Id.* at 133. Another would have the teenage boys, including Petitioner, "go steal stuff from other people's houses and bring it back," including "four wheelers and stuff like that . . . ." *Id.* at 134, 155. This resulted in Petitioner

23

being arrested as a teenager. *Id.* at 134-35. Ms. Frederick admitted that she did not have control over Petitioner as a teenager because she "worked a lot." *Id.* at 143. She said, "[H]e did want he wanted to do." *Id.* But she testified that she did not know about him stealing "until the cops came up to the house and" arrested him. *Id.* at 155.

Ms. Frederick testified that one of the older men that Petitioner hung around with had "mooned" her, and that Petitioner "didn't like it . . . ." [135-13], at 7-8. She believed that Petitioner's response was appropriate, and it was the type of behavior she had tried to teach him. *Id.* at 8. Despite her difficulties growing up, she had tried to do the best for her children, including teaching them to respect other people and other people's property. *Id.* at 8-9. She never approved of Petitioner's drinking and smoking marijuana, and she tried to get him to stop running with the wrong crowd. *Id.* at 9-10.

When Petitioner was about twenty-three, he fathered a child with a girl named Robin Marroy. [135-12], at 135, 138. He took care of the child – a girl named Michelle – until his arrest for the murder of Konya Edwards. *Id.* at 138-39.

Ms. Frederick testified at Petitioner's trial, but she said that neither of his trial counsel spoke with her about her testimony before the trial. *Id.* at 139. She said that Petitioner's trial counsel told her "not to talk to nobody." *Id.* If asked, she would have provided the same testimony at Petitioner's trial that she did in the post-conviction hearing. *Id.* at 140. She was familiar with the details of Petitioner's crime, and she testified that it was not the type of behavior that he would have learned in her

household. [135-13], at 10.

    *3. Nellie Richards*

Next, Petitioner called his aunt, Nellie Richards – Ms. Frederick's younger sister. *Id.* at 11-12. Ms. Richards testified at length about her own childhood. *Id.* at 13-18. Although Richards lived far from Ms. Frederick, she would come down to visit on vacations and talk to her on the phone. *Id.* at 13. She admitted that she only saw Petitioner sporadically throughout his childhood, and that most of what she knew about his life was through her sister, his mother. *Id.* at 26.

She felt that it was good for Petitioner and his younger brother to go stay with their father in Alaska so that they could have a relationship with him. *Id.* at 18-19. She said, "It wasn't that [he] was an abusive father or anything." *Id.* at 19. As far as she knew, Petitioner had a "good experience" in Alaska with his father. *Id.* Both he and his brother, Terry, were happy. *Id.* at 19-20. She testified: "They got great gifts . . . at Christmas time when they were up there because they would stay for a year . . . . And they seemed to do well. The school up there was very good. They enjoyed that. They enjoyed their time with their father. And they seemed to love Alaska from what I could tell." *Id.* at 20.

According to Ms. Richards, Petitioner's mother "always worked." *Id.* She typically had multiple jobs to support her children because "[t]hey came number one." *Id.* Petitioner's mother would typically find an extra job in the fall "so she could start saving, putting that money aside so that she could have Christmas gifts to put

underneath the tree for the kids. She always made sure that she had something for the kids to make sure they had a good Christmas." *Id.* at 20-21.

Ms. Richards testified that she tried to spend one-on-one time with each of her nieces and nephews, including Petitioner. *Id.* at 20. She said Petitioner was "great," and they "got along very well." *Id.* at 21. She never had any problems with him. *Id.* She said: "You could ask him to do something for you, and he would always do it. Whereas some of the other nieces or nephews, . . . you may ask them to . . . do something, and they might say no." *Id.* She became aware that Petitioner started drinking alcohol in his teens, but he never drank around her. *Id.* at 21-22. She also never observed him smoking marijuana. *Id.* at 27.

Ms. Richards testified that none of Petitioner's lawyers contacted her prior to his trial, and that if they had asked her to testify, she would have done so. *Id.* at 22.

### 4. Ronald Walker

Petitioner's next witness was Ronald Walker, his father. *Id.* at 29-30. He was married to Petitioner's mother for about seven years, and they divorced because of "incompatibility." *Id.* at 31-32.

Mr. Walker testified about various aspects of Petitioner's childhood home. When Petitioner was about three years old, Mr. Walker's brother stayed with them, and he "was a paranoid schizophrenic." *Id.* at 32. Also, Petitioner's mother had been arrested once because she had harassed a neighbor on the phone. *Id.* at 33.

When Mr. Walker and Ms. Fredrick separated, he was already living in Alaska.

*Id.* He did not see his sons, including Petitioner, for about three and a half years after that because Ms. Frederick kept their location hidden from him. *Id.* at 34. He tried to find them, though. *Id.* He said: "[T]hat really hurt me because I wanted to see my kids and I didn't know where they were." *Id.* Eventually, Ms. Frederick got back in touch with him, and he "came down and took them to Alaska . . . ." *Id.* Petitioner was about nine years old. *Id.* at 36.

Mr. Walker described Petitioner as a "great kid. . . . Very great kid." *Id.* at 36. He said, "[S]ometimes [Petitioner] used to go to my place of work and I would get compliments on him, how well behaved he was. I thought that was great." *Id.* at 37.

Mr. Walker remarried, and his wife had two sons that got along well with Petitioner. *Id.* at 37, 54. When Petitioner stayed with them in Alaska, he did chores such as cleaning his room, vacuuming, and working in the yard, and he received an allowance. *Id.* Petitioner complied with household rules, and Mr. Walker had no serious behavior problems out of him. *Id.* Although Mr. Walker was "working quite a bit," they would do activities together, such as going to the lake and fishing. *Id.* at 38. They went to church. *Id.* at 44. Both boys were baptized, and Mr. Walker "noticed a difference in them . . . by going to church and stuff like that . . . ." *Id.* at 45.

Petitioner went up to stay with his father in Alaska three times throughout childhood and adolescence. *Id.* at 34, 46. Each time, Mr. Walker would enroll them in school. *Id.* at 35-36. The first time was for a year when Petitioner was nine. *Id.* at 36. The second time was for a year when Petitioner was seventeen, *id.* at 39-40, and the

third time was a year later, *id.* at 46.

Mr. Walker said that when Petitioner returned as a teenager, he was "a little rebellious." *Id.* at 40. For example, Petitioner had grown his hair long and did not want to get it cut. *Id.* Also, once Petitioner "snuck out of the house and was out all night." *Id.* at 41. Mr. Walker didn't like the people that Petitioner would hang around with. *Id.* He said Petitioner "was at an age he just didn't want to take on too much responsibility . . . . He wouldn't want to listen to me." *Id.* at 41-42.

Ms. Frederick had sent the boys back up to him again because of "[a] little trouble he got into here in Mississippi." *Id.* at 42. Petitioner was "just being a little wild . . . ." *Id.* His mother wanted to "get him away from Mississippi because he was involved in too many wrong things like fighting chickens and stuff like that . . . ." *Id.* at 43. "[S]he thought that the best thing for him to do is to come to Alaska where he could have maybe a father figure that could try to straighten him out and set him on the right road." *Id.* But Petitioner "didn't like [Mr. Walker's] rules and stuff, so he wanted to come home" to his mother. *Id.* According to Mr. Walker, Petitioner never complained about life with his mother in Mississippi, never complained of abuse. *Id.* at 53.

Mr. Walker testified that Petitioner's trial counsel never contacted him before trial, but that if they had asked him, he would have testified. *Id.* at 45-46.

### 5. *Terry Walker*

Petitioner's next witness was Terry Walker, his younger brother. *Id.* at 56.

28

Terry testified that his first memory of their father was visiting him in Florida as a child. *Id.* at 57. Terry lived in Alaska with his father for a year as a child, but he permanently moved there as a teenager. *Id.* at 57-59. Petitioner came to visit two times after their initial one-year stint as kids, and Terry did not notice any change in Petitioner's behavior that gave cause for alarm. *Id.* at 77-79. He admitted, though, that because he went back to Alaska and stayed there, he and Petitioner had not grown up together. *Id.* at 80.

Terry said life in Alaska entailed a "little more discipline," because his father made them do chores and school work. *Id.* at 58. He described life in Alaska as "a pretty good childhood." *Id.* at 67-68. He "wouldn't pass it up for the world." *Id.* at 68.

Back in Mississippi, their mother worked two jobs, and no one watched them. *Id.* at 59. They had complete freedom as teenagers. *Id.* at 60. Sometimes their stepfather, Winfred Frederick, was home, but he was "always drunk" and never supervised them. *Id.* at 59-60. Terry said that Mr. Frederick drank "[e]very day that [he had] known him." *Id.* at 60. Frederick "would complain if we got into his soda or stuff like that," but he was never physically abusive to them. *Id.* at 60, 73. Terry said: "I don't ever recall . . . getting hit by Winfred. . . . I mean, I was scared of him, but I don't recall him ever putting his hands on me." *Id.* at 64.[11] Their mother, however,

---

[11] This testimony contradicts information in the affidavit prepared by Petitioner's counsel and submitted to the Mississippi Supreme Court in support of his motion seeking leave to file a successive post-conviction petition. *See* [135-16], at 7; [135-13], at 76. There, Terry ostensibly asserted that Winfred would hit them with a leather strap when he became angry. *Id.*

would give them spankings with a leather strap. [135-13], at 64; [135-16], at 7.[12]
Terry also recalled that he "got in a fight lots of times" with Petitioner's friends, and
that they were a "corrupt" influence. *Id.* at 68.

Terry testified that their stepfather, Winfred Frederick, had a sexual
relationship with his niece, Brenda Reyer, who lived near them. *Id.* at 65. She was
about sixteen or eighteen at the time, and they would have sex in a van outside the
house. *Id.* at 66. He said that Brenda and her two sisters also had sexual contact with
him when he was about twelve. *Id.* at 66-67. He said, "[A]ll the Reyer systers, . . . they
would all play with you and suck your penis, do . . . sexual things. . . . I don't recall
how often it happened. But it happened more than once and more than twice." *Id.* at
66. The girls did not threaten or force him, however, *Id.* at 72. Terry said that
Petitioner was present when this occurred, but they "would go in two different
bedrooms . . . ." *Id.* at 66. So, he does not know if the sisters did the same thing with
Petitioner, who was about thirteen at the time. *Id.* at 71.

Finally, Terry testified that Petitioner's attorneys never contacted him before
trial, and that if they would have asked, he would have come down to testify. *Id.* at
69-70.

### 6. *Leon Frederick*

Next, Petitioner called Leon Frederick, his half-brother. *Id.* at 81. Petitioner
and Leon shared a mother, and Leon's father was Winfred Frederick. *Id.* He testified

---

[12] To be clear, Terry specifically distinguished being spanked from being beaten or abused. [135-13],
at 72. He testified that his mother "spanked" them with a leather strap or a switch. *Id.*

in Petitioner's trial, and he was a senior in high school at the time. *Id.* at 85. Petitioner is six or seven years older than Leon. *Id.* Leon testified that both their mother and his father, Winfred Frederick, were disciplinarians. *Id.* at 93. As for Winfred, he said, "If he said something, you'd do it. . . . I never got whipped from him except maybe once in a blue moon. But if you made him mad, he would whoop you." *Id.* He said their mother would spank them with a belt. *Id.*

Leon testified that Petitioner had various friends during the time before he was arrested and tried for murder, including teenage boys and older men. *Id.* at 85-87. He said that Petitioner would "go fishing, work on cars, and go to the river" with the boys his own age. *Id.* at 87. He sometimes witnessed them drinking beer, but he never witnessed them using drugs. *Id.* at 88-89. He said they did not drink beer all the time at home. *Id.* at 98. He witnessed one of the older men, Duke Maloney, smoking marijuana. *Id.* at 92. Leon admitted, however, that he did not run with Petitioner and his friends all the time. *Id.* at 97.

Leon testified that Petitioner's trial counsel never spoke with him before the trial. *Id.* at 93-94. He also said that he did not testify at the trial.[13] [135-13], at 94.

### 7. *Vera Faye Breland*

Next, Petitioner called Vera Faye Breland, a former supervisor over Petitioner's mother at the South Mississippi Regional Center. *Id.* at 99-101. Ms. Breland worked with Ms. Frederick for at least twenty years, and they kept in touch

---

[13] This is not true. Leon Frederick did, in fact, testify during the sentencing phase of Petitioner's trial. *See* [158-10], at 10.

after Ms. Frederick retired. *Id.* at 100-01. Ms. Breland knew that Ms. Frederick worked more than one job, and that she had three children – Alan, Leon, and Amanda. *Id.* at 101-02. She did not know how Ms. Frederick handled child care while she worked. *Id.* at 105.

Once or twice a week, Petitioner would come visit his mother at work. *Id.* at 102. Once, Ms. Breland witnessed Petitioner and his mother "tickling or playing," and Petitioner touched his mother's breast. *Id.* at 104. She did not know whether Petitioner tickled or pinched his mother's breast. *Id.* Ms. Breland also testified that Ms. Frederick had told her that an adult male neighbor had given Amanda, Petitioner's younger sister, a bikini as a gift when she was twelve. *Id.* at 106-07. According to Ms. Breland, Ms. Frederick did not believe the man was a threat, but he later got caught "peeping in her window or something like that." *Id.* at 107-08. Ms. Breland admitted that she had no firsthand knowledge of these events. *Id.* at 104-08. She also admitted that she had no personal relationship with Petitioner. *Id.* at 110.

### 8. *Earl Stegall*

Petitioner called his trial counsel, Earl Stegall, to open the second day of the post-conviction evidentiary hearing. *Id.* at 123. Mr. Stegall testified that he had suffered a stroke which affected his memory. *Id.* at 124. He said, "At first I couldn't remember literally my son's names. . . . [B]ut gradually . . . I've gotten a lot, lot better." *Id.* When asked whether he had "sufficient recollection of the facts of this case," he answered, "As best I can. I've reviewed things and tried to remember everything,

particularly talking with [Petitioner's post-conviction counsel] in recent times, and that refreshed my memory. . . . I still have problems with my memory. But I will do my best." *Id.* He could "remember certain parts of it perfectly clear," but not "all of it that way." *Id.* at 140-41. Stegall's files, including the one from Petitioner's trial, were destroyed in Hurricane Katrina. *Id.* at 126.

Stegall started practicing law in about 1972 or 1973, and he handled "a lot" of death penalty trials. *Id.* at 125. At the time of Petitioner's trial, Stegall was handling most of the capital cases in Harrison County. *Id.* at 140. He was never found to have provided ineffective assistance in one. *Id.* But two years after Petitioner's trial, Stegall was disbarred for accepting fees from two clients serving life sentences for murder but failing to file post-conviction relief motions on their behalf. *See Stegall v. The Mississippi Bar*, 618 So. 2d 1291 (Miss. 1993). He was also charged and convicted of embezzling client funds from a trust account. [135-13], at 125-26. He did not recall whether he was having the issues that led to his disbarment at the time of Petitioner's trial. *Id.* at 126.

Stegall testified that he filed a motion to have the statement of Jason Riser, Petitioner's co-defendant, suppressed, as well as a motion to change venue. *Id.* at 127-28. The trial court granted both motions. *Id.* Stegall said it "was the only capital case I ever had where I won a motion to suppress a confession." *Id.* at 127. Once Riser's statement was suppressed, Stegall's "whole defense was going to be he didn't do it, the other kid did, and he just happened to be with him . . . ." *Id.* He believed this was

a strong plan because, at the time, "he knew or believed that [Riser] was not going to testify," and "there would have been nobody there to dispute too much . . . what I was going to argue." *Id.* But then, "right at the last second they made some arrangement for a plea," and Riser testified at trial. *Id.* at 128.

The day before the trial, Stegall was notified of Riser's plea and that he would testify against Petitioner. *Id.* He filed a motion for continuance, but the trial court denied it. *Id.* at 129; *see also* [135-16], at 13-14. Stegall said this drastically affected his trial strategy. [135-13], at 129. He said:

> I thought for sure that once I got that confession suppressed, I thought for sure that I would be offered a plea offer for him so that he would, at worst, receive . . . a life sentence rather than facing the death penalty . . . . [U]ntil the confession was suppressed, I thought the guilt phase was a foregone conclusion, but after that it kind of switched right at the last there.

*Id.* at 129-30. Prior to Riser's plea, he "thought [he] had a shot at that case . . . ." *Id.* at 130. In fact, he said, "[O]nce I got that confession suppressed, I thought I had a lock on the life sentence," but things changed once Riser entered a plea. *Id.* at 136. At that point, he "would have then changed course . . . to just do a shotgun approach, . . . . just try everything in the world you can think of to avoid that death sentence." *Id.* at 146.

Stegall described his plan for the sentencing phase of trial:

> I was going to have him address the jury rather than have him testify. I think that's exactly what we did. And I wanted to – my thing in death penalty cases was to personalize them. Make them a person, you know. And tell their life story as well as you could so the jury could look at them and think of them as a person and not just somebody sitting there

charged as a murderer. And I remember, I don't have an independent recollection of this, but I know I must have done it. We had the mother come and testify, that was the plan, and then a sister or brother was going to testify.

*Id.* at 130. Stegall did not recall what the mitigation witnesses said, whether he visited them in their homes before the trial, whether he met them in person before the trial, whether he had any contact with Petitioner's family in Alaska and Florida, or whether he filed a motion for an investigator. *Id.* at 130-31. He believed it unlikely that he would have met with mitigation witnesses in their home, though. *Id.* at 131.

Stegall's co-counsel was Robin Midcalf, a new lawyer. *Id.* at 131-32. He testified that she "did everything . . . that [he] could get her to do, and she did a good job at it in the office." *Id.* at 132. He did not specifically recall whether he had her conduct any investigation on the case. *Id.*

Stegall admitted that he did not consult any mitigation experts. *Id.* at 133. At the time of the trial, he did not know of the experts that Petitioner's counsel later obtained in post-conviction, but he had Petitioner examined by Dr. Maggio for competency to stand trial. *Id.* at 137, 142. All the same, he "never got a good report . . . , . . . one that was favorable to the defendant, in a capital case from Dr. Maggio . . . ." *Id.* at 138. He testified that he would not have put any expert's report in front of the jury if it contained information about Petitioner committing any "violent or really serious crime . . . ." *Id.* at 147. Even so, "[n]othing at all" about Petitioner led him to believe that he should hire a psychological expert. *Id.* at 149.

*9. Matthew Mendel*

35

Next, Petitioner called Dr. Matthew Mendel, a forensic psychologist. *Id.* at 149-50. Petitioner's counsel hired Mendel to "explore the presence of possibly traumatizing factors in [Petitioner's] life, and to address the impact of those factors upon him, how they contributed, if at all, . . . to his childhood development, and to becoming the adult he became." [135-14], at 6.[14] In making this assessment, Mendel spoke with Petitioner "on two separate days for a total of about eight hours" and conducted psychological testing. *Id.* at 8-9. He also spoke with Petitioner's mother, father, daughter, former girlfriends, former neighbors, sister, and brothers. *Id.* at 8, 10. He read declarations from several witnesses, including the same people he interviewed. *Id.* at 9. Finally, he considered the report prepared by Petitioner's other expert, Dr. Shaffer. *Id.* at 10.

Dr. Mendel testified that Petitioner had "experienced a wide range of disturbing events that have had a profound impact on him." *Id.* at 13.[15] More specifically, he testified that "we can only understand Alan's behavior on [the date he murdered Konya Edwards] by understanding and taking into account . . . these multiple factors, the traumas that he experienced in childhood. That those are the

---

[14] Mendel admitted that he was effectively a professional expert witness, with criminal forensic work providing the majority of his income. [135-13], at 150-51. Of that work, the "vast majority" are capital cases, in which he almost "exclusively" testified for the defense. [135-14], at 2, 70. He has been retained in over 100 capital cases, and he found some form of trauma or abuse in 80-85 of them. *Id.* at 71, 83-84. He denied that he was an advocate, however. *Id.* at 82. He said, "I pride myself on the objectivity. If there is no trauma, I'm not going to say there is trauma. If the trauma has had minimal impact, I'm not going to say it's had a greater impact than is, in fact, known. So I'm not an advocate." *Id.* at 82-83.

[15] On cross-examination, Mendel admitted that much of what he referred to as "trauma" did not fit the definition promulgated by the American Psychological Association. *Id.* at 75. He also admitted that Petitioner did not have post-traumatic stress disorder. *Id.* at 77.

direct antecedents of his behavior on that date." *Id.* Mendel testified that Petitioner's

actions were not "predetermined," yet

> . . . factors in our lives, childhood events, whether those be benign and
> positive events, or whether those be traumatizing events, have profound
> impacts upon us, and lead us in certain directions. That people who have
> experienced abuse of various sorts have higher rates of substance abuse,
> for example. Higher rates of aggression or violence, for example. . . .
> [T]he question came down to, where does [Petitioner's] rage, and rage at
> women in particular, where did that come from? What are the sources
> of that? And we can only understand that by looking at this full range
> of factors in his childhood.

*Id.* at 14.

The first traumatizing event that Mendel believed led Petitioner to murder

Konya Edwards was "extreme poverty and instability." *Id.* at 15. He noted

Petitioner's parents' separation, his father's absence, the brief period of homelessness

when Petitioner was child, and the frequent moves during Petitioner's early

childhood. *Id.*

Next, Mendel noted the "[l]ack of parental supervision and oversight" during

Petitioner's childhood. *Id.* at 17. He said, "[E]ssentially, there was no one there

providing supervision, taking care of these children. [P]etitioner was actually placed

in a role of looking out, even at age four, five, six, for his younger brother. At an age

when he really wasn't prepared to do so." *Id.* Specifically, he noted Terry Walker's

testimony during the successive post-conviction hearing that "no one" looked after

them while their mother worked because their step-father, Winfred, was "at work, or

if he was home he was drinking. And essentially, these kids were left free to roam

37

around, do whatever they wanted without supervision." *Id.* at 17-18.

Next, Mendel said that Petitioner told him that when he was "five or six years old," a friend of his mother was keeping him and "made him take off all of his clothes." *Id.* at 18. "He made clear that she didn't mess with him, that there was nothing sexual that went on, but that he was utterly terrified and that he hid beneath the bed." *Id.* When Mendel spoke with Petitioner's mother about the same event, she said that the woman "was kind of a jokester or prankster, and that she believes that this woman made him take off his clothes and was threatening to give him a whipping or spanking, but didn't end up doing so." *Id.*

Mendel believed this event to be significant because Petitioner was not "able to recall a whole lot of things from his childhood," but "he promptly described this incident and talked about how terrified he was at the time." *Id.* at 18-19. He testified that it was "fairly unusual" for people to only be able to recall a memory of something that scared them. *Id.* at 19-20. He admitted that Petitioner "ultimately was able to . . . come up with a happy memory," but it was from middle school. *Id.* at 20. Mendel believed it was "significant that if somebody can't recall a time when he felt happy as a young child or . . . sad or angry." *Id.* But he denied that this event, by itself, led to or caused Petitioner to murder Konya Edwards. *Id.* at 21. Rather, he testified that "[i]n the context of [Petitioner's] life, in the context of all of the things he experienced, it was a very painful, terrifying, overwhelming event that remained vivid in his life." *Id.* at 22.

Next, Mendel testified that the absence of Petitioner's father was a traumatizing childhood experience. *Id.* at 22. He said:

> [W]ith a single mother who was pretty absent from his life . . . working two or even three jobs at a time, and connected with the absence of his father, there came, not surprisingly, a great deal of longing for father figures, which left him very vulnerable to the influence of some really unhealthy . . . people of his father's age or perhaps older . . . , who had a very damaging and corrupting influence on [him].

*Id.* at 23. Mendel noted three specific men who lived around Petitioner's neighborhood: Duke Maloney, Big Jack Collins, and Frank Potter. *Id.* at 23-24. "[T]hese adult men . . were apparently coming over and would be drinking with and providing alcohol to [Petitioner] and his brother, Terry, and the other boys in the group. Smoking, at least cigarettes, and likely marijuana with them." *Id.* at 24. Mendel also noted that Collins "involved [Petitioner] in stealing things for him, . . . so that he basically . . . indoctrinated him into this thieving activity." *Id.*

Moreover, Petitioner's step-father, Winfred Frederick, "was . . . furthest thing from a benign figure. Was actually a very malevolent figure." *Id.* at 25. Mendel repeated stories about Winfred not allowing Petitioner to touch food and drink purchased for Winfred and his son, Leon. *Id.* He said Petitioner had told him that Winfred once tried to hit him with a car. *Id.* Finally, Mendel testified that Winfred "was one of several figures that exposed [Petitioner] to extremely unhealthy pathological distorted sexual activity . . . ," by "carrying on an ongoing sexual relationship with his niece, Brenda Reyer, who was approximately fourteen years old at the time." *Id.* Mendel said multiple witness told him that all the neighborhood kids

39

would "go and . . . peak through the curtains in the van, and watch [Winfred] have sex with . . . Brenda Reyer." *Id.* at 25-26.

Mendel also testified that he received "pieced together" reports that Petitioner had engaged in sexual activity as early as eight years old with a neighborhood girl of roughly the same age. *Id.* at 29-30. He said:

> And the sexual activity was quite extreme. We're not talking about . . . you show me yours, I will show you mine kind of things, which are pretty common and benign. We're talking about actual attempted, possibly actual performed penile/vaginal sexual intercourse, which is extremely unusual at this sort of age. And . . . if kids are doing that, at least one, if not more of them, have already had that done to them by an older individual, or at the very least, been exposed to a great deal of graphic sexual material.

*Id.* at 30.[16] Mendel said that he believed, from the information he gathered, that Brenda Reyer, the girl who had sex with Winfred Frederick in the van, performed oral sex on Petitioner when he was about eight years old. *Id.* at 30-31.[17] Mendel testified that this constituted sexual abuse. *Id.* at 31.

Mendel also noted Faye Breland's testimony that she had observed Petitioner, as a teenager, "grab[ ] and squeeze[ ]" his mother's "nipples." *Id.* at 36-37. He said, "Alan presents this as something that was not sexual at all. He said, . . . 'I would do

---

[16] Mendel admitted on cross-examination that the children could have simply observed sexual activity, such as when they saw Winfred Frederick having sex with his niece. *Id.* at 91-92. He also admitted that there were conflicting reports on whether the children had engaged in sexual intercourse with one another. *Id.* at 92.

[17] This contradicts the firsthand testimony of Terry Walker, who said that the Reyer sisters had sexual contact with them when Petitioner was about thirteen years old. [135-13], at 66-67, 71. On cross-examination, Mendel admitted that it was possible they could have been older than he had stated. *Id.* at 98. However, he did not believe there was any difference between Petitioner engaging in sexual activity at the age of twelve and such behavior at age eight, as he had originally asserted. *Id.*

that with different friends and it was just this joking sort of thing.'" *Id.* at 37. "Alan and his mother . . . didn't view that as sexual." *Id.* Mendel cited this as an example of Petitioner not knowing proper boundaries, and of Petitioner's mother not teaching him such boundaries. *Id.*

Mendel went substantially further, suggesting that there could be "more overt physical sexual contact between" Petitioner and his mother "behind closed doors." *Id.* at 38. He said that "a number of people have strongly suspected or brought to my attention that possibility." *Id.* One neighborhood girl described an occasion on which Petitioner and his mother emerged from a locked room "sweaty" and "disheveled." *Id.* at 40. But Mendel admitted that "[b]oth [Petitioner] and his mother deny that there has ever been any . . . sexual activity between them." *Id.* at 38. In fact, they "emphatically, adamantly" deny it. *Id.* But even if the activity were limited to what Petitioner admitted (touching his mother's breast), Mendel cited it as an example of Petitioner's "poor or distorted sense of appropriate sexual boundaries." *Id.* at 40.[18]

Mendel also testified that Petitioner complained that his mother never hugged him. *Id.* at 42. Mendel said: "I think he was missing a fundamental human need. We need warmth. We need contact. We need hugs." *Id.* Without that, Mendel testified, Petitioner "ended up going . . . through into his teenage years, only getting physical

---

[18] On cross-examination, Mendel backtracked on whether Petitioner had been sexually abused by his mother. *See, e.g., id.* at 65-68. When pressed on the issue, he would only respond, "I don't know if there was." *Id.* at 65, 69.

contact or affection . . . in a sexual context." *Id.* at 43.[19]

According to Mendel, all these factors were "enormously" significant in Petitioner's childhood development. *Id.* at 26. He testified: "[T]his is an entire neighborhood, a small environment in which there was this degree of crossing of sexual boundary, incestuous with . . . sexual relationships across generations, and that entire constellation of sexual events had a huge impact on [Petitioner]." *Id.* He said that "someone growing up in that environment and exposed to those influences is at enormous danger . . . of him or herself growing up with sexual distortions and disturbances." *Id.* at 27. In his opinion, the problems in Petitioner's childhood were not just in his family, but in the entire neighborhood. *Id.* at 28. He noted other examples of sexual disfunction in the neighborhood which did not involve Petitioner. *Id.* at 33-35. According to Mendel, this contributed to Petitioner's "profoundly distorted view of sex and of relationships . . . ." *Id.* at 36.

Mendel also cited Petitioner's use of drugs and alcohol as a traumatizing factor in his childhood and adolescence. *Id.* at 44. He said that he was told Petitioner started drinking somewhere between age fourteen to seventeen. *Id.* Eventually, "[h]e was drinking very, very heavily" with his friends, "drinking every day pretty much throughout the day." *Id.* at 45. Mendel testified that all his collateral sources described Petitioner "as being very different when he was . . . drunk . . . than when

---

[19] Mendel admitted on cross-examination that the need for non-sexual physical contact was "most important" in infancy and as a toddler, and that he did not know whether Petitioner had been hugged or held as a baby. *Id.* at 93-94, 97.

he was sober." *Id.* at 46. They described him as "well-mannered" when sober, but "belligerent, getting into fights, being aggressive, and particularly being aggressive toward females" when drunk. *Id.* Alcohol also removed Petitioners inhibitions, allowing "expressions of rage and violence." *Id.* at 56.

Mendel testified on the effect these factors had on Petitioner. *Id.* at 49-50. He said, "[H]e was a very needy boy, teenager, young man, wanting affection, not knowing how to get it and not trusting that anybody would provide for him . . . ." *Id.* at 49. He was introduced to sex at a young age "in the context of this dynamic of control and domination." *Id.* at 50. Mendel testified, "[T]hat's the way sexual relations began for him. It was always . . . in this context of power dynamics, power, lack of power, control and dominance," and it created "profound distortions in his views of women and of sexual relationships . . . ." *Id.*

No one described Petitioner "as being chronically pervasively aggressive," but "[h]is aggression, his violence has . . . solely come out . . . toward women." *Id.* at 51. Mendel believed that "the premature introduction into sexual relationships, the sense of powerlessness and helplessness he experienced, plays a central pivotal role in his anger and rage and in understanding why it's directed solely . . . at women." *Id.* at 52. According to Mendel, Petitioner suffered from "Madonna-whore complex," in which he viewed all women as either "perfect, pure virginal beings" or "promiscuous, slutty, whorish women." *Id.* at 53-54. Mendel testified that Petitioner had an ideal vision of what a woman should be, but he was "drawn to women who were

promiscuous, who were heavy drinkers, who were kind of wild and unpredictable," setting himself up for conflict and disappointment. *Id.* at 54-55.

On cross-examination, Mendel applied these principles to Petitioner's interaction with Konya Edwards. *Id.* at 78-80. He said that Petitioner murdered Konya because she was "a female he picked up in a bar," and "that's the entire sum total of it. . . . He is full of anger and rage at . . . women." *Id.* at 78. Although it was not the only reason, Mendel believed that Petitioner's "sexual interactions . . . in his early years" were a "central[ ]" reason Petitioner murdered Konya Edwards. *Id.* at 79-80.

Mendel admitted, though, that Petitioner still exhibited positive behaviors. *Id.* at 56-57. He cared for his younger sister. *Id.* at 57. His mother's coworker, Faye Breland, spoke well of him, as did his own father. *Id.* Mendel noted that the negative behaviors were "apparently solely directed at women," and exacerbated by drugs and alcohol, which means imprisonment "essentially eliminates" the "primary risk factor" for them. *Id.* at 57-58.

Mendel testified that all the principles he applied in his analysis were available in 1991, when the case went to trial, and a psychologist retained then could have reached the same conclusions. *Id.* at 58. He produced two reports for Petitioner. *See* [135-16], at 16-29. Only the first one, dated May 15, 2008, was admitted into evidence. *Id.* at 16-27; [135-14], at 61. It did not differ materially from his testimony.

*10.  Robert Shaffer*

Petitioner's final witness was Robert Shaffer, a forensic neuropsychologist. [135-14], at 106-07.[20] Shaffer was hired to conduct a neuropsychological assessment of Petitioner. *Id.* at 113. He administered a battery of neuropsychological tests and a malingering test. *Id.* at 113-14. He also reviewed Petitioner's educational records and Dr. Mendel's report. [135-15], at 4, 6. Shaffer concluded that Petitioner's "neuropsychological profile . . . is consistent with that of individuals that have experienced various traumas during their developmental period." [135-14], at 125. In his written report, he said:

> [Petitioner] shows weaknesses in the specific brain centers that govern appreciation for the consequences of actions, particularly in new and changing circumstances. This may be a function of exposure to adult sexual behavior and verbal abuse as a child, to presence of injury or toxicity in his environment, or to the effects of drug and alcohol dependency over a prolonged period. Severe alcohol dependency is known to create a similar pattern of brain deficit. [Petitioner's] condition is likely the result of an interactive combination of these factors.

[135-16], at 39.

The first test Shaffer administered was the Test of Memory Malingering ("TOMM"), which is used to "determine whether someone is attempting to perform at the best of their abilities or if they're attempting to appear to have deficits." [135-14], at 126; *see also* [135-16], at 34-35. Shaffer concluded that "there was no attempt to appear falsely impaired, and that he was performing to the best of his ability." [135-14], at 127.

---

[20] Shaffer once worked as a staff psychologist for the Federal Bureau of Prisons. *Id.* at 108. Now, he is "retained almost exclusively by defense" counsel in "murder cases." *Id.* at 109.

Next, Shaffer conducted a series of "structured interviews" about symptoms particular to persons with brain impairment caused by childhood trauma. *Id.*; *see also* [135-16], at 35. Shaffer described what he learned:

> It was evident . . . that [Petitioner] had difficulties in the area of speech articulation, confusional spells, memory gaps, and unrecalled behaviors. That each of those occurred with the approximate occurrence or frequency of about once a month in his experience. We also were aware of numbing and tingling sensations, irregular heartbeat, flushing or hot sensations, and frequent headaches. All of those statistically are correlated with known cases of brain impairment.

[135-14], at 127.

Shaffer also administered a "series of tests regarding frontal lobe executive functioning." *Id.* at 128. First among these was the Wisconsin Card Sorting Test, which is used to determine whether one has "impairment of the frontal lobes of the brain." *Id.*; *see also* [135-16], at 36. Petitioner scored below average on the test. [135-14], at 129-30.

Shaffer also administered the Stroop test, which "assesses . . . the ability to inhibit an automatic response and give a more correct response." *Id.* at 130; *see also* [135-16], at 36. Petitioner scored "below the sixth percentile." [135-14], at 131. Shaffer noted that Petitioner "seemed to be perplexed when he was making mistakes," and that "perplexity is often used as a clinical indicator that somebody feels like they ought to be doing better than they are. . . . [I]t suggests that there is some neuropsychological conflict going on." *Id.*

Next, Shaffer administered the Category Test, which is used to assess whether

one has "frontal lobe injury" as scored against "people with identical age range and education level." *Id.* at 132; *see also* [135-16], at 36. Petitioner "committed 74 errors" on this test, and "more than 50 errors was indicated pathological." [135-14], at 132. Shaffer described Petitioner's performance as "substantially significantly below average." *Id.*

Shaffer also administered the Iowa Gambling Test ("IGT"), which measures "functioning of the prefrontal cortex using a very specific paradigm . . . making choices in a gambling situation . . . ." *Id.*; *see also* [135-16], at 36. "[I]t's a test to see if somebody can register the threat of a catastrophic loss and consider that in their" decision-making. [135-14], at 133. Petitioner scored "in the impaired range . . . , which indicates that he has . . . some difficulty appreciating the consequences of a sequence of actions when it might involve significant losses." *Id.* at 134.

Shaffer also testified that a low score on the IGT indicates brain impairments which cause one to "have trouble making moral decisions." *Id.* at 134-35. He said, "In the case of Mr. Walker, a sexual stimulation, sexual encounter or encounter with a woman could trigger an experience of conflict, emotional conflict. Some of which would involve feelings of rage and hostility. . . . [P]eople with difficulties in the frontal lobes are much more likely to act out on their reactions." *Id.* at 137. Still, "even people with injury to this part of the brain, after the experience, reflecting back, have a full range of emotion. Full range of regret, remorse, feelings of sorrow about what has happened." *Id.* at 137-38.

Next, Shaffer administered tests measuring left hemisphere function, including the Rey Auditory Verbal Learning Test ("RAVLT") and Boston Naming Test ("BNT"). *Id.* at 138; [135-16], at 37. He testified that "with people exposed to childhood traumatic events, . . . there is a tendency for difficulty with verbal memory," which is a function of the brain's left hemisphere. [135-14], at 138. Petitioner scored in the "third percentile" on the RAVLT, and in the "low impaired range" on the BNT. *Id.*; [135-16], at 37. While taking the RAVLT, Petitioner repeatedly inserted the word "family," when it was not included in the words given to him by Shaffer. [135-14], at 139. Shaffer interpreted this as "a lack of control between some of the more subjective aspects of memory, like emotional memory," indicating "impairment of some kind." *Id.*

Finally, Shaffer administered tests requiring the transfer and integration of brain function, which measure how the "disparate structures of the brain combin[e] information together." *Id.*; [135-16], at 37-38. Two of these, the KAIT Fluid Intelligence Subtests, measure "fluid intelligence," which involves "thinking on your feet, responding to situations that are novel that you haven't seen before, and providing information with strategies that you come up on the run." [135-14], at 140-41. Petitioner scored in the impaired or below average range on each of these tests. *Id.* at 141; *see also* [135-16], at 37.

In summary, Shaffer found that Petitioner has impairments in "frontal lobe executive functioning," the left hemisphere of the brain, and in the "transfer of

information between the hemispheres of his brain." [135-14], at 142. According to Shaffer, these results were consistent with one who has experienced trauma. *Id.* He said that, for someone with such impairments, they would act more impulsively when under the influence of alcohol, compounding their neuropsychological impairment. *Id.* at 142-43. Shaffer opined that Petitioner would not have had a "problem with conducting most of the routines of daily living," but that he "would not be a good person to trust with emergency type situations or unusual circumstances, where he has to think on his feet." *Id.* at 143. Thus, Shaffer believed that "people with his profile perform best in prison" because of the "very consistent routines." *Id.*

Shaffer admitted on cross-examination that his report did not include Petitioner's scores on various tests, which prevented anyone reviewing it from determining how far below average Petitioner scored on any given test. *Id.* at 146. He also admitted that people with no brain impairment commonly obtained some scores in the abnormal range when taking the same neuropsychological tests. [135-15], at 7.

Despite Petitioner's test scores, Shaffer believed he would still "understand the difference between what is legal and what is illegal." *Id.* at 10. He denied that Petitioner is a "psychopath." *Id.* at 13. He said: "[T]o diagnose psychopathy, it has to be evident that there was a conduct disorder that began in early life . . . . And that there was an absence of acts of caring and kindness. Both of those, there's evidence to the contrary. So my opinion is that this is not a case of psychopathy." *Id.*

When asked whether Petitioner had the same alleged impairments when he

murdered Konya Edwards twenty-six years prior, Shaffer answered: "[I]t's my opinion by inference that that's the case. . . . I can't make that statement with 100 percent certainty." *Id.* at 15. Still, Shaffer believed that the testing he performed in May 2016 demonstrated that Petitioner's "brain functioning had specific deficits" in September 1990. *Id.* at 16-17. He said Petitioner suffered from "deficits in executive function, his ability to anticipate the consequences of a series of actions, and especially to attach relevant emotional significance to the consequences of his actions. . . . There are other issues, too, pertaining to impulsivity and the regulation of emotions. The ability to calm and regulate hostility and anger." *Id.* at 21.

When directly asked whether he believed in the death penalty, Shaffer was evasive, refusing to provide a straightforward answer. [135-14], at 150-51; [135-15], at 2. But he maintained that it was irrelevant to his testing. [135-15], at 24. When asked whether the alleged brain impairments caused Petitioner to murder Konya Edwards, Shaffer answered: "I'm unable to determine causality with that degree of certainty. . . . It is a causation factor. But that's different than saying that it caused it." *Id.* at 22. "I'm saying that the actions that he committed on that day were influenced by . . . compromised brain functioning." *Id.* at 22-23.

### 11. *Affidavit of Paula Shavers*

The trial court received into evidence an affidavit executed by Paula Shavers, a neighbor and childhood friend of Petitioner's who had died before the hearing. *Id.* at 28; [135-16], at 11. Amanda Frederick, Petitioner's sister, was the child of Ms.

Shavers' brother, Michael, and Petitioner's mother. [135-15], at 11. Ms. Shavers said that she "always found [Petitioner] to be a loving and caring person," but he "[hung] out with the wrong crowd, who drank a lot and did drugs." *Id.* She believed that Petitioner's mother was "naïve about drugs, especially [Petitioner's] marijuana use," and "not very bright." *Id.*

### 12. *Simons and Fortner Affidavits*

Petitioner presented two more affidavits in support of his successive petition for post-conviction relief – from attorneys, purporting to establish that his trial counsel's performance was deficient. *See* [135-11], at 15-24. The Mississippi Supreme Court declined to consider them because they were not admitted at the evidentiary hearing. *See Walker IV*, 303 So. 3d at 725. Typically, that would mean that this federal habeas court could not consider them under § 2254(d). *See, e.g., Lucio*, 987 F.3d at 471 (quoting *Pinholster*, 563 U.S. at 181); *Rivers v. Lumpkin*, 2022 WL 1517027, at *4-*5 (5th Cir. May 13, 2022) (where affidavits were "presented" to state court in a procedurally improper manner and thus not considered by the state court when it rendered a decision, they were not in evidence before the state court and so not considered in habeas). But as noted below, the Mississippi Supreme Court did not address the second prong of the *Strickland* analysis, and this Court's review on that point is de novo. *Henderson*, 333 F.3d at 598; *see also Rompilla v. Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005).

Ross Parker Simons and Thomas Fortner, criminal defense attorneys from

South Mississippi, executed affidavits in which they opined that Petitioner's trial counsel provided deficient representation by failing to adequately prepare for trial. [135-11], at 15-24. The affidavits contained no information material to the question of prejudice, the only prong the Court addresses below.

### 13. *Evidence Discussed in Previous Opinion*

The Court also incorporates all the evidence discussed in its previous opinion, including that regarding the nature of the crime, the sentencing phase of trial, and the mitigation efforts of Petitioner's counsel. *See, e.g., Walker III*, 2012 WL 1033467, at *1-*4, *53-*62.

### C. Analysis

The Fifth Circuit has summarized the law governing claims of ineffective assistance of counsel:

> To demonstrate a claim of ineffective assistance of counsel under *Strickland v. Washington*, the defendant must show both that counsel rendered deficient performance and that counsel's actions resulted in actual prejudice. To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Trial counsel's strategic decisions must be given a strong degree of deference. On habeas review, if there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard, the state court's denial must be upheld. . . .

> To demonstrate prejudice under *Strickland*, [the petitioner] must show that counsel's deficient performance was so serious as to deprive him of a fair trial, a trial whose result is reliable. This requires the showing of a reasonable probability that but for counsel's deficiencies, the result of

the proceeding would have been different.

*Rhoades v. Davis*, 852 F.3d 422, 431-32 (5th Cir. 2017) (punctuation and citations omitted); *see also Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

"When an ineffective-assistance-of-counsel claim is based on counsel's performance at the sentencing phase of a capital case, a defendant is prejudiced only if 'there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Thornell v. Jones*, 602 U.S. 154, 163, 144 S. Ct. 1302, 218 L. Ed. 2d 626 (2024) (quoting *Strickland*, 466 U.S. at 695) (alteration original). "A reasonable probability is a probability sufficient to undermine confidence in the outcome. Prejudice exists when the likelihood of a different result is substantial, not just conceivable." *Trottie v. Stephens*, 720 F.3d 231, 241 (5th Cir. 2013) (citations and punctuation omitted).

As for mitigation, "[t]he Supreme Court has interpreted the Sixth Amendment to require defense counsel 'to make reasonable investigations [into potential mitigating evidence] or to make a reasonable decision that makes particular investigations unnecessary.'" *Brewer v. Lumpkin*, 66 F.4th 558, 565 (5th Cir. 2023) (alteration original) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)). "[T]o succeed on a claim for failure to investigate, a defendant must allege with specificity what the investigation would have revealed

and how it would have altered the outcome of the trial." *United States v. Bernard*, 762 F.3d 467, 477 (5th Cir. 2014).

A trial counsel's "failure to present a particular line of argument or evidence is presumed to have been the result of strategic choice." *Devoe v. Davis*, 717 F. App'x 419, 430 (5th Cir. 2018) (quoting *Taylor v. Maggio*, 727 F.2d 341, 347 (5th Cir. 1984)) (punctuation omitted). Indeed, "[c]laims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy[,] and speculation about what witnesses would have said on the stand is too uncertain." *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *see also Robinson v. Whitley*, 2 F.3d 562, 571 (5th Cir. 1993) ("general allegations and speculation" insufficient to support ineffective assistance claim). "[A] tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997). "[A]n attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Bernard*, 762 F.3d at 477. Likewise, an attorney's failure to present mitigating evidence cumulative of that which was presented does not prejudice the defendant. *Brewer*, 66 F.4th at 566; *Thornell*, 144 S. Ct. at 1312-13. Federal habeas courts "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial

second-guessing" than other claims of ineffective assistance. *Ward v. Stephens*, 777 F.3d 250, 265 (5th Cir. 2015).

Petitioner claims that his trial counsel, Earl Stegall, provided ineffective assistance by failing to adequately investigate and later present mitigating evidence during the sentencing phase of trial. *See* [132], at 23. He contends that his trial counsel should have conducted more interviews of his friends and family and better prepared his mitigation witnesses. *Id.* at 25. He also contends that his trial counsel should have retained experts. *Id.* He argues that counsel's failure to perform these tasks resulted in "only a bare overview" of his life story being presented to the jurors, and the omission of expert testimony that provided context for his murder of Konya Edwards. *Id.* at 26, 32.

The Mississippi Supreme Court applied the *Strickland* standard to Petitioner's claim, but it only evaluated the first prong – whether his trial counsel's performance was deficient. *Walker IV*, 303 So. 3d at 726, 728. It observed that Stegall's testimony that his "strategy was to humanize his client," and that, "[t]o that end, he called witnesses in mitigation to testify, among other things, that Walker had a supportive family, loved his daughter, and risked his own life to save the life of a child." *Id.* at 727. Stegall intentionally avoided any "evidence of bad and criminal conduct," such as some that admitted in post-conviction. *Id.* The Mississippi Supreme Court found that this was a reasonable strategy. *Id.*

Moreover, citing *United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014), the

Mississippi Supreme Court held that counsel's failure to present expert testimony from psychological experts did not constitute deficient performance. *Id.* It said he did not "disregard multiple red flags with zero justification. Rather, he made very clear that he pursued a tactical decision to humanize Walker." *Id.* at 728. Given the burden of proof and deferential standard of review, the Mississippi Supreme Court affirmed the trial court's determination that Stegall had provided adequate representation at trial, and it did not address the second prong of the *Strickland* analysis. *Id.*

Petitioner argues that the Mississippi Supreme Court unreasonably applied *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), and made unreasonable determinations of fact related to this ineffective-assistance claim. The Court need only address the second prong of the claim – whether Petitioner's trial counsel's failure to conduct more investigation and present more mitigation evidence caused actual prejudice to Petitioner's defense. Because the Mississippi Supreme Court did not address this prong of the *Strickland* analysis, the Court's review is de novo. *Henderson*, 333 F.3d at 598; *Rompilla*, 545 U.S. at 390.

Petitioner's additional mitigation evidence can be divided into two categories: fact testimony from Petitioner's friends and family about his background, and opinion testimony from psychological experts. First, the Court is not convinced that the extra testimony from Petitioner's friends and family would have been helpful at trial. Mitigation evidence often cuts both ways, providing fodder for the prosecution and the defense. If Petitioner's attorney put on a parade of his friends and family

56

testifying about the various social disfunctions of Petitioner's childhood and adolescence, it would have provided the prosecutor an opening to argue that Petitioner was beyond rehabilitation and presented a future threat to prison staff or other prisoners. At the very least, much of the mitigating evidence introduced through Petitioner's friends and family would provide "an independent basis for moral judgment by the jury." *Suggs v. McNeil*, 609 F.3d 1218, 1231 (11th Cir. 2010).

Moreover, the picture of Petitioner's background presented in his briefing is substantially darker than that from his family's testimony. A transcript can only provide limited context, but the mood of the testimony appears to differ from briefing in that the witnesses did not seem to think all these events were as big a deal as Petitioner's briefing makes them out to be. To be sure, the Court does not take lightly the alleged exposure of children to social disfunction – particularly abuse and/or sexual disfunction. However, the absence or presence of disfunction often depends on the observer. One person may say, "Anita Frederick was a derelict mother who was never at home, leaving her children without love, nurture, or supervision." Another may say, "Anita Frederick was a brave, hardworking mother who did what she had to do to provide for her children's material needs, working up to three jobs at a time." Ultimately, both observations may contain some truth, which just demonstrates that mitigation evidence often cuts both ways.

The Court does not suggest that Petitioner had a good childhood, by any means. However, Mississippi is a poor state with a lot of social disfunction. Virtually all

Mississippians know someone who comes from poverty, and many know someone whose background includes abuse or neglect. Yet most of Mississippi's citizens – even those who come from backgrounds of poverty and abuse – do not grow up to commit crimes. Even fewer grow up to brutally rape, torture, and murder a young woman. Ultimately, that is why the Court is not convinced that Petitioner's new testimony from his friends and family would have made any difference in the outcome of his sentencing. If Petitioner's trial counsel had presented these materials at trial, a South Mississippi jury may have concluded that counsel was trying to use Petitioner's background to excuse his actions and become even more skeptical of his defense. Indeed, many Mississippians would find it offensive if an attorney suggested that being raised in an impoverished community rife with social disfunction leads one to commit capital murder.

Other minor issues diminish the effect of Petitioner's community background testimony. First, Petitioner's mother, father, and aunt spent substantial time talking about events in their life before Petitioner was born which are irrelevant to Petitioner's mitigation case. Indeed, the Court previously observed that the problems of Petitioner's parents, grandparents, and neighbors were not particularly relevant to his actions. *Walker III*, 2012 WL 1033467, at \*61.

Second, most of Petitioner's witnesses could not specify his age when specific events occurred, or different witnesses provided conflicting testimony on his age. *See, e.g.* [135-12], at 146-54; [135-13], at 3-7. For example, Petitioner's briefing would lead

one to believe that, as a child, Petitioner drank beer all the time and was friends with an adult man who had him steal things. *See, e.g.* [148], at 29, 56. But his mother testified that he was "about 20, 21" when he was hanging around with the rough crowd drinking and stealing. [135-13], at 2.[21] Also, Petitioner's sister testified that he fathered a child as a teenager, but his mother said he was twenty-three when the baby was born. [135-12], at 95, 138. At best, the record is unclear on many of the key dates in Petitioner's life, and the lines between his childhood, adolescence, and young adulthood are blurred.

Third, some of the main examples of "abuse" or "trauma" cited by Petitioner in briefing were either less sensational in the actual testimony or, at best, equivocal in their impact. As an example of a "traumatic" childhood experience, Petitioner cited an occasion when he was five or six years old and a babysitter had him take his clothes off. *See* [148], at 49. The Court does not diminish the legitimate concern such an event should prompt, but the record contains no other information about the incident. *See* [135-12], at 119. Likewise, Petitioner spent substantial briefing space discussing the sexual disfunction in Petitioner's family and neighborhood, and even Petitioner's own alleged childhood sexual activity. *See, e.g.* [148], at 49-51. The testimony established, though, that Petitioner was thirteen or fourteen years old when he engaged in sexual activity with girls who lived in the neighborhood. [135-13], at 66-67, 71-72. Sexual activity at that age is not uncommon, and, without more, not necessarily traumatic.

---

[21] Based on his age when he committed the crime, the Court believes that Petitioner was probably a couple of years younger than this. Regardless, he was not a child.

Finally, as the Court observed in its initial opinion, much of the information about the general environment in which Petitioner lived could have been gleaned from what was already presented at trial. *Walker III*, 2012 WL 1033467, at *61. It was apparent from evidence presented at both the guilt and sentencing phase of trial that Petitioner lived in an impoverished neighborhood and spent time with a number of unsavory characters.

The credibility of Petitioner's expert testimony was also diminished in several ways. First, it would not be unfair to characterize both Dr. Mendel and Dr. Shaffer as professional expert witnesses for capital defendants. Mendel admitted that criminal forensic work provides the majority of his income, and that the "vast majority" of that work is for the defense in capital cases. [135-13], at 150-51; [135-14], at 2, 70. Out of about 100 capital cases, Mendel found some form of trauma or abuse in 80-85 of them. [135-14], at 71, 83-84. Likewise, Shaffer is "retained almost exclusively by defense" counsel in "murder cases." *Id.* at 109.

And at times, Mendel's analysis rested on extreme interpretations of the fact witnesses' testimony. In other words, when presented with testimony that, on its face, was either equivocal or relatively benign, Mendel consistently extrapolated a much more extreme conclusion from it. This affected the credibility of Shaffer's testimony in that Shaffer relied on the information given to him by Petitioner's counsel, which included Mendel's report. [135-14], at 149; [135-15], at 4, 6.

For example, Petitioner's brother, Terry, testified that Petitioner was thirteen

or fourteen years old when he engaged in sexual activity with Brenda Reyer, but Mendel testified that this occurred when Petitioner was eight years old and called it sexual abuse. *Compare* [135-13], at 66-67, 71-72, *to* [135-14], at 30-31. On cross-examination, Mendel admitted he could be wrong about Petitioner's age, but he maintained there was no difference between Petitioner engaging in sexual activity at the age of twelve and such behavior at age eight, as he had originally asserted. [135-14], at 98.

In a more egregious example, Mendel suggested that Petitioner had engaged in sexual activity with his own mother, Anita Frederick. *Id.* at 38. He based this conclusion on nothing more than supposition and innuendo, alluding to "a number of people [who] have strongly suspected or brought to my attention that possibility." *Id.* Mendel admitted that both Petitioner and his mother "emphatically, adamantly" denied these rumors, *id.* at 38, and the record contains no evidence supporting them. But when pressed on the issue, Mendel would only admit that he did not know whether Petitioner's mother had sexually abused him. *Id.* at 65, 69.

In the end, the Court does not believe that Petitioner's new mitigation evidence would have outweighed the brutal nature of his crimes. To be clear: Alan Dale Walker's murder of Konya Edwards is easily the most heinous and brutal crime that this judge has seen in over thirty years on the state and federal bench.[22] Walker intended to rape and murder Edwards from the moment they arrived at the lake.

---

[22] The Court provided a detailed narrative of the crime in its previous opinion. *Walker III*, 2012 WL 1033467, at *3-*4.

When they got there, he told Riser they were "gonna rape this girl." Over the next two hours, Walker and Riser violated every orifice of her body, beat her, and choked her, all while Walker threatened to kill her. After they had their way with Edwards, Walker unsuccessfully tried to kill her by making her put her chin on a log and stomping on the back of her neck seven or eight times. When that didn't work, he told her that they would let her go after she cleaned up. Then Walker led Edwards down to the water and held her under until he thought she had drowned. After Walker emerged from the lake, Edwards moved and made a sound. So, he pushed her back into the water and drowned her a second time. After Edwards was dead, Walker molested her body by inserting a stick into her vagina and said, "I've always wanted to do that." Finally, Walker poured gasoline on her body and set it on fire.

Considering these facts, Petitioner has not proven that there is a "reasonable probability" that at least one juror "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death" if they had been presented his new mitigation evidence. *Thornell*, 144 S. Ct. at 1310. In fact, the new mitigation evidence could easily have backfired, prejudicing the jury against his case if they believed he was trying to make excuses for such a brutal crime. For all these reasons, the Court finds that Petitioner has not shown that his trial counsel's alleged deficient performance caused him to suffer prejudice, and this ineffective-assistance claim fails.[23]

---

[23] *See Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 481 (5th Cir. 2023) (where circumstances surrounding murder were "substantially aggravating," there was no reasonable probability additional

## V. CONCLUSION

For all the reasons provided above, the Court denies the Amended Petition [132] and dismisses this case with prejudice. The Court has considered all arguments, and any not addressed here would not have changed the outcome of the case.

The Rules Governing § 2254 Proceedings require the Court to issue or deny a certificate of appealability ("COA") upon the entry of a final order adverse to the petitioner, and a petitioner must obtain a COA before appealing this Court's decision denying habeas relief. 18 U.S.C. § 2253(c)(1). To obtain a COA, Petitioner must show "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). Petitioner has not made this showing, and the Court denies a certificate of appealability.

The Court will enter a separate final judgment consistent with this opinion.

SO ORDERED AND ADJUDGED this 25th day of September, 2025.

    /s/    Keith Starrett
KEITH STARRETT
UNITED STATES DISTRICT JUDGE

---

mitigating evidence would have changed the outcome of trial); *Sheppard v. Davis*, 967 F.3d 458, 469 (5th Cir. 2020) (additional mitigating evidence would not have outweighed the aggravating evidence offered at trial, and counsel's failure to present it was not prejudicial); *Canales v. Davis*, 966 F.3d 409, 414-15 (5th Cir. 2020) (additional mitigating evidence did not create substantial likelihood of a different result because it did not outweigh the aggravating evidence against petitioner).